# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #057

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **19th day of October, 2016**, are as follows:

**BY HUGHES, J.**:

2014-KA-1449      STATE OF LOUISIANA v. ROBERT LEROY MCCOY (Parish of Bossier)

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed.  In the event this judgment becomes final on direct review when either:  (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which:  (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts. CONVICTION AND SENTENCE AFFIRMED.

CRICHTON, J., additionally concurs and assigns reasons.

SUPREME COURT OF LOUISIANA

NO. 2014-KA-1449

STATE OF LOUISIANA

VERSUS

ROBERT LEROY McCOY

ON APPEAL
FROM THE TWENTY-SIXTH JUDICIAL DISTRICT COURT
FOR THE PARISH OF BOSSIER

**HUGHES, J.**

This is a direct appeal under LSA-Const. Art. V, § 5(D)[1] by the defendant,

Robert LeRoy McCoy. The defendant was indicted by a Caddo Parish grand jury,

on May 29, 2008, on three counts of first degree murder, for the murders of Willie

Ray Young, Christine Colston Young, and Gregory Lee Colston, in violation of

LSA-R.S. 14:30. After a trial, the jury found the defendant guilty as charged on all

three counts. At the conclusion of the penalty phase of the trial, the jury

unanimously returned a verdict of death on all three counts, finding the aggravating

circumstance that the defendant knowingly created a risk of death or great bodily

harm to more than one person. The trial court sentenced the defendant to death, in

accordance with the jury's determination. The defendant now appeals his

convictions and sentences, raising sixteen assignments of error. After a thorough

review of the law and the evidence, we find no merit in any of the assignments of

---

[1] Article V, Section 5(D) provides, in pertinent part: "[A] case shall be appealable to the supreme court if . . . the defendant has been convicted of a capital offense and a penalty of death actually has been imposed."

error.  Therefore, we affirm the defendant's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

Christine Colston Young and her husband, Willie Ray Young, were shot and killed at their home at 19 Grace Lane in Bossier City, Louisiana, on May 5, 2008; Christine's grandson, Gregory Lee Colston, was also shot and later died.  Gregory had recently come to live with his grandparents so that he could finish his senior year at a local high school, after his mother, Yolanda Colston, had separated from the defendant earlier in the Spring of 2008 and following an incident of domestic abuse battery in April 2008.[2]  On advice of law enforcement, Yolanda and her infant daughter had gone into protective custody out-of-state, and a warrant was issued, on April 16, 2008, for the defendant's arrest for aggravated battery, by Detective Kevin Humphrey.  In April and May, the defendant had evaded arrest under the warrant by failing to show up for work at his place of employment.  The defendant had also traveled to Oakland, California, where his half-brother resided, but his cell phone records indicated that he returned to Bossier City on or about May 4, 2008, as calls were initiated from the defendant's cell phone in Bossier and Caddo Parishes on the day of, and the day after, the murders.

On the night of May 5, 2008 a 911 call was placed from 19 Grace Lane, in which Christine Colston Young could be heard screaming, "She ain't here, Robert . . . I don't know where she is.  The detectives have her.  Talk to the detectives.  She ain't in there, Robert."  A gunshot was then heard on the 911 tape and the call was disconnected.

The Bossier City Police Department ("BCPD") broadcast that a disengaged 911 call came from 19 Grace Lane, which was heard by Detective Humphrey, who immediately recognized the address as the residence of Yolanda Colston's parents.

---

[2] At the penalty phase, Yolanda Colston testified that, during the incident of domestic abuse, the defendant pinned her down on the bed at knifepoint and threatened to kill her and then kill himself.

However, Detective Humphrey was working a security detail at a local store, and so he notified the first responders, via police radio, that he had an arrest warrant for Robert McCoy, whose estranged wife's mother resided at 19 Grace Lane. Detective Humphrey cautioned the first responders to be on the lookout for a white four-door Kia, which he believed was driven by Robert McCoy.

Officer Kary Szyska responded that he was in the vicinity, approaching 19 Grace Lane, and that he saw a white Kia fleeing from the scene, which was recorded on the officer's dashboard video camera. Officer Szyska made a U-turn and gave chase. On a dead-end street within a few blocks of the victims' home, the video showed a black male matching the defendant's general physical description jump out of the driver's side of the Kia, scale a nearby fence, and run across I-20.

Meanwhile, Detective Humphrey called the victims' home and, receiving no answer, he drove there, arriving with other officers to find the front door ajar. Upon entering, the officers discovered fifty-five-year-old Christine Colston Young and fifty-year-old Willie Young, who was a cousin of the defendant, dead at the scene. Seventeen-year-old Gregory Colston was found gravely injured, but alive, and he was transported to the hospital, where he died a short time later. All three victims suffered a single gunshot wound to the head, fired from close range.

Since the abandoned Kia had a temporary license plate, the police ran the VIN (vehicle identification number) and found that it was registered to Robert and Yolanda McCoy. The police impounded the vehicle and searched the interior. There was a white cordless (landline) telephone on the driver's seat, and the charger/cradle for the cordless handset was found inside the victims' residence. The serial and model numbers on the handset found in the defendant's Kia matched that on charger/cradle found in the victims' home, confirming that the phone used by Christine Colston Young to call 911 was the phone found in the

3

defendant's abandoned vehicle immediately after the murders.

Also found in the center console of the abandoned Kia was a Walmart bag with a box of .380 caliber ammunition. Inside the Walmart bag was a cash receipt from earlier that same day (at 16:55, or 4:55 p.m., on May 5, 2008), for the purchase of the ammunition. The police obtained video surveillance footage from Walmart, generated at the time of the purchase on the receipt, which showed an individual matching the defendant's physical description purchasing ammunition while wearing a black "do-rag" on this head.[3]

A manhunt began for the defendant involving the BCPD, the U.S. Marshall's Office, and the FBI. The police began with the defendant's cell phone records.[4] They noticed he had been repeatedly calling a number in Oakland, California. Detective Humphrey testified that the last ping on the cell phone being used by the defendant occurred in Fort Smith, Arkansas, and then the phone went dead. At that point, the police subpoenaed the phone records for the Oakland number the defendant had been calling, and as soon as the defendant's phone was no longer being used, an Arkansas cell phone began calling the Oakland number. The police called the Arkansas cell phone number and a truck driver answered.[5] The police asked the truck driver if a black male named Robert was riding in the eighteen-wheeler with him. The driver replied, "[H]e was, but he's not now,"

---

[3] A witness, Sharon Moore, testified that she had a relationship with the defendant in 2008, and that, on May 5, 2008, he asked her to buy some bullets for him because he was working on the railroad in some bad neighborhoods. The defendant also tried to borrow money from Ms. Moore to buy the bullets, but she did not give him any money. Ms. Moore testified that she accompanied the defendant to buy the bullets at the Walmart in Minden.

[4] When the defendant abandoned the white Kia, he left a black bag with a Mason insignia on the front, in the back seat, which contained his personal cell phone. The police ascertained that, after the murders and after abandoning his cell phone in the Kia, the defendant began using his sister's cell phone. The defendant took his sister's cell phone on his four-day flight from justice, which law enforcement traced to ultimately track down the defendant. The black Mason bag and its contents, including the defendant's abandoned cell phone, were not admitted at trial for lack of evidentiary value and that property was retained by the BCPD.

[5] On first obtaining the name and address of the Arkansas cell phone's owner (an elderly lady living in Arkansas), law enforcement contacted her to ascertain that she was safe, and she informed law enforcement that the cell phone was used by her husband, who was a truck driver.

4

relating that Robert had gotten into another eighteen-wheeler, which had been directly behind him at a weigh station in Spokane, Washington. The Arkansas truck driver told the police that he had picked Robert up in East Texas,[6] and Robert had borrowed his cell phone to make some calls after the battery went dead on his phone. The Arkansas truck driver disclosed that he and the second truck driver, with whom the defendant thereafter hitched a ride, had been issued tickets at the Spokane weigh station. The police contacted the weigh station and learned that the truck the defendant was traveling in was a Swift Transportation eighteen-wheeler. The police contacted Swift Transportation and learned that the eighteen-wheeler in which the defendant was traveling was bound for Oakland, California. Through GPS tracking, they located the Swift truck in Lewiston, Idaho, where it was making a warehouse pick-up.

The BCPD communicated to the Lewiston Police Department ("LPD") that a murder suspect was a passenger in a Swift eighteen-wheeler in their jurisdiction and gave the location. On May 9, 2008 the LPD stopped the eighteen-wheeler in Lewiston, Idaho, and they arrested the defendant.[7] The defendant and the truck driver were the only occupants of the eighteen-wheeler, and the driver was not suspected of, or charged with, any crimes. The police searched the eighteen-wheeler, and found a loaded, silver handgun on the floorboard behind the passenger seat where the defendant had been seated. The weapon was not in a

---

[6] The police learned that after the murders, the defendant's brother, Spartacus McCoy, had given him a ride to Lindale, Texas. Spartacus was initially charged as an accessory to first degree murder. He gave a statement to police, but by the time of trial, Spartacus was deceased. The State did not oppose the defense motion in limine to exclude that statement and it was not introduced at trial. According to the PSI prepared by the Probation and Parole Division following the verdicts in this case, the police also charged another brother of the defendant, Carlos McCoy, as an accessory after the fact. Carlos McCoy pled not guilty, and the case was continued without date on June 1, 2009.

[7] A video dashboard camera, mounted in one of the LPD patrol cars showed the defendant being removed from the eighteen-wheeler, placed under arrest, and put in a patrol car. At that time, the defendant was wearing a black "do-rag."

5

holster or bag, and the safety was not on.[8] The truck driver denied having a gun or any knowledge of a gun being in his truck. The LPD also seized from the defendant a cell phone and his wallet, which contained a pay stub, a birth certificate, a social security card, identification cards, insurance cards, and credit cards, all in the name of Robert McCoy, though the defendant had given the name of "Vance McCoy."

On May 12, 2008, while awaiting extradition to Louisiana, the defendant unsuccessfully tried to hang himself with a bed sheet. The defendant was returned to Louisiana on May 14, 2008.

On May 15, 2008 the defendant appeared, by video, at a 72-hour hearing, and the court appointed the Indigent Defender Board to represent him. On May 29, 2008 a Bossier Parish grand jury indicted the defendant for the May 5, 2008 first degree murders of Christine Colston Young, Willie Ray Young, and Gregory Lee Colston, alleging in each instance a violation of LSA-R.S. 14:30(A)(3) (murder when "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person"). On June 17, 2008 the defendant entered a plea of not guilty to the charges at the formal arraignment.

On July 1, 2008 the State gave its notice of intent to seek the death penalty against the defendant. Thereafter, the defense moved for the appointment of a sanity commission to evaluate the defendant's mental capacity to understand the proceedings against him and to assist in his defense. The trial court ordered Dr. Richard Williams, a psychiatrist, and Dr. Mark Vigen, a clinical psychologist, to examine the defendant, which they did and by agreement submitted their findings

---

[8] The gun seized from the eighteen-wheeler in which the defendant was traveling was a .380 caliber Tanfoglio pistol, model Tital II, serial number EB06206. That gun was admitted into evidence at trial, as State Exhibit Number 74 ("S-74"). A firearms examiner tested the weapon and the evidence, and conclusively determined that the bullet that killed Willie Young, which was removed from his brain during autopsy, was fired from S-74, and all four cartridge casings found at the scene at 19 Grace Lane were conclusively determined to have been fired from S-74. A forensic pathologist testified that Christine Colston Young and Gregory Colston suffered exit wounds, meaning the bullets that killed them passed through their skulls and exited.

by report to the court. At a hearing held on November 14, 2008 the trial court noted that both experts found the defendant competent to stand trial.[9]

Thereafter, both the State and the defense filed motions for discovery and inspection, and the defendant filed a variety of pro se motions into the record, including subpoena requests for a number of witnesses.[10] The State filed motions to quash the defendant's pro se subpoena requests, asserting that the testimony of the individuals, sought by the defendant to be subpoenaed, had no evidentiary value or relevance to contribute to the case and that the defendant's actions were "meant to harass and unduly delay this matter."

On December 6, 2009 the defendant wrote to the trial court advising that a conflict of interest had arisen between him and the public defender's office, and he sought to represent himself until additional counsel could be retained and enrolled.[11] On January 12, 2010 the trial court held a hearing, initially slated to address the motion to quash subpoenas, but after the defendant announced to the court that he had a conflict of interest with the public defender's office and that his

---

[9] As discussed hereinafter, the defendant was not found to suffer from mental retardation or intellectual disability, as defined by LSA-C.Cr.P. art. 905.5.1 ("[N]o person with an intellectual disability shall be subjected to a sentence of death . . . ."). The sanity commission experts evaluated the defendant's full scale IQ at 89, his verbal IQ at 95, and his performance IQ at 83.

[10] The group of individuals the defendant sought to have subpoenaed included, among others: a Caddo Parish juvenile court judge, an FBI agent, and Senator David Vitter. The defendant also sought to subpoena a newspaper columnist, Loresha Wilson, who wrote several articles in the local newspaper about the defendant and the triple homicide. The trial court subsequently quashed the defendant's pro se subpoenas issued to Senator Vitter and to the local newspaper columnist because they were not filed in proper form.

[11] In his pro se filing, the defendant stated that he was representing himself, after a breakdown in his relationship with the public defender's office on April 16, 2009, when attorney Craig Forsythe and "private investigator Shanks" came to the jail to meet with him. The defendant asserted that Mr. Forsythe "cursed [him] like a dog!" During a subsequent April 24, 2009 meeting with Mr. Forsythe and Mr. Shanks, the defendant indicated that he tried to discuss information with them about his alibi defense, his whereabouts, and the subpoenas he wanted issued, which information he stated that he had already given to his public defender, Pam Smart, and Mr. Shanks stated to the defendant that they had not received any information about subpoenaing those witnesses. The defendant said he then stated to Mr. Forsythe and Mr. Shanks, "I told them that's the exact reason why I don't trust them!" Whereupon, the defendant stated that Mr. Forsythe began to curse him, and he (the defendant) "dismissed [himself] from the meeting." The defendant stated that he reported the incident to "Chief Defender Phillips" and "informed him of the incident and dismissal of counsel."

7

family would be hiring an attorney, the trial judge recessed the hearing until the counsel issue could be resolved.

On February 11, 2010 after the trial judge gave the defendant a full recitation of his rights under **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the defendant waived those rights and asserted his right to represent himself under **Faretta v. California**, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975). After interrogating the defendant, the trial judge ascertained that the defendant merely sought to represent himself "until my [retained] counsel enrolls next month." The defendant assured the judge that even if counsel did not enroll, he would still be prepared to go to trial on the previously set date of May 24, 2010.

On March 1, 2010 Larry English filed a motion to enroll as counsel for the defendant, and Mr. English appeared in open court two days later to formally enroll. Mr. English admitted to the court that he was not certified to try death penalty cases but that he had made calls to board certified lawyers in order to assemble a legal team to try the case. The trial judge informed the defendant that his new attorney was not certified in death penalty cases, and the defendant acknowledged that he understood that and still wished to go forward with Mr. English as his attorney. Then Mr. English filed a motion to continue the trial, which the judge denied because the defendant had filed a pro se motion for speedy trial on January 13, 2010 and the case had already been set for trial at least once before. Thereafter, the trial judge relieved the public defender's office from its representation of the defendant.

On April 16, 2010 Mr. English took a writ to the Second Circuit on the trial court's denial of his motion to continue. While that writ application was pending, the trial court held an additional hearing, on April 23, 2010, on the defendant's motion to continue, at which time Mr. English reported that he was "having trouble

8

. . . putting together a legal team to represent Mr. McCoy because nobody wants to step into a capital murder case that they've got to go to trial on within such a short period . . . . I'm still not up to speed or nearly ready to undertake the representation of Mr. McCoy." After the defendant and counsel assured the trial judge that they were withdrawing the defendant's speedy trial motion, the judge reset the trial date to February 7, 2011, which he deemed "a hard . . . date." The trial judge also warned counsel: "Mr. English, I want you to understand that if I grant this continuance you will not be allowed to withdraw." Subsequently, the Second Circuit noted that the trial court had granted the defendant's motion to continue, and the writ was withdrawn. See **State v. McCoy**, 45,623 (La. App. 2 Cir. 5/20/10).

On March 12, 2010 the State filed its notice of intent to use evidence of other acts and/or crimes at trial, pursuant to LSA-C.Cr.P. art. 720 and LSA-C.E. art. 404(B). Specifically, the State's notice covered "[a]ll evidence from the criminal investigation of the incident that occurred on or about the 2nd day of April, 2008 concerning Yolanda Colston." The defense responded by filing a motion in limine to exclude "any prior bad acts" of the defendant from trial. The parties argued the motions before the court on November 16, 2010, with the State urging that the issue of the defendant's aggravated battery against Yolanda Colston constituted res gestae because "that's what caused [the defendant] to come into contact with these victims on that particular night." The trial judge agreed and granted the State's motion to admit other crimes evidence. The defense counsel noticed his intent to seek writs, which were subsequently denied by the appellate court "on the showing made." See **State v. McCoy**, 46,266 (La. App. 2 Cir. 1/6/11) (unpublished).

On December 14, 2010 Mr. English filed a motion requesting the trial court to declare the defendant indigent, for purposes of obtaining funds through the

9

Louisiana Public Defender Board, so that the defense could hire a mitigation expert and investigator, a social worker, and a mental health expert, which was heard by the trial court on January 4, 2011. Mr. English disclosed to the court that mitigation experts were necessary should there be a guilty verdict in the case, but the defendant disagreed with that defense strategy. Mr. English further informed the court that the defendant had directed him not to proceed with the motion to declare him indigent, but Mr. English stated that to follow the defendant's directive would not be in the defendant's best interest, opining that his client was suffering from "severe mental and emotional issues that ha[ve] an impact upon this case." Mr. English asked the trial court to "order that Mr. McCoy submit to the experts that are required in a capital murder case."

In addition, numerous motions filed by the defendant, pro se, were addressed during the January 4, 2011 hearing, concerning which Mr. English stated: "I do not adopt those motions. I've asked [the defendant] not to file those motions . . . . I do not believe it's in his best interest to do so . . . . [T]here may be some statements or documents in there that I believe . . . may be detrimental to his case given the overwhelming . . . evidence that is against him." Mr. English also indicated that he was satisfied with the discovery response by the State, which he said had "provided us with all of the evidence in this case." The district attorney confirmed that the State had given "open file" discovery to the defense. At the conclusion of the hearing, the defendant acquiesced in withdrawing his various pro se motions.

Thereafter, the State realized that declaring the defendant indigent triggered Rules of the Supreme Court of Louisiana, Rule XXXI ("In any capital case in which a defendant is found to be indigent, the court shall appoint no less than two attorneys to represent the defendant . . . .") and that since Mr. English's enrollment

there had been only one attorney representing the defendant.[12] Accordingly, on January 24, 2011, the State filed a "Motion to Determine Waiver of Co-Counsel," requesting a contradictory hearing "to determine defendant's waiver of co-counsel at defendant's capital murder trial." On that same day, the trial court held a hearing on the motion, during which the district attorney stated that he filed the motion to "get Mr. English and/or Mr. McCoy's position." Mr. English advised the court that although another attorney, James Gray, had been advising him about the case, neither Mr. Gray nor any other attorney would be participating in the trial of the case, and he was comfortable trying the case single-handedly.[13] The trial judge questioned the defendant about the issue, and the defendant informed the court that, even though Mr. English was not capital certified, he waived the Rule XXXI two-attorney representation standard because he did not want to have the public defender's office reappointed to his case. Also during the January 24, 2011 hearing, Mr. English orally requested a continuance of the February 7, 2011 trial date to further develop mitigation evidence. The trial court denied the defense motion to continue the trial date, and the defense thereafter filed an application for review with the appellate court.

Initially, the appellate court denied the writ application because the defense "failed to provide this Court with any documentation that the motion to continue was ever filed or ruled upon by the trial court." **State v. McCoy**, 46,387 (La. App. 2 Cir. 2/1/11) (unpublished). However, on the following day, the appellate court issued a stay of the proceedings and, thereafter, issued a ruling granting the writ, lifting the stay, and remanding the case with instructions. **State v. McCoy**, 46,387

---

[12] Mr. English clarified to the court that, despite having filed a motion in the matter, attorney Carlos Prudhomme had "not been involved in the case" and would "not be helping . . . handle the trial."

[13] Mr. English admitted to the trial court that, while he anticipated trying the case alone, he had relied on both Pam Smart and James Gray of the Public Defender's Office for assistance in preparing for trial.

(La. App. 2 Cir. 2/2/11) (unpublished); **State v. McCoy**, 46,394 (La. App. 2 Cir. 2/3/11) (unpublished). In its ruling, the appellate court expressed concern that the defendant was proceeding to trial with only one defense attorney, who was not certified as qualified to defend capital cases. **Id.**, 46,394 at p. 2. The appellate court granted the writ and remanded the case back to the trial court to grant the defendant a continuance of the trial date,[14] directing the trial court to also "ensure that Mr. McCoy is, or has been, fully apprised on the record of the benefits of having two capital-defense qualified attorneys and that McCoy has knowingly and intelligently waived same." **Id.**, 46,394 at p. 3.

In response to the appellate court's February 3, 2011 ruling, the State immediately filed a "Motion to Appoint Additional Counsel," and, on the same day, the trial court held a hearing on the motion to address the concerns voiced by the appellate court. In addition to the district attorney and defense counsel of record, a representative from the local public defender's office, Randall Fish, was present at the February 3, 2011 trial court hearing, during which the court and the parties discussed whether the defendant could continue to be represented by retained counsel and also be entitled to the appointment of two capital-qualified attorneys through the public defender's office. The defendant unequivocally declined assistance from the public defender's office, stating: "I don't want the Court to put counsel on me . . . that I don't want." The trial judge and the district attorney questioned the defendant as to his waiver of counsel under Rule XXXI, and the defendant affirmed that he voluntarily waived the public defender's office being appointed as co-counsel in his case. The defendant stated that he was

---

[14] In support of his argument that a continuance of the trial date was needed, defense counsel submitted to the appellate court documentation from the mitigation experts, containing "an explanation from the experts of the time required to conduct a meaningful study suitable for use as evidence in a criminal trial," which the appellate court recognized had not been submitted to the trial court. **Id.**, 46,394 at p. 2. The appellate court noted that, at the time of the January 24, 2011 hearing, "[d]espite a trial date approximately one month away and despite a nearly year-old promise [by Mr. English] to 'assemble a team,' evidently no work had been done in this capital case to develop this evidence." **Id.**

12

"totally opposed to that and most of all . . . I choose not to be strong armed to take a public defender's aspect of secondary counsel when that's totally against my wishes." Based on the defendant's repeated assurances that he was knowingly and voluntarily waiving the appointment of additional counsel, the trial judge denied the State's motion for appointment of a second trial counsel, and a trial date of July 28, 2011 was set.

On July 12, 2011 the trial court held a hearing to address the State's motion for discovery, which requested written notice from the defendant of his intention to offer a defense of alibi, and the State's motion to quash various subpoena requests issued by the defendant in proper person. As to the former, Mr. English informed the court that "[w]e have no alibi evidence in this case," notwithstanding the defendant's pro se notice of intent to offer an alibi. As to the defendant's pro se subpoena requests, the State asserted they were not in proper form, and Mr. English replied, "I do not adopt any of the subpoenas that Mr. McCoy has filed. He has done that against my advice." The trial court did not quash the pro se subpoenas on that date, but reserved his decision until a later date.

On July 26, 2011 two days before the trial was slated to begin, the court held a hearing in which Mr. English reported that he learned over the weekend of the defendant's "intention to terminate my services." After the trial judge fully advised the defendant of his rights under **Miranda**, the defendant disclosed that Mr. English would not be his lawyer going forward. The trial judge informed the defendant, "[T]hat's my determination at this point." The defendant claimed that his parents had retained two new attorneys, although those attorneys were not in court at the July 26th hearing. The defendant asserted that Mr. English has been "trying to . . . make me cop out to three counts of first degree murder. Didn't want me to go to trial." Mr. English informed the court that he and the defendant had an irrevocable disagreement as to the trial strategy. Relying on **State v. Bridgewater**,

13

the trial judge denied the defendant's motion to substitute counsel as untimely, given that the lawyers the defendant was seeking to enroll were not present in court that day and trial was slated to commence in two days. See **State v. Bridgewater**, 00-1529 (La. 1/15/02), 823 So.2d 877, on rehearing, 00-1529 (La. 6/21/02), 823 So.2d 877, 909, cert. denied, 537 U.S. 1227, 123 S.Ct. 1266, 154 L.Ed.2d 1089 (2003). Accordingly, the trial judge ordered Mr. English to remain counsel of record. Moments after the trial court's ruling that the defendant's request to discharge counsel was untimely, the defendant made a one-sentence invocation of his right to self-represent, which the court disposed of as untimely under **State v. Bridgewater**.

Voir dire commenced on July 28, 2011, and jury selection of twelve jurors and two alternate jurors was completed on August 2, 2011. Trial on the merits commenced on August 3, 2011, and the State gave its opening statement. Thereafter, Mr. English gave an opening statement in which he conceded guilt, stating, "I'm telling you Mr. McCoy committed these crimes," but he asserted that the defendant was suffering "from serious emotional issues" that inhibit his ability "to function in society and to make rational decisions." Accordingly, Mr. English urged the jury to consider this case in terms of a second degree murder trial.

The State presented its case through the testimony of eleven witnesses and 100 exhibits before resting its case-in-chief. On August 4, 2011 Mr. English announced to the court that, against the advice of counsel and warnings of a possible perjury indictment, the defendant had elected to testify. The trial judge advised the defendant of his rights under **Miranda**, and the defendant acknowledged that he understood those rights and wished to testify. Thereafter, the defendant testified to his alibi defense and sought to refute the State's evidence

14

with his theories of a vast conspiracy that landed him on trial for his life.[15]  The district attorney cross-examined the defendant, after which the defense rested its case.  After deliberations on August 4, 2011, the jury returned a unanimous verdict of guilty as charged on all three counts.

The penalty phase was held on August 5, 2011.  The State called five victim impact witnesses:  (1) Yolanda Colston (mother of victim Gregory Colston, and daughter/step-daughter of victims Christine Colston Young and Willie Young); (2) Lorenzo Evans (friend of Gregory Colston); (3) Kent Falting (teacher and coach of Gregory Colston); (4) Eric Davis (son of Christine Colston Young); and (5) Pauline Miles (sister of Willie Young).  Thereafter, the defense called one mitigation expert, Dr. Mark Vigen.[16]  After deliberation, the jury returned a verdict

---

[15] At trial, the defendant denied committing an aggravated battery upon his estranged wife, Yolanda Colston.  He also denied owning a gun and suggested that the Idaho police had planted the murder weapon in the eighteen-wheeler as part of a conspiracy with BCPD Detective Humphrey.  The defendant further denied spending the night with Sharon Moore the night before the murders or that he asked her for money to buy bullets, suggesting that the district attorney had "concocted that story."  The defendant testified that he went out-of-state on April 21, 2008, after Officers Joshua Bounds and Richard McGee came to his house and beat him in the face with a weapon.  The defendant stated that those officers stole his car on April 18, 2008, so he could not have been the person seen running from the white Kia on the police cruiser dashcam video recorded on May 5, 2008.  The defendant claimed that he never returned to Bossier City.  He explained that he had let his good friend, Robert Evans, a truck driver, use his cell phone, and it was Robert Evans who was calling Sharon Moore around the time of the murders because he had "offered" Sharon Moore to Mr. Evans, although "she didn't think highly of that."  The defendant further claimed that Detective Humphrey threatened to kill him because he was going to expose corruption in the police department involving Officers Bounds and McGee, all of whom the defendant described as being "very strongly in drugs."  The defendant further testified that the "Robert" that Christine Colston Young was screaming at on the 911 tape was really Robert Thomas, a drug-dealing cop who owned White Automotive off Barksdale.  The defendant theorized that Mr. Thomas killed the victims because Willie Young was transporting drugs for them and owed them a debt of $2,500.  The defendant claimed that Robert Evans hitched a ride with the truckers, not him.  The defendant stated that he was in Houston on the night of the murders, and the reason that calls were being initiated from his cell phone in Bossier and Caddo Parishes on the day of, and day after, the murders was because Mr. Evans had his cell phone. The defendant denied ever attempting to commit suicide.  He claimed that the officers made that up to cover-up the fact that they had beaten him.  The defendant testified that he had been unable to subpoena any of his witnesses, relating that he had wanted to call to the stand FBI Agent J.T. Coleman, who investigated alleged drug-dealing activities of Officers Richard McGee and Robert Thomas.  He said that he also wanted Senator David Vitter to be subpoenaed for trial because "I know Mr. David Vitter personally and [he] knows everything that goes on with me." The defendant testified that those witnesses would have corroborated all that he was saying.

[16] Dr. Vigen testified that the defendant "is one of those people that can lie to themselves so extensively and for such a long period of time that they ultimately end up believing what the lie is."

recommending the sentence of death on all three counts, finding that the State proved one of the three aggravating circumstances advanced,[17] namely that the offender knowingly created risk of death or great bodily harm to more than one person.

On December 6, 2011 attorneys from the Louisiana Capital Assistance Center appeared before the trial court and filed a motion for new trial and a motion in arrest of judgment on the defendant's behalf. Appellate counsel filed a supplemental motion for new trial on January 17, 2012. The trial court held a hearing on the defendant's post-verdict motions on January 23, 2012, and at the conclusion, denied the motion for new trial. The defendant waived delays, and the trial court formally imposed the sentence of death in accordance with the jury's verdict.

On August 8, 2012 appellate counsel filed a "Second Motion for New Trial." The trial court subsequently ruled that the second motion for new trial was untimely filed. A writ application was denied by the appellate court "on the showing made." **State v. McCoy**, 48,083 (La. App. 2 Cir. 1/17/13) (unpublished). This court also denied review. **State v. McCoy**, 13-0400 (La. 4/5/13), 110 So.3d 1067.

The defendant now appeals his convictions and death sentences on the basis of sixteen assignments of error: (1) the defendant's right to counsel of choice was violated when the trial court denied his request to discharge and substitute trial counsel prior to trial; (2) the trial court erred in denying the defendant's right to self-representation; (3) the trial court erred in failing to conduct a hearing and grant the defendant's request for substitution of counsel on his showing that trial counsel

---

[17] The State relied on three aggravating circumstances, pursuant to LSA-C.Cr.P. art. 905.4(A)(1) ("The offender was engaged in the perpetration or attempted perpetration of . . . aggravated burglary . . . ."); LSA-C.Cr.P. art. 905.4(A)(4) ("The offender knowingly created a risk of death or great bodily harm to more than one person."); and LSA-C.Cr.P. art. 905.4(A)(7) ("The offense was committed in an especially heinous, atrocious or cruel manner.").

16

was incompetent or otherwise unable to furnish adequate representation; (4) the trial court erred in ruling that trial counsel, rather than the defendant, could decide whether to concede guilt of murder; (5) the defendant's right to counsel was denied when he was involuntarily represented by trial counsel who conceded his guilt against his express instructions and entirely failed to adversarially test the State's case; (6) the defendant's right to conflict-free counsel was violated when his trial counsel actively represented interests contrary to the expressed interests and objectives of the defendant; (7) the defendant's rights to compulsory process, to an impartial jury trial, to plead not guilty, to present a defense, to confront witnesses, to require the State to prove guilt beyond a reasonable doubt, and to a fair trial were violated when trial counsel advocated his guilt of second degree murder; (8) the trial court erred in failing to appoint certified indigent counsel; (9) the trial court erred in denying the defendant's motion to suppress the statement of Gayle Houston as untimely; (10) the State exercised peremptory challenges based on the race of prospective jurors in violation of state and federal equal protection clauses and LSA-C.Cr.P. art. 795; (11) the trial court erred in failing to give a "lesser-included offense" instruction; (12) the trial court erred in permitting "untested, unnoticed, unadjudicated act evidence" at the penalty phase, in violation of **State v. Jackson**, 608 So.2d 949 (La. 1992), the Eighth Amendment, and due process; (13) the trial court erred in admitting victim impact evidence from the basketball coach of one of the victims; (14) the trial court committed prejudicial error in refusing to allow the defendant to voluntarily excuse himself from being present at trial; (15) the trial court erred in dismissing the defendant's "Second Motion for New Trial," without reaching any of the merits, pursuant to an incorrect application of LSA-C.Cr.P. art. 853(B); and (16) the trial court erred in failing to hold a renewed competency hearing in violation of LSA-C.Cr.P. art. 643 and procedural due process. The defendant has urged no challenge to the sufficiency

of the evidence used to convict him of three counts of first degree murder.

## LAW AND ANALYSIS

Right to Counsel of Choice

In his first assignment of error, the defendant contends that the trial court erred in denying his pretrial motion to discharge Mr. English as his trial counsel and to substitute another attorney as defense counsel, as the defendant contends a conflict arose between the defendant and Mr. English concerning the manner of trial defense to be presented.

The Sixth Amendment to the U.S. Constitution provides that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." An accused's right to counsel is echoed in Louisiana Constitution, Article I, Section 13, which states that "[a]t each stage of the proceedings, every person is entitled to assistance of counsel of his choice, or appointed by the court if he is indigent and charged with an offense punishable by imprisonment." See also LSA-C.Cr.P. art. 511 ("The accused in every instance has the right to defend himself and to have the assistance of counsel. His counsel shall have free access to him, in private, at reasonable hours.").

The Supreme Court has recognized the efficacy of having the assistance of counsel during the adversarial procedure of a criminal trial. **Wheat v. United States**, 486 U.S. 153, 158-59, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988) ("[T]he Sixth Amendment secures the right to the assistance of counsel, by appointment if necessary, in a trial for any serious crime.") (citing **Gideon v. Wainwright**, 372 U.S. 335, 343-44, 83 S.Ct. 792, 796, 9 L.Ed.2d 799 (1963)). Although "the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant," the Sixth Amendment also encompasses "the right to select and be represented by one's preferred attorney." **Wheat v. United States**, 486 U.S. at 159, 108 S.Ct. at 1697.

The denial of a criminal defendant's right to retained counsel of choice is a violation of the Sixth Amendment and a structural error, requiring reversal. **United States v. Gonzalez-Lopez**, 548 U.S. 140, 148-50, 126 S.Ct. 2557, 2564, 165 L.Ed.2d 409 (2006).  When the right to be assisted by counsel of one's choice is wrongly denied, no harmless error analysis inquiring into counsel's effectiveness or prejudice to the defendant is required:

> Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received.  To argue otherwise is to confuse the right to counsel of choice - which is the right to a particular lawyer regardless of comparative effectiveness - with the right to effective counsel - which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

**Gonzalez-Lopez**, 548 U.S. at 148, 126 S.Ct. at 2563.

The assistance of counsel may be secured in various ways, including: the hiring of an attorney's services by the criminal defendant or by another on behalf of the defendant, the attorney's volunteering of services pro bono, or the court's appointment of private counsel or the public defender if the defendant is indigent.[18] **State v. Reeves**, 06-2419, p. 35 (La. 5/5/09), 11 So.3d 1031, 1055, <u>cert. denied</u>, 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009).  However, in order to exercise the right to choose a particular attorney, a defendant must have the means to obtain and afford the services of said counsel, whereas an indigent defendant has a right to "appointed" counsel, but does not have the right to have a particular attorney appointed.  **State v. Sims**, 07-2216, p. 1 (La. 11/16/07), 968 So.2d 721, 722 ("A defendant is guaranteed the right to counsel of choice so long as the defendant can obtain and afford the services of said counsel."); **State v. Jones**, 97-

---

[18] <u>See</u> LSA-C.Cr.P. art. 512 ("When a defendant charged with a capital offense appears for arraignment without counsel, the court shall provide counsel for his defense in accordance with the provisions of R.S. 15:141 et seq. . . ."); LSA-C.Cr.P. art. 515 ("Assignment of counsel shall not deprive the defendant of the right to engage other counsel at any stage of the proceedings in substitution of counsel assigned by the court. The court may assign other counsel in substitution of counsel previously assigned or specially assigned to assist the defendant at the arraignment.").

2593, pp. 2-3 (La. 3/4/98), 707 So.2d 975, 976; **State v. Rideau**, 278 So.2d 100, 103 (La. 1973) ("An indigent defendant is not entitled to choose a certain lawyer.").[19]

The Sixth Amendment right to choose one's own counsel is circumscribed in several important respects. **Wheat v. United States**, 486 U.S. at 159, 108 S. Ct. at 1697; **State v. Reeves**, 06-2419 at pp. 35-36, 11 So.3d at 1055-56. See also **Caplin & Drysdale, Chartered v. United States**, 491 U.S. 617, 624-26, 109 S.Ct. 2646, 2652-53, 105 L.Ed.2d 528 (1989). Regardless of his persuasive powers, an advocate who is not a member of the bar may not represent clients, other than himself, in court. **Wheat v. United States**, 486 U.S. at 159, 108 S. Ct. at 1697. Similarly, a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant. **Id.** Nor may a defendant insist on the counsel of an attorney who has a previous or ongoing relationship with an opposing party, even when the opposing party is the government. **Id.**

The Supreme Court has stated unequivocally that a criminal defendant who has been appointed counsel has no right under the Sixth Amendment to the counsel of his choice:

> The Amendment guarantees defendants in criminal cases the right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts. "[A] defendant may not insist on representation by an attorney he cannot afford."

**Caplin & Drysdale**, 491 U.S. at 624, 109 S.Ct. at 2652 (quoting **Wheat**, 486 U.S. at 159, 108 S.Ct. at 1697). This distinction was again noted by the Supreme Court in **United States v. Gonzalez-Lopez**, 548 U.S. at 151, 126 S.Ct. at 2565, wherein

---

[19] See also **State v. Sims**, 07 2216, p. 1 (La. 11/16/07), 968 So.2d 721, 722 (per curiam) ("The right to private, non-appointed counsel of choice does not distinguish between a paid attorney and a pro bono lawyer.").

20

the Court held that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them."

A defendant's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice if he can manage to do so, but that right is not absolute. **State v. Harper**, 381 So.2d 468, 470-71 (La. 1980); **State v. Leggett**, 363 So.2d 434, 436 (La. 1978); **State v. Mackie**, 352 So.2d 1297, 1300 (La. 1977). See also **Caplin & Drysdale**, 491 U.S. at 626, 109 S. Ct. at 2652 ("Whatever the full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of . . . counsel.'"); **State v. Brown**, 03-0897, p. 11 (La. 4/12/05), 907 So.2d 1, 12, decision clarified on rehearing, 03-0897 (La. 6/29/05), 907 So.2d 1, 36, cert. denied, 547 U.S. 1022, 126 S.Ct. 1569, 164 L.Ed.2d 305 (2006) ("[A] criminal defendant's right to the counsel of his choice is not absolute.").

Furthermore, this court has consistently held that a defendant's right to counsel of his choice cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. **State v. Bridgewater**, 00-1529 at p. 20, 823 So.2d at 896; **State v. Seiss**, 428 So.2d 444, 447 (La. 1983); **State v. Champion**, 412 So.2d 1048, 1050 (La. 1982). See also **State v. Givens**, 99-3518, pp. 9-10 (La. 1/17/01), 776 So.2d 443, 452. The "[d]efendant must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner[,] and at an appropriate stage of the proceedings." **State v. Seiss**, 428 So.2d at 447. A trial court, therefore, does not abuse its broad discretion to conduct proceedings "in an orderly and expeditious manner," as mandated by LSA-C.Cr.P. art. 17, by denying a continuance on the morning of trial based on the defendant's desire to change counsel. **State v. Anthony**, 347 So.2d 483, 487 (La. 1977) ("The law is well settled that a defendant in a criminal

21

trial cannot, by a last minute change of counsel, force a postponement of his trial.").

The circumstances of **State v. Seiss**, supra, are analogous to the present case. In **State v. Seiss**, an indigent defender was appointed to represent the defendant, and on the day of trial the defense counsel presented a motion to withdraw so that the defendant could substitute another defense counsel. The indigent defender explained to the court why he should be allowed to withdraw from representation of the defendant:

> Yesterday I talked with Mr. Seiss and he emphatically informed me that he had no desire at all for me to represent him. It is my position that the fiduciary relationship of attorney/client is too valuable for me to be forced to represent a client who has no confidence in my abilities, nor is he willing to co-operate with me in any manner for me to represent him. Given that lack of rapport between us . . . I don't see how the amount of exposure that he has in this matter that I should be forced to represent him and I do not think that the administration of criminal justice in Rapides Parish would be so unduly burdened by allowing him, now that his indigency status has altered, he is employed and he is financially able to hire an attorney of his own choosing why he could not be allowed to so do and that's basically my position.

**State v. Seiss**, 428 So.2d at 446. The defendant also informed the court of his reason for seeking to replace appointed counsel with retained counsel: "Like he said, you know, he was appointed to me as a State lawyer and now . . . I [am] employed and I'd like to get a lawyer of my choice." **Id.** Although the defendant claimed to have hired a replacement attorney, that attorney had not enrolled as counsel for the defendant and was not present on the day of trial; the trial court denied the motion to withdraw. **Id.** In ruling that the trial court did not abuse its discretion in denying defense counsel's motion to withdraw, this court stated:

> This court has consistently held that this right cannot be manipulated to obstruct the orderly procedure of the courts and cannot be used to interfere with the fair administration of justice. **State v. Champion**, 412 So.2d 1048, 1050 (La. 1982); **State v. Johnson**, 389 So.2d 1302, 1304 (La. 1980); **State v. Jones**, 376 So.2d 125, 129 (La. 1979); **State v. Lee**, 364 So.2d 1024, 1028 (La. 1978); **State v. Anthony**, 347 So.2d 483, 487 (La. 1977). Defendant must exercise

22

his right to counsel of his choice at a reasonable time, in a reasonable manner and at an appropriate stage of the proceedings. **State v. Champion**, supra at 1050; **State v. Johnson**, supra at 1304; **State v. Lee**, supra at 1028; **State v. Leggett**, 363 So.2d 434, 436 (La. 1978); **State v. Cousin**, 307 So.2d 326, 328 (La. 1975). Absent a justifiable basis, "[t]here is no constitutional right to make a new choice of counsel on the very date the trial is to begin, with the attendant necessity of a continuance and its disrupting implications." **State v. Leggett**, supra at 436. Once the trial date has arrived, the question of withdrawal of counsel largely rests with the discretion of the trial court, and his ruling will not be disturbed in the absence of a clear showing of abuse of discretion. **State v. Leggett**, supra at 436; **State v. Cousin**, supra at 328; **State v. Boudoin**, 257 La. 583, 588-89, 243 So.2d 265, 267 (1971).

**State v. Seiss**, 428 So.2d at 447. Likewise, in both **State v. Lee**, 364 So.2d at 1028, and **State v. Anthony**, 347 So.2d at 487, this court found no error in the trial court's denial of a motion to withdraw, on the defendant's claim that another retained counsel would be substituted, when the attorney to be substituted neither enrolled as counsel nor appeared in court on the day the motion was heard.

During the instant prosecution, the defendant was first represented by appointed counsel, then represented himself for approximately one month (as discussed hereinafter), and thereafter counsel was retained by the defendant's family.

On May 15, 2008 at the defendant's initial appearance before the court, he was referred to the public defender's office, and on June 17, 2008, when he was arraigned, the defendant was represented by the public defender's office. However, the defendant's relationship with his appointed counsel soured when the defendant felt that no investigation was being done on his claims of innocence. In February of 2010 the defendant declared that he would represent himself, but he qualified that he would be doing so only "until my [retained] counsel enrolls next month," but assured the court that whether new counsel enrolled or not he would still be prepared for previously-set trial date of May 24, 2010.

On March 1, 2010 retained counsel Larry English enrolled as defense

23

counsel and informed the court that while the defendant's family "approached me . . . about retaining my services . . . I'm basically handling this case pro bono."[20] On January 4, 2011, on motion of Mr. English, the trial court declared the defendant indigent, so that he could apply for state funding to hire mitigation experts. Nevertheless, Mr. English proceeded as either retained or pro bono counsel.

When Mr. English enrolled as defense counsel on March 1, 2010, he assured the trial court that he had begun to assemble a "legal team . . . to try this case" since he was not a certified capital counsel, but he sought a continuance of the May 24, 2010 trial date. In denying the motion for continuance, the trial court extensively detailed the delays that had already been encountered in bringing the case to trial, which had been originally set for June 1, 2009, noting the fact that the defendant had previously filed a pro se motion for speedy trial on January 13, 2010. However, an application for writs was filed with the appellate court, and subsequently the trial court agreed to continue the May 2010 trial date to February 7, 2011, on the defendant's agreement to withdraw his motion for speedy trial and on Mr. English's assurance that he would not thereafter withdraw as defense counsel.

At a hearing held before the trial court on July 26, 2011, two days before the commencement of the defendant's capital trial, Mr. English stated to the court that

---

[20] On February 3, 2011, Mr. English informed the court that "there's a lot about me not having capital experience - capital certified which I'm not. But I just want to put on the record and remind the reason why I'm sitting here . . . not making any money representing Mr. McCoy because Mr. McCoy's family came to me and Mr. McCoy was representing himself." Mr. English stated to the trial court that he believed that it would be better for him to represent the defendant than for the defendant to proceed pro se, but Mr. English reiterated, "I'm not being paid." The defendant then responded on the record: "Mr. English ha[s] been paid by my mom . . . . We're not totally . . . indigent . . . on this but they may have not paid him as much as he choose [sic] to pay. But he has not just taken this case without any financial contributions, Your Honor." On the issue of Mr. English's compensation, a typewritten letter, written in July of 2011 to the trial judge by the defendant's parents, appears in the record and states that they "advanced" to Mr. English $5,000 for his representation of the defendant in this capital trial, money which they stated they borrowed against their car title.

24

he had learned over the weekend that the defendant wanted to terminate him as defense counsel. The defendant confirmed this statement, telling the trial court that Mr. English would not be continuing as his attorney. The trial court informed the defendant, "[T]hat's my determination at this point." The defendant then stated that Mr. English had been paid a fee, implying that he had the right to terminate Mr. English as his counsel. The defendant expressed frustration as to Mr. English's refusal to adopt his alibi defense and to the fact that Mr. English was "trying to make [him] cop to all three counts of murder," indicating these factors had caused a breakdown in the attorney-client relationship. The defendant also claimed to have two new defense attorneys "on standby" ready to enroll "as soon as Mr. English is taken out of my case," and the defendant assured the trial judge that these two new attorneys were "ready to proceed [to] trial," scheduled to begin two days later, and that there would "be no . . . delays." However, when the trial court asked the defendant if these replacement attorneys were present in the courtroom, the defendant replied "no." The defendant was further unable to tell the trial court the names of his new defense attorneys, but argued to the court that he was credible about the fact that new counsel would enroll as he stated.[21] The trial court then denied the defendant's request to discharge Mr. English and substitute counsel, stating:

> [I]n anticipation of this motion and in looking up the law in this motion, I've looked at *State of Louisiana versus Roy Bridgewater* that is cited at 823 So.2d 877 . . . . Mr. McCoy, there have been times that

---

[21] On this issue, the defendant stated:

> I just want to bring back to the Court's remembrance when I dismissed [public defender] Ms. Pam Smart. I didn't have a standby lawyer here then, Your Honor. And when I spoke to you about Mr. English enrolling he enrolled in the same and proper fashion in which, you know, I told you he would enroll, Your Honor. I was creditable of my word. I was creditable of the things that I spoke to you about in that aspect, Your Honor. And I'm still creditable about this aspect. These attorneys have -- are very familiar with this case. They have been standing by and vindicating things with the case; they are very familiar with this case, Your Honor. That's why they're not going to need any continuance hiring for this case; they're very familiar with it.

you have been represented by the Public Defender's Office. There was a time that you had attempted to represent . . . yourself . . . . [Y]ou have been represented by Mr. English. And the case stands for the right -- you do have the right to choose counsel but that counsel cannot be chosen when it is an attempt to obstruct the Court's orderly procedure or to interfere with a fair administration of justice. And it states that . . . "In order for the defendant to exercise his right to counsel he must exercise his right to counsel of his choice at a reasonable time, in a reasonable manner, and at an appropriate stage of the proceedings." This matter has been set since February. This matter has been under a scheduling order at least two different times. The case was continued by the Louisiana Second Circuit Court of Appeal in February and was continued to this term, which I specifically set aside in order to be able to have this hearing. We are two days before the hearing date . . . . [T]hese two attorneys that you state are going to represent you are not in this courtroom at this time. They have not come before this Court and asked to enroll in this case. Even if they were to enroll there would have to be assurances that they were prepared to go to trial on Thursday. So based on the fact that this is not a timely request and this Court also takes into consideration that even if there are irreconcilable differences between counsel and the person that is accused of a crime that the [**Bridgewater**] Court said that . . . "A right to counsel choice must be made in a timely manner. It must be the choice at a reasonable time, and a reasonable manner, and at an appropriate stage of the proceedings." This is not an appropriate stage of the proceedings. There is no counsel that is present today to state that they would enroll. And therefore, I deny Mr. English being relieved at this time and he will remain as counsel of record and this case will go to trial on Thursday.

Having carefully examined the trial court record in this matter, we are unable to say the trial court erred in its finding that the defendant's motion to substitute counsel was untimely and constituted an attempt "to obstruct the Court's orderly procedure or to interfere with a fair administration of justice." Although the defendant asserts that he was unaware of Mr. English's alleged refusal to pursue his claims of innocence as a defense and therefore unable at an earlier point in the proceedings to bring the alleged irreconcilable differences to the attention of the trial court and to seek a substitution of counsel, the record reflects that differences in the defendant's expectations for his defense and Mr. English's trial strategy were evident to the court and the parties as early as a December 14, 2010 hearing before the court, wherein the defendant and Mr. English discussed their

disagreements before the trial court.

During the December 14, 2010 hearing (held on motion of Mr. English to have the defendant declared indigent so that public funds could be made available to hire mitigation experts), the trial court was informed that the defendant did not want to be declared indigent and did not want to hire mitigation experts since he wanted to put on a defense based entirely on his claim of innocence. During the hearing, Mr. English made several statements to the trial court, in the presence of the defendant, that the defendant was suffering from "severe mental and emotional issues," and yet the defendant did not seek to replace Mr. English as his defense counsel at that time.

Subsequently, during a January 4, 2011 hearing (held on issues related to pro se discovery motions filed independently by the defendant), it was revealed that Mr. English did not support the defendant's pro se discovery requests seeking to develop certain evidence and witnesses related to his claims of innocence and the existence of an alibi. At the conclusion of the hearing, the defendant acquiesced in withdrawing his various pro se motions, and he made no objection to Mr. English's continued representation.

Then, at a January 24, 2011 hearing, provoked by the district attorney in light of Louisiana Supreme Court Rule XXXI ("In any capital case in which a defendant is found to be indigent, the court shall appoint no less than two attorneys to represent the defendant . . . .") to "get Mr. English and/or Mr. McCoy's position" on the rule since Mr. English was not certified as a capital defense qualified counsel and there was no second defense counsel enrolled on the defendant's behalf, the trial judge questioned the defendant about the issue, and the defendant informed the court that, even though Mr. English was not capital certified, he waived any Rule XXXI entitlement to representation by two attorneys because he did not want to have the public defender's office reappointed to his

27

case. Mr. English also divulged to the court, during that hearing, the difficulties he was having representing the defendant because of his "severe mental issues," stating, "Mr. McCoy is going to attempt to take over this trial and argue in front of the jury." Mr. English further stated, "It's going to be a zoo, Judge, because I'm not going to do what he wants me to do . . . I do not believe this man is rational . . . I have an ethical duty to this man not to follow his bizarre behavior." In response, the defendant advised the trial court that Mr. English "won't subpoena people that will validate my innocence," expounding at length on that assertion. The defendant further revealed to the trial court his awareness of Mr. English's planned trial strategy when he stated: "Mr. English has told me there is no way he can win this case." Notwithstanding, the defendant did not seek to have Mr. English substituted with other defense counsel.

Further, as noted hereinabove, following an order by the appellate court in **State v. McCoy**, 46,394 (La. App. 2 Cir. 2/3/11) (unpublished), the trial court held a February 3, 2011 hearing, to revisit the defendant's refusal to allow appointment of a second defense attorney from the public defender's office to satisfy this court's Rule XXXI of "no less than two attorneys" to represent an indigent defendant, the defendant chose to continue to be represented only by Mr. English, stating, "I choose not to be strong armed to take a public defender's aspect of secondary counsel when that's totally against my wishes." It was at this hearing that the trial date of July 28, 2011 was set.

Even though the defendant claims he had no knowledge that Mr. English was going to concede his guilt until July 12, 2011, argument presented by newly-enrolled appellate counsel alluded, during a January 23, 2012 post-trial hearing on a motion for new trial, that the issue had been under discussion for at least a few months before trial, in stating:

Mr. English formed the view relatively early on that the evidence

28

against Mr. McCoy was overwhelming and that the . . . only successful outcome in the case, in Mr. English's view, was to try to persuade the jury to return a life sentence rather than the death sentence and that the best way to do that strategically was to concede Mr. McCoy's guilt of the killings, being the killer of the three victims in this case . . . . A couple of months before the trial, Mr. English approached Mr. McCoy to put in fairly bold terms that he believed that Mr. McCoy needed to take a plea of guilty to a life sentence if he could get one rather than to proceed to trial.

The record clearly reveals the defendant's awareness of Mr. English's trial strategy, to avoid the death penalty by conceding guilt and seeking a life sentence, some eight months prior to July 12, 2011.[22] Thus, the trial judge did not abuse his discretion by denying the motion to discharge and replace retained counsel two days before trial. This assignment of error is without merit.

Right to Self-Representation

In his second assignment of error, the defendant contends he was denied his right to self-representation, when, after the trial court denied his motion to substitute another trial counsel for Mr. English during a July 26, 2011 hearing on the matter held two days before trial, the defendant attempted to invoke his right of self-representation.

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel; for this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. **Faretta v. California**, 422 U.S. at 835, 95 S.Ct. at 2541. Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-

---

[22] In a recorded jailhouse telephone conversation between the defendant and his father, on August 4, 2011 (the day the jury returned its unanimous verdicts in the guilt phase of the defendant's capital trial), which was filed into the record in connection with the defendant's "Supplemental Motion for New Trial," the defendant told his father, "I seen straight through English, Daddy, when he first came and met me, Daddy. And that's been over a year and a half ago."

representation, so that the record will establish that he knows what he is doing and his choice is made "with eyes open." **Id.** Thus, when a defendant asserts this right of self-representation, a trial judge must make two independent decisions: (1) whether defendant's waiver of his right to be represented by counsel is intelligently and voluntarily made, and (2) whether his assertion of his right to represent himself is clear and unequivocal. **State v. Hegwood**, 345 So.2d 1179, 1181-82 (La. 1977). A trial judge confronted with an accused's unequivocal request to represent himself need determine only whether the accused is competent to waive counsel and is "voluntarily exercising his informed free will." **State v. Santos**, 99-1897, p. 3 (La. 9/15/00), 770 So.2d 319, 321 (per curiam).[23]

Whether the defendant has knowingly, intelligently, and unequivocally asserted the right to self-representation must be determined based on the facts and circumstances of each case. **State v. Bridgewater**, 00-1529 at p.18, 823 So.2d at 894 ("[C]ourts should 'indulge in every reasonable presumption against waiver.'") (quoting 3 Wayne R. LaFave, Jerold H. Israel & Nancy J. King, Criminal Procedure § 11.3(a) (2nd ed. 1999)).

Furthermore, the right to self-representation is not absolute. **Martinez v. Court of Appeal of California**, 528 U.S. 152, 161, 120 S.Ct. 684, 691, 145 L.Ed.2d 597 (2000). Most courts require the defendant to elect to represent himself in a timely manner. **Id.**, 528 U.S. 152, 161-62, 120 S.Ct. 684, 691. A defendant who waits until trial to ask the court to excuse his appointed attorney in order to search for retained counsel, after having acquiesced in representation by an attorney throughout pretrial procedures, has waited so long that a trial judge's

---

[23] We note the Supreme Court's pronouncement in **Indiana v. Edwards**, 554 U.S. 164, 177-78, 128 S.Ct. 2379, 2387-88, 171 L.Ed.2d 345 (2008): "[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under **Dusky** [**v. United States**, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves."

action in denying such a delaying tactic is justified. **State v. Hegwood**, 345 So.2d at 1182; **State v. Austin**, 258 La. 273, 278-79, 246 So.2d 12, 13-14 (1971).

In the case at bar, on July 26, 2011, the defendant sought to discharge and replace Mr. English as defense counsel, but the motion was denied by the trial court. Immediately after the trial court informed the parties that Mr. English would be continuing as counsel and that the trial would commence in two days, the defendant stated:

> MR. MCCOY: Through *Ache [sic] versus Oklahoma*,[24] Your Honor, I have the right to speak, I have a right to represent myself through *Ache [sic] versus Oklahoma*, Your Honor, and too -
>
> THE COURT: Not at this time, Mr. McCoy, the *State versus Bridgewater* [case] states that you have unequivocally given up that right because . . . you have not made that known to the Court unequivocally before this date. So I will instruct you to speak through Mr. English at this time and . . . Mr. English is your attorney and he will be representing you . . . .

Given the circumstances and prior procedural history of this case, the defendant's one-sentence statement was not perceived by the trial court as a "clear and unequivocal" assertion of his right to self-represent. Coming as it did moments after the trial court's ruling that the defendant could not discharge and replace Mr. English as his defense counsel, since the defendant's request to do so came just two days before trial, it was not urged "in a timely manner." The trial judge refused to entertain the defendant's late mention of self-representation, stating, "Not at this time."

Notably, the trial judge had previously allowed the defendant to represent himself, in February of 2010, and the defendant did so for one month before Mr. English enrolled as counsel. In contrast with the one-line assertion the defendant invoked on July 26, 2011, after which his request was denied, he made an unequivocal invocation of his right to represent himself on February 11, 2010,

---

[24] **Ake v. Oklahoma**, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

when he sought to substitute his self-representation for the representation of the public defender's office, stating:

> MR. MCCOY:      Your Honor, I would like to present to the Court today under *Ferret versus Carroll -- California.*[25]    I've also presented to the Public Defender's Office a valid -- requested document for respective counsel to assist me through the proceeding that I'm going through and not to collate themselves within my attorney aspects. But I ask them to assist me through it because I am a competent defendant, and I am literate, and I'm up under *Ferret versus California.* You know, I am eligible for -- to represent myself and not being able to represent myself when I'm eligible is a violation of my Sixth and Fourteenth Amendment right. I've given the Public Defender's Office a year and a half of opportunities to represent me and they did not represent me.  And being competent, and being an understanding defendant, I have the right up under the United States Constitution to represent myself and not to be forced to have representation on me . . . .

After this February 11, 2010 assertion of his right to self-representation, the trial judge advised the defendant of his **Miranda** rights and questioned him under **Faretta** as to his capacity to represent himself in a capital murder trial.  During that colloquy, the defendant told the judge that he understood he was facing a possible death penalty, that he graduated from Rice University with a degree in Business Administration,[26] that he understood he was entitled to a trial by jury during which the State would have to prove its case beyond a reasonable doubt, and that he was entitled to an attorney.  At that point, the defendant volunteered that "I'm going to have [an attorney] next month . . . I have paid counsel."  The trial judge completed his **Faretta** questioning and after satisfying himself that the defendant was exercising a knowing and voluntary choice with "eyes open,"[27] the trial judge continued:

---

[25] **Faretta v. California**, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

[26] We note that in penalty phase mitigation testimony, Dr. Mark Vigen told the jury that the defendant lied about going to Rice University and about earning a degree in Theology from another institution.

[27] **Faretta v. California**, 422 U.S. at 835, 95 S.Ct. at 2541 ("A defendant . . . should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'") (quoting **Adams v. U.S. ex rel. McCann**, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942)).

THE COURT:    All right, first of all you're asking to represent yourself.  I believe that you have the education if that is what you want to do but I am strongly and I mean very strongly encouraging you not to represent yourself in this matter, sir . . . because of the complexities of the law in this matter and the evidence regarding this matter . . . . And you understand that you'll be held to the same rules [or] standards as an attorney if you represent yourself?

MR. MCCOY:    Yes, sir, I do.  And I know this is a complex situation, Your Honor, but this is my life and . . . I know the steps that I'm taking.  I know the, you know, the advantages and disadvantages but I choose to proceed forward because this is for my best interest.

On February 11, 2010, based on the defendant's assurances that no one was forcing him to waive counsel, that he understood the penalties he was facing, and that he would be held to the same courtroom decorum and standards as an attorney, the trial judge ruled that the defendant could proceed pro se, noting specifically that in the event that his anticipated retained counsel did not sign on as expected, the defendant would proceed to trial representing himself on the then-scheduled trial date of May 24, 2010.  The trial judge also appointed Randall Fish of the public defender's office to assist the defendant in any matters of law at that time.

A comparison of the colloquies that took place on February 11, 2010 and July 26, 2011 demonstrates that the July 2011 one-sentence assertion was not the definitive expression of the right to waive counsel and exercise the right to self-representation that the defendant had asserted before the trial court on February 10, 2010, and the trial judge was no doubt able to compare those two events when he dismissed the July 2011 one-sentence assertion.[28]  After the trial court declined the

---

[28] Appellate counsel urged the same issue of self-representation at the hearing on the motion for new trial held on January 23, 2012, the denial of which counsel now asserts was error.  Appellate counsel argued that in requesting to represent himself two days before trial, the defendant "wasn't playing games."  In denying the motion for new trial, the trial judge recalled that defendant's July 26, 2011 assertion of his right to represent himself was a "very brief request" contrasted with his earlier (February 11, 2010) assertion to self-represent which had been granted "after a long dissertation or a long discussion with Mr. McCoy."  The trial judge looked to defendant's entire history of representation in this case, which showed vacillation between appointed counsel, self-representation, and retained counsel: "There was just too much that was not clear and unequivocal about that and the Court declined to allow him to represent himself." Here, the trial judge had the benefit of his own memory of defendant's repeated endorsement of Mr. English, even after the Second Circuit pointedly questioned whether his waiver of representation by two capital qualified attorneys was knowingly and intelligently made.

defendant's July 26, 2011 assertion ("I have a right to represent myself through Ache [sic] versus Oklahoma"), two days before trial, the defendant presented no further assertion of a right to self-representation in lieu of retained counsel, nor did he enter a contemporaneous objection. The trial court, based on the facts and circumstances surrounding the defendant's July 26, 2011 statement, determined that any motion of self-representation was untimely and, as stated in **Bridgewater**, the "defendant's request to represent himself was not an unequivocal one; rather, it was an obfuscated request to substitute appointed counsel because of his disagreement with current counsel's choice of trial strategy." **State v. Bridgewater**, 00-1529 at p. 19, 823 So.2d at 895. We find no abuse of discretion in any denial by the trial court of self-representation on July 26, 2011.

Right to Hearing on Motion to Withdraw

In the defendant's third assignment of error, he contends that the trial court is required to appoint substitute counsel when the defendant makes a showing that appointed counsel is incompetent or unable for some cause to furnish adequate representation and that he made a clear showing that Mr. English was unable to furnish adequate representation, such that the trial court erred in failing to hold a hearing on the issue. The defendant argues that the trial judge had notice that the defendant's right to effective assistance of counsel was being jeopardized by the strategic differences in how to defend this case, which lead to irreconcilable differences between attorney and client.

The defendant cites **State v. Draughn**, 05-1825 (La. 1/17/05), 950 So.2d 583, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007), in which the capital defendant specifically did not raise a claim of ineffective assistance of counsel under the standard of **Strickland v. Washington**, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), but rather, challenged the trial court's failure to hold

a hearing or otherwise address the defendant's pretrial allegations about counsel, stating, "In brief, the defendant states: 'Mr. Draughn is not here asserting a claim of ineffective assistance of counsel, but, rather, is challenging the trial court's failure to hold a hearing or otherwise address his pre-trial allegations.'" **State v. Draughn**, 05-1825 at pp. 18-19, 950 So.2d at 599. Likewise, the instant defendant's brief to this court states that the "[d]**efendant is not now advancing a claim under** *Strickland*." (Emphasis original.) The defendant further states, "[T]he summary denial of the defendant's requests and complaints without adequate investigation into Mr. McCoy's entirely legitimate grievances requires reversal."

On the similar claims urged in **State v. Draughn**, this court cited LSA-C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."), and held:

> Assuming, without deciding, that the trial court's failure to hold a hearing on the defendant's pre trial motions may have been error, this fact, without more, fails to present the court with anything from which to discern prejudice to the defendant without a corresponding claim that counsel rendered ineffective assistance at trial. At the most, the trial court's failure to hold a pre trial hearing on the motions would constitute harmless error.

**State v. Draughn**, 05-1825 at p. 19, 950 So.2d at 599.

In this case, the defendant claims he made a "clear showing" that he and Mr. English had a "catastrophic conflict" in their attorney-client relationship, which at a bare minimum, required the trial judge to conduct an ex parte hearing, as was done in **State v. Bridgewater**, supra, and **State v. Campbell**, 06-0286 (La. 5/21/08), 983 So.2d 810.[29] Indeed, on July 26, 2011, Mr. English asked the trial

---

[29] Importantly, as discussed in the defendant's second assignment herein, on July 26, 2011, the defendant did not make a clear and unequivocal assertion of his right to waive counsel and represent himself, as he had done previously on February 11, 2010. Consequently, the trial judge did not err by not holding an ex parte hearing to interrogate defendant under **Faretta**. In this respect, this case is distinguishable from **Bridgewater** and **Campbell**, wherein the trial court

court for an ex parte hearing to air the divergent defense theories between counsel and client, which the trial court declined, telling Mr. English, "[Y]ou are the attorney, sir . . . [a]nd you have to make the trial decision of what you're going to proceed with . . . ."

In **State v. Bridgewater**, the trial court held a pretrial, ex parte hearing (following which the transcript was sealed), in which appointed defense counsel clarified that the conflict arose out of the defendant's wish to present a defense of total innocence and counsel's recommendation that the defendant admit to second degree murder and argue that the requisite specific intent, needed to prove first degree murder, was lacking. **State v. Bridgewater**, 00-1529 at pp. 20-21, 823 So.2d at 896. In **Bridgewater**, the trial court found that the defendant had voiced the same strategic conflict with his previous counsel and that he had "gone through" two other defense attorneys, suggesting a "pattern." **Id.** Given that the **Bridgewater** defendant's capital trial was scheduled to begin in four days, this court found no abuse of discretion in the trial court's denial of defense counsel's motion to withdraw. **Id.**

A fair reading of the instant record leaves this court with the inescapable conclusion that the trial judge was intimately familiar with the strategic difficulties playing out between the defendant and Mr. English, which had previously caused the defendant to discharge the public defender's office and to briefly represent himself. Thus, an ex parte hearing for the sole purpose of reviewing the case history that was already known to the trial court was unnecessarily cumulative, particularly when the issues repeatedly came to light at various pretrial hearings, including on January 4, 2011, January 24, 2011, July 12, 2011, and July 26, 2011. The defendant's stated complaints about Mr. English all centered on strategic differences, as subsequently articulated by appellate counsel at the hearing on the

held an ex parte hearing.

36

motion for new trial: "Mr. McCoy's objective was to be acquitted . . . and to be allowed to go home. Mr. English's clear objective was in the guilt phase to have him found guilty of second degree murder . . . but given a life sentence and that if it went into the penalty phase to have the jury return a life sentence rather than a death sentence." The same scenario occurred in **Bridgewater** and **Campbell**, wherein capital defendants disagreed with their appointed counsels' appreciation of the overwhelming evidence against them and disagreed with counsels' decision to embark on the same defense strategy as Mr. English did in this case, leading to requests to forego representation by their respective counsel.

In this case, neither the defendant nor appellate counsel argue that Mr. English was otherwise incompetent as a defense attorney, although there was considerable discussion about his lack of capital certification. Mr. English held himself out as "a seasoned criminal trial lawyer," who had "practic[ed] law for close to twenty years."

This court has stated that the district court cannot be required to appoint different counsel "merely to please the desires of the indigent accused, in the absence of a showing that the court appointed attorney is inept or incompetent to represent the accused." **State v. White**, 256 La. 36, 42, 235 So.2d 84, 86 (1970).

Nothing presented by the defendant in this assignment of error suggests that the trial judge in this case abused his discretion by not holding an ex parte hearing, in addition to the July 26, 2011 hearing, on the question of Mr. English's competence to provide an adequate representation. Notwithstanding, any trial court error in this respect appears harmless under **State v. Draughn**, supra, and **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error."). For these

reasons, this assignment of error is without merit.

Concession of Guilt at Trial

In his fourth assignment of error, the defendant contends that the trial court erred in ruling that the defendant's retained counsel could decide whether to concede guilt of the charged murders at trial, without the defendant's consent. The defendant asserts that the relationship between an attorney and his client "is one of principal and agent wherein the lawyer's authority derives from and is limited by the authority of the client" (emphasis omitted), such that the defendant should have been able to decide what manner of defense would be presented at trial, instead of having to accept Mr. English's decision to concede his guilt, at the outset, in the opening statement.

In support of his position on this issue, the defendant cites **State v. Felde**, 422 So.2d 370, 393 (La. 1982), cert. denied, 461 U.S. 918, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983), in which the capital defendant asserted that he was "denied effective assistance of counsel at trial due to adherence by defense counsel to an employment condition set by the defendant that defense counsel not attempt to obtain any jury verdicts other than 'Not Guilty by Reason of Insanity' or 'Guilty of First Degree Murder' with Capital Punishment." After the **Felde** defendant was sentenced to death, he appealed raising a claim of ineffective assistance for counsel's adherence to pursue the "all or nothing" strategy he had imposed. This court refused to find the **Felde** defendant's counsel ineffective, observing that "[u]nder our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, which must be made before and during trial rests with the accused and his attorney . . . . The fact that a particular strategy is unsuccessful does not establish ineffective assistance." **State v. Felde**, 422 So.2d at 393. The **Felde** court went on to rule that "a defendant can limit his defense consistent with his wishes *at the penalty phase* of trial." **Id.**, 422 So.2d at

38

395 (emphasis added).

This court has subsequently applied the **Felde** case to permit a capital defendant to instruct his appointed counsel not to present any mitigating evidence *in the penalty phase*. **State v. Bordelon**, 07-0525, pp. 35-36 (La. 10/16/09), 33 So.3d 842, 864-65. Cf. **Schriro v. Landrigan**, 550 U.S. 465, 479-81, 127 S.Ct. 1933, 1942-44, 167 L.Ed.2d 836 (2007) ("[I]t was not objectively unreasonable for th[e] [Arizona] court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish **Strickland** prejudice based on his counsel's failure to investigate further possible mitigating evidence . . . ."). Importantly, **State v. Felde** did not endorse the suggestion espoused in the instant case by the defendant, i.e., that trial counsel must adopt a capital client's unsupportable trial strategy *at the guilt phase*, particularly when the assertion of such a defense would involve perjured testimony.

Nevertheless, the defendant urged in brief to this court that Mr. English should have advanced his "unflinchingly maintained claim of innocence," while Mr. English repeatedly advised the trial court that to do so would run afoul of his ethical obligations. See Louisiana Rules of Professional Conduct, Rule 1.2(d) ("A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent . . . ."). Given the overarching burden of Mr. English's requirement as an attorney to adhere to Rule 1.2(d), the defendant's repeated assertion that "the principal has the right throughout the duration of the relationship to control the agent's acts" is unpersuasive.

The Supreme Court discussed such an ethical dilemma in **United States v. Cronic**, 466 U.S. 648, 656 n.19, 104 S.Ct. 2039, 2045 n.19, 80 L.Ed.2d 657 (1984):

> Of course, the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his

client by attempting a useless charade. At the same time, even when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt. And, of course, even when there is a bona fide defense, counsel may still advise his client to plead guilty if that advice falls within the range of reasonable competence under the circumstances. [Citations omitted.]

Applying these ethical considerations to the present case, the agency relationship between an attorney and client anticipates that the attorney will comply with the client's *lawful* instructions. In this case, presenting an alibi defense at the guilt phase put Mr. English in an ethical conundrum, as committing perjury is a crime pursuant to LSA-R.S. 14:123. In **Nix v. Whiteside**, 475 U.S. 157, 173-76, 106 S.Ct. 988, 997-99, 89 L.Ed.2d 123 (1986), the Supreme Court determined that the Sixth Amendment right to assistance of counsel is not violated when an attorney refuses to cooperate with a defendant in presenting perjured testimony at trial.

In the instant case, the State's evidence against the defendant was overwhelming. In a post-trial affidavit, Mr. English explained his trial strategy:

Robert McCoy believed that law enforcement and others were conspiring against him and he was simply unable to accept the evidence against him . . . . I became convinced that the evidence against Robert McCoy was overwhelming . . . . I know that Robert was completely opposed to me telling the jury that he was guilty of killing the three victims and telling the jury that he was crazy but I believed that this was the only way to save his life. I needed to maintain my credibility with the jury in the penalty phase and could not do that if I argued in the guilt phase that he was not in Louisiana at the time of the killings, as he insisted. I consulted with other counsel and was aware of the **Haynes** case and so I believed that I was entitled to concede Robert's guilt of second degree murder even though he had expressly told me not to do so. I felt that as long as I was his attorney of record it was my ethical duty to do what I thought was best to save his life even though what he wanted me to do was to get him acquitted in the guilt phase. I believed the evidence to be overwhelming and that it was my job to act in what I believed to be my client's best interests . . . . I firmly believe that Robert McCoy is insane and was not competent to be tried . . . . [H]e could not assist counsel or participate effectively in the proceedings due to his mental illness. He could not rationally understand the proceedings because he saw the evidence, the procedures and the rulings through the lens of his delusion that law enforcement, the prosecutor, the judge and

40

ultimately myself were conspiring against him. Robert could not consult with me with any reasonable degree of rational understanding both because his paranoia and delusions destroyed our professional relationship and also because all information was distorted or obscured by his delusions . . . . Robert was unable to deal rationally with the evidence of his guilt and the case against him. Robert could not recall and relate facts pertaining to his actions and whereabouts at the time of the crime because he truly believed that he was elsewhere at the time of the crime. He could not assist in locating and examining relevant witnesses because his witnesses were a part of his delusions in some cases or their relevance was dictated by his paranoia and his belief in a large scale conspiracy against him. Robert could not review discovery or listen to evidence and assist in assessing any distortions or misstatements because he could not grapple with the evidence in the real world. He could not make rational decisions despite my efforts to clearly explain his alternatives and could not testify except to give vent to his delusions and paranoia . . . .

Mr. English acknowledged his ethical dilemma to the trial judge numerous times during the course of the trial court proceedings. During a January 4, 2011 hearing, Mr. English stated that the defendant was "recommending . . . a course of action that [he (Mr. English) did] not believe [was] in [the defendant's] best interest," and Mr. English "believe[d] as a lawyer that [he had] an ethical duty given the ramifications of this case to not follow that advice." Mr. England further advised the trial court, during a January 24, 2011 hearing, that he believed he "ha[d] an ethical duty to this man not to follow his bizarre behavior." Mr. England repeatedly reiterated to the trial court, as he did during a July 12, 2011 hearing, that he "ha[d] an ethical duty . . . to try to defend [the defendant] and do the . . . best [he (Mr. English) could] to save [the defendant's] life." The alibi defense the defendant wanted Mr. England to put on, but which could not be substantiated, had no reasonable chance of success, but exposed those who attempted such a defense to the charge of perjury.

The ongoing discussion of this trial strategy issue culminated at the pretrial hearing held on July 26, 2011, when it was raised by trial counsel as follows:

MR. ENGLISH: Your Honor, at this time I'm going to ask for an ex parte hearing with the Court to discuss my representation with Mr.

41

> McCoy . . . . Mr. McCoy is insistent that I put forward a defense in this case at the guilt phase of this trial. I have made a determination, Your Honor, that the evidence in this case is so overwhelming against Mr. McCoy that in order to do that . . . .
>
> * * *
>
> THE COURT: . . . I think that you've stated this on the record prior to this date . . . . I believe that - you are the attorney, sir . . . . And you have to make the trial decision of what you're going to proceed with . . . .

Clearly, the trial judge had Professional Conduct Rule 1.2(d) in mind when he reminded Mr. English that he was the attorney, i.e., the person who had the ethical obligation to advance a lawful defense.[30]

Conceding guilt, in the hope of saving a defendant's life at the penalty phase, is a reasonable course of action in a case in which evidence of guilt is overwhelming. Louisiana courts have consistently upheld the defense strategy of acknowledging guilt, against a charge of ineffective assistance of counsel, under the standard enunciated in **Strickland**. See e.g. **State v. Tucker**, 13-1631, pp. 36-41 (La. 9/1/15), 181 So.3d 590, 618-21, cert. denied, ___ U.S. ___, 136 S.Ct. 1801, ___ L.Ed.2d ___ (2016) (wherein the capital defendant did not acquiesce in counsel's decision to admit guilt of second degree murder and feticide in the guilt phase closing argument and, on direct appeal, this court found that the defendant failed to demonstrate a per se violation of the Sixth Amendment resulting from a conflict of interest, noting that "counsel's obligation to provide effective assistance 'is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth' and did not extend to 'in any way assisting the client in presenting false evidence or otherwise violating the law'"; no claim of ineffective

---

[30] See also Louisiana Rules of Professional Conduct, Rule 3.3(b) ("A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal."). In furtherance of his ethical obligations, before the defendant testified in the guilt phase of the trial, Mr. English stated on the record that he had advised the defendant not to testify and had warned him about perjury and its criminal consequences.

assistance, under **Strickland**, was presented on appeal); **State v. Holmes**, 06-2988, p. 1 n.2 (La. 12/2/08), 5 So.3d 42, 48, <u>cert denied</u>, 558 U.S. 932, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009) (unpublished appendix) (noting defense counsel conceded the defendant was guilty of second degree murder, but that the jury found the State proved guilt of first degree murder, this court concluded that, given the defendant's numerous inculpatory statements and possession of the victim's property, counsel's decision to concede her guilt to second degree murder fell well within the ambit of sound trial strategy); **State v. Legrand**, 02-1462, p. 27 (La. 12/3/03), 864 So.2d 89, 107 (unpublished appendix) ("[R]egarding counsel's acknowledgment of guilt during defense closing argument, an acknowledgment of guilt may form part of defense strategy" and did not constitute ineffective assistance.); **State v. Taylor**, 01-1638, p. 4 (La. 1/14/03), 838 So.2d 729, 737 ("The defense conceded defendant's guilt, but argued the crime more properly fit second degree murder."); **State v. Frost**, 97-1771 (La. 12/1/98), 727 So.2d 417, 439, <u>cert denied</u>, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999) (unpublished appendix) ("Trial counsel employed a clear strategy throughout voir dire, the guilt phase, and the penalty phase of defendant's trial of acknowledging defendant's guilt and the brutal nature of the crime while pleading for the jury to spare defendant's life . . . [C]ounsel's admission that the crime was 'cruel, heinous, and atrocious,' formed part of a carefully constructed strategy to save defendant's life . . . [T]he defendant has not demonstrated counsel's decision rendered his trial globally unfair or the verdict generally suspect . . . [and it] did little to prejudice defendant's case."); **State v. Burkhalter**, 428 So.2d 449, 457 (La. 1983) (wherein the defendant was found guilty of second degree murder, though charged with first degree murder, and this court found no ineffective assistance of defense counsel, who had argued that at most the defendant was guilty of second degree murder; this court stated, "Defendant's lawyer succeeded in saving defendant from

execution, no doubt . . . because of tactical decisions in trying the case like the arguments to which defendant now takes exception."); **State v. Berry**, 430 So.2d 1005, 1014-15 (La. 1983) (wherein defense attorney's admission of the defendant's intent to commit robbery was not held ineffective assistance of counsel, finding that counsel "may have been trying to establish his candor with the jury" and that "[n]arrowing the presumption of innocence claim to the charge of first degree murder was intended to direct the jury toward a lesser verdict").

This court does not sit to second guess strategic and tactical choices made by trial counsel. **State v. Hoffman**, 98-3118, p. 40 (La. 4/11/00), 768 So.2d 542, 579, supplemented, 00-1609 (La. 6/14/00), 768 So.2d 592 (per curiam), cert. denied, 531 U.S. 946, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000); **State v. Myles**, 389 So.2d 12, 31 (La. 1979). We find no merit in this assignment of error.

Counsel's Failure to Follow Express Directions of the Defendant

In the interrelated fifth and sixth assignments of error, the defendant claims that he was denied the assistance of counsel within the meaning of the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution when his lawyer conceded his guilt against his expressly-stated wishes, setting up an irreconcilable conflict of interest between attorney and client and resulting in defense counsel's failure to adversarially test the State's case.[31]

---

[31] In the guilt phase opening statement by Mr. English, he stated to the jury, in pertinent part:

[A]s a defense lawyer, we are trained to make the State prove every piece of evidence that it wishes to interject into a trial. In this case I cannot stand in front of you because of what the stakes are in this case and lie to you or tell you any differently that the District Attorney can prove every fact that he has just alleged to you. There is no way reasonably possible that you can listen to the evidence in this case and not come to any other conclusion than Robert McCoy was the cause of these individuals' death[s]. But that's not the only issue to be decided. First degree murder requires that there be specific intent -- specific intent to kill those individuals. The State cannot put on any evidence that Robert McCoy ever made any malice statement towards those individuals; that those individuals was [sic] ever on his radar to do harm. Robert McCoy is crazy . . . . He meets the legal definition of competent, but evidence will be put on in this case that Robert McCoy suffers from emotional and mental issues that affects [sic] his ability to make decisions in this case . . . . We believe that the evidence will show that because of Mr. McCoy's emotional and mental conditions that this is a second

44

By conceding the defendant's guilt in his opening statement and again in his closing argument of the guilt phase - conceding before the jury that the defendant caused the deaths of the three victims but because of his mental deficiencies he lacked the specific intent to murder - the defendant argues that Mr. English failed to subject the prosecution's case to meaningful adversarial testing, and under **United States v. Cronic**, supra, prejudice must be presumed. The defendant urges that this trial strategy deprived him of the presumption of innocence along with the right to knowingly and intelligently exercise his privilege against compulsory self-incrimination, his right to trial by jury, his right to present a defense, and his right to confront his accusers. Even though the fifth and sixth assignments of error are worded in terms of "denial of right to counsel," the argument is essentially one of ineffective assistance of counsel, which this court has consistently reviewed under the **Strickland** standard.[32]

In **United States v. Cronic**, decided the same day as **Strickland v. Washington**, the Supreme Court created a limited exception to the application of **Strickland**'s two-part test in situations that "are so likely to prejudice the accused that the cost of litigating their effect in the particular case is unjustified." **Cronic**, 466 U.S. at 658, 104 S.Ct. at 2046. The Supreme Court identified three situations implicating the right to counsel in which prejudice will be presumed. First are situations in which a defendant is denied counsel at a critical stage of a criminal proceeding, i.e., the complete denial of counsel. Second, and the most relevant here, are situations in which a defendant's trial counsel "entirely fails to subject the

degree murder trial.

[32] Under the standard for ineffective assistance of counsel set out in **Strickland v. Washington**, adopted by this court in **State v. Washington**, 491 So.2d 1337, 1339 (La. 1986), a reviewing court must reverse a conviction if the defendant establishes: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. Nevertheless, the defendant in the instant case specifically avers that he is not raising a claim of ineffective assistance of counsel under **Strickland** in this direct appeal, reserving that claim for collateral review.

prosecution's case to meaningful adversarial testing." **Cronic**, 466 U.S. at 659, 104 S.Ct. at 2047. Finally, prejudice is presumed when the circumstances surrounding a trial prevent a defendant's attorney from rendering effective assistance of counsel. **Cronic**, 466 U.S. at 659-60, 104 S.Ct. at 2047 (citing **Powell v. Alabama**, 287 U.S. 45, 57-58, 53 S.Ct. 55, 77 L.Ed. 158 (1932)). As to the second situation envisioned by **Cronic**, prejudice is presumed when the attorney "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" **Bell v. Cone**, 535 U.S. 685, 696-97, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002) (quoting **Cronic**, 466 U.S. at 659, 104 S.Ct. 2039). **Bell v. Cone** made plain that the difference between **Strickland**, which deals with the failure of counsel on specific points, and **Cronic**, which addresses the complete failure of counsel to oppose the prosecution, is one "not of degree but of kind." **Id.**[33] Courts distinguish **Strickland** and **Cronic**, as the "distinction between ineffective assistance of counsel and the constructive denial of counsel," respectively. **Haynes v. Cain**, 298 F.3d 375, 381 (5th Cir. 2002), cert. denied, 537 U.S. 1072, 123 S.Ct. 676, 154 L.Ed.2d 567 (2002).

In the present case, the defendant argues that **Cronic** controls his Sixth Amendment claim and that prejudice should be presumed because, by conceding his guilt in the opening statement of the guilt phase of trial, Mr. English "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing." (Emphasis omitted.) On the other hand, the State opines that in analyzing the defendant's counsel and representation claims, the **Strickland** standard should apply. For the second situation of **Cronic** to apply, "the attorney's failure must be

---

[33] In **Bell v. Cone**, the Supreme Court held that the defendant's claims that counsel had been ineffective at his capital sentencing hearing for failing to adduce mitigating evidence and for waiving closing argument. The Court found that such omissions "are plainly of the same ilk as other specific attorney errors we have held subject to **Strickland**'s performance and prejudice components." **Bell v. Cone**, 535 U.S. at 697-98, 122 S.Ct. at 1851-52. Notably, in **Cronic**, the Supreme Court remanded that case to be considered under the **Strickland** test. **Cronic**, 466 U.S. at 666-67, 104 S.Ct. at 2050-51.

complete." **Bell v. Cone**, 535 U.S. at 697, 122 S.Ct. at 1851. Here, by conceding the defendant's guilt, Mr. English did not completely abdicate the defendant's defense, rather Mr. English advanced what he saw was the only viable course of action. At the hearing on the motion for new trial, Mr. English testified about his trial strategy of conceding the defendant's guilt:

> [MR. ENGLISH:] I reached that conclusion [as to trial strategy] a long time before [the day of trial], that I was going to have to stand in front of that jury and beg for Robert McCoy's life. I had no option.
>
> [POST-CONVICTION DEFENSE COUNSEL:] And that conceding his guilt in your mind was the only way to go for it.
>
> [MR. ENGLISH:] I'm a seasoned criminal trial lawyer, had been doing this for a number of years, and I had never had a case where the evidence was so overwhelming against a client.

In addition, Mr. English remained active at trial, probing weaknesses in the prosecution's case. As stated hereinafter in connection with our discussion of the defendant's tenth assignment of error, during jury selection, Mr. English ardently fought to retain some racial diversity in the defendant's trial by pressing a **Batson** claim and arguing for challenges when warranted. During trial, Mr. English cross-examined most of the State's guilt phase witnesses, frequently asking questions written by the defendant.[34]

Here, the defendant pled not guilty to the three-count indictment. Mr. English's strategy was to concede the defendant's guilt, but in an effort to spare

---

[34] Mr. English was able to get the police officer who had pursued the suspect, who fled from the scene of the crime in a white car owned by the defendant, to admit that he could not positively identify the assailant he was pursuing as the defendant. Mr. English cross-examined the police dispatcher, who admitted that there was no way to identify the "Robert" named in the 911 recording as the defendant, without a last name having been given. Mr. English also elicited testimony from the State's firearms examiner that she had not been asked to look for DNA or fingerprints on the weapon or the cartridges or bullets, and she did not know who had fired the weapon. On cross-examination by Mr. English, the Walmart employee/witness admitted that he could not say that the individual in the video purchasing ammunition was definitely the defendant. Mr. English elicited testimony from the forensic pathologist that there was a sufficient quantity of a marijuana metabolite in the body of victim Willie Young at the time of autopsy to indicate that Mr. Young had smoked some marijuana thirty to sixty minutes prior to his death. During Mr. English's cross-examination of the defendant's friend, Gayle Houston, Mr. Houston admitted that when he gave the defendant a ride on the evening of the shooting, the defendant was crying, thereby humanizing the defendant as capable of remorse in front of the jury.

him capital punishment he argued that a verdict of second degree murder would be more appropriate, asserting that the defendant's mental incapacity prevented him from forming the requisite specific intent to commit first degree murder. The defendant faults this trial strategy, given that Louisiana does not recognize the defense of diminished capacity.[35] The defendant urges that, by conceding the only factual issue in dispute, Mr. English did not submit the State's case to the crucible of adversarial testing and, thus, denying him the second category of right to counsel delineated in **Cronic**, and depriving him of a fundamentally fair trial, requiring reversal without any showing of specific prejudice.

The U.S. Supreme Court addressed a similar argument in **Florida v. Nixon**, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Nixon was charged with capital murder and faced overwhelming evidence of his guilt at trial, including his own confession in graphic detail as to how he kidnapped and killed his victim. **Nixon**, 543 U.S. at 180, 125 S. Ct. at 556. After investigating the State's evidence

---

[35] In **State v. Dressner**, 08-1366, pp. 25-26 (La. 7/6/10), 45 So.3d 127, 143-44, cert. denied, 562 U.S. 1271, 131 S.Ct. 1605, 179 L.Ed.2d 500 (2011), this court stated:

> It is well-settled, "[w]hen a defendant is tried upon a plea of 'not guilty', evidence of insanity or mental defect at the time of the offense shall not be admissible." La.Code Crim. Proc. art. 651; **State v. Holmes**, 06-2988, p. 46 (La. 12/2/08), 5 So.3d 42, 74, cert. denied, —— U.S. ——, 130 S.Ct. 70, 175 L.Ed.2d 233 (2009). Under La.Rev.Stat. § 14:14, Louisiana's codification of the **M'Naughten** Rule, an offender is exempt from criminal responsibility only if he is incapable of distinguishing between right and wrong with reference to the conduct in question. Thus, Louisiana does not recognize the doctrine of diminished capacity absent a dual plea of not guilty and not guilty by reason of insanity. **State v. Deboue**, 552 So.2d 355, 366 (La. 1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990); **State v. Nelson**, 459 So.2d 510, 513 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985); **State v. Lecompte**, 371 So.2d 239, 243 (La. 1978). Evidence of a mental defect, which does not meet the **M'Naughten** definition of insanity, therefore, cannot negate a specific intent to commit a crime and reduce the degree of the offense. **Holmes**, 06-2988 at p. 46, 5 So.3d at 74. Consequently, in crimes requiring specific intent, diminished mental capacity is not a recognized defense. **Lecompte**, 371 So.2d at 243. [Footnote omitted.]

In the present case, the defendant did not enter a dual plea of not guilty and not guilty by reason of insanity, and thus no evidence of insanity or mental defect at the time of the offense was admissible at his trial. See LSA-C.Cr.P. art. 651 ("When a defendant is tried upon a plea of 'not guilty', evidence of insanity or mental defect at the time of the offense shall not be admissible . . . .").

and witnesses, defense counsel developed a strategy to concede Nixon's guilt and ask the jury to spare his life.  **Id.**, 543 U.S. at 181, 125 S.Ct. at 557.  Defense counsel explained this strategy to Nixon on multiple occasions.  **Id.**  However, Nixon never consented and, instead, remained unresponsive throughout these discussions.  **Id.**  After state post-conviction proceedings, the Florida Supreme Court, relying on **Cronic**, held that Nixon's conviction should be reversed because of defense counsel's failure to obtain Nixon's affirmative and explicit consent to pursue a strategy of conceding guilt.  **Id.**, 543 U.S. at 186, 125 S.Ct. at 560.  The U.S. Supreme Court granted certiorari to resolve the question of whether defense counsel's failure to obtain Nixon's express consent to concede his guilt should be evaluated under **Cronic** or **Strickland**.  **Nixon**, 543 U.S. at 186-87, 125 S.Ct. at 560.  The Supreme Court reversed, holding that "counsel's effectiveness should not be evaluated under the **Cronic** standard, but under the standard described in **Strickland**."  **Id.**[36]  Defense counsel, in conceding Nixon's factual guilt, had not waived the State's obligation to prove beyond a reasonable doubt, through competent and admissible evidence, that Nixon committed first degree murder.  **Id.**, 543 U.S. at 188, 125 S.Ct. at 561.  The Supreme Court stated that such a concession strategy does not amount to the functional equivalent of entering a guilty plea on the defendant's behalf - the State must still prove its case subject to cross-examination of its witnesses by defense counsel - and may constitute a reasonable strategic choice in a case in which the circumstances of the crime are horrendous and the evidence of the defendant's guilt overwhelming.[37]  Under those

---

[36] See also **Haynes v. Cain**, 298 F.3d 375, 381 (5th Cir. 2002) (commenting that "those courts that have confronted situations in which defense counsel concedes the defendant's guilt for only lesser-included offenses have consistently found these partial concessions to be tactical decisions, and not a denial of the right to counsel.  As such, they have analyzed them under the two-part **Strickland** test.") (footnote omitted).

[37] Herein, the defendant cites **Cooke v. State**, 977 A.2d 803, 843-44 (Del. 2009), also a capital case, in which the Delaware Supreme Court reversed the defendant's conviction because defense counsel not only argued for a verdict of "guilty but mentally ill" over his client's objection (albeit without formally changing his plea), but defense counsel also introduced a privileged and

circumstances, "'avoiding execution [may be] the best and only realistic result possible.'" **Id.**, 543 U.S. at 191, 125 S.Ct. at 562-63 (quoting ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, § 10.9.1, Commentary (Rev. ed. 2003) (reprinted in 31 Hofstra L.Rev. 913, 1040 (2003)).[38]

Given the circumstances of this crime and the overwhelming evidence incriminating the defendant, admitting guilt in an attempt to avoid the imposition of the death penalty appears to constitute reasonable trial strategy. The jury was left with several choices after Mr. English conceded that the defendant shot the three victims, including returning a responsive verdict of second degree murder or manslaughter, as well as not returning the death penalty. Therefore, in light of **Nixon**, the defendant has not shown that trial counsel's actions were ineffective. See **State v. Felde**, 422 So.2d at 393 ("The fact that a particular strategy is unsuccessful does not establish ineffective assistance."). Cf. **Jones v. Stotts**, 59 F.3d 143, 146 (10th Cir. 1995) ("A defendant may prevail on an ineffective assistance claim relating to trial strategy . . . if he can show counsel's strategy decisions would not be considered sound.").

The defendant states that he "is explicitly *not* raising a claim of ineffective assistance under the **Strickland** standard at this time," in which case the defendant "would bear the burden of establishing prejudice," reserving that claim for post-conviction proceedings "if they should become necessary."

---

otherwise inadmissible confession to the crime in order to advance the mental illness argument. The confession, which the **Cooke** defendant disputed, essentially made the State's case at the guilt stage. Here, although the defendant claims that **Cooke** is "on all fours" with the present case, the distinction is obvious, and this court is not bound by it.

[38] **Nixon** acknowledged that although such a concession in a run-of-the-mill trial might present a closer question, "the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus . . . . Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared." **Nixon**, 543 U.S. at 190-92, 125 S.Ct. at 562-63. The Court reasoned, "In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in a useless charade." **Id.** (internal quotation marks and citation omitted).

Accordingly, we conclude that the defendant has shown no per se violation of the Sixth Amendment resulting from any conflict of interest. Therefore, we find no merit in the defendant's fifth and sixth assignments of error.

Deprivation of Other Constitutional Rights

In his seventh assignment of error, the defendant complains that Mr. English was not acting as the defendant's lawyer "in any true sense," which deprived him of his constitutional rights, including the right to compulsory process. Specifically, the defendant claims that Mr. English refused to subpoena the defendant's witnesses, offered no opposition to quashal of the defendant's pro se subpoenas, and declared that he would not call any of the witnesses the defendant sought by way of those subpoenas, contrary to the defendant's wishes. The defendant also complains that by conceding his guilt Mr. English nullified his plea of not guilty, deprived him of his constitutional right to an impartial jury, and Mr. English's "limited" cross-examination undermined his right to confront and cross-examine his accusers, all of which relieved the State of its burden under the Due Process Clause. The defendant suggests that at his capital trial, he "had in effect two prosecutors and no defense lawyer."

The defendant's pro se subpoena requests commanded a good bit of the trial court's pretrial attention in this case. As noted in our discussion of the defendant's fourth assignment of error, supra, presentation of the defendant's alibi defense was not ethically possible for Mr. English, and thus there was no legitimate reason that Mr. English would have defended the pro se subpoena requests from quashal. See **State v. Kenner**, 336 So.2d 824, 831 (La. 1976) (counsel is not required to undertake futile steps). No constitutional violation has been demonstrated.

Likewise, as discussed in connection with the defendant's fifth assignment of error, supra, Mr. English actively cross-examined the State's witnesses. Finally, Mr. English's concession of guilt did not render the defendant's not guilty plea

meaningless, as the State was still obliged to present evidence establishing the essential elements of the crimes charged. See **Florida v. Nixon**, 543 U.S. at 187-88, 125 S.Ct. at 560-61 (counsel's guilt phase concession of Nixon's guilt did not amount to "the functional equivalent of a guilty plea" and did not waive Nixon's constitutional rights, including the right to a trial by jury, the protection against self-incrimination, and the right to confront one's accusers).

The abundance of evidence that the defendant killed the three victims in this case set the course for how the trial would unfold. All of the parties were imminently aware of the high stakes of the capital trial.[39] At every turn, the trial judge scrupulously sought to protect the defendant's constitutional rights. Mr. English's strategic decision to concede factual guilt did not waive the defendant's constitutional rights, but rather was a strategic choice designed to obtain the lesser verdict of second degree murder, instead of first degree murder. **Nixon** forecloses the claims raised in this assignment of error.

Failure to Appoint Certified Capitol Defense Co-Counsel

In the defendant's eighth assignment of error, he claims that he was denied the assistance of co-counsel to which he was entitled and that his waivers of appointment of co-counsel were not knowingly and intelligently made. The issue arose during pretrial at hearings held on January 24, 2011 and February 3, 2011. At the conclusion of both hearings, the trial judge indicated that the "only way" he could appoint additional counsel would be to have the public defender's office assist Mr. English as co-counsel, a choice that the defendant repeatedly declined as an option. Consequently, the hearings ended with the trial judge's conclusion that the defendant had made a "knowing, voluntary, and intelligent" waiver of co-counsel, and he denied the State's motion for appointment of additional counsel.

---

[39] See **California v. Ramos**, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171 (1983) (recognizing that "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination").

The defendant now argues that at both the January 24, 2011 and the February 3, 2011 hearings, the trial court erred by failing to fully advise him of the benefits of two capital qualified attorneys. The defendant further suggests that the trial judge erred by limiting his options for co-counsel to only that provided by the public defender's office, when additional counsel could have been appointed from the "office of the State Public Defender."

At issue during the January 24, 2011 hearing was Louisiana Supreme Court Rule XXXI(A)(1)(a), which provides that in cases of indigent capital defendants, the trial court "shall appoint no less than two attorneys to represent the defendant. At least two of the appointed attorneys must be certified as qualified to serve in capital cases . . . ." "[T]o determine defendant's waiver of co-counsel at defendant's capital murder trial," the State had filed a "Motion to Determine Waiver of Co-Counsel," which was before the court on January 24, 2011. Also present at the January 24, 2011 hearing was Randall Fish of the local public defender's office.

During the hearing, not only did the trial court inform the defendant of his rights, but the district attorney also stated that "the intent of the rule in having two attorneys is, if one attorney gets up there in the guilt phase and the jury finds the defendant guilty there is a theory out there that that attorney has lost his . . . 'creditability' . . . with the jury. And then another attorney should step up to handle . . . the penalty phase." Mr. English advised the court that he did "not have another counsel that intends to participate at trial." After the defendant and trial counsel conferred, the following colloquy occurred:

> MR. ENGLISH:    It is my understanding that if the Court appoints a co-counsel, that co-counsel . . . would be a public defender. Mr. McCoy has . . . stated to me that he does not want the public defender's office appointed as co-counsel in this case. Okay. I want to state for the record, Your Honor . . . I'm not capital certified; we waived that . . . . I am confident, Your Honor, that if I'm allowed to have all the tools that I can adequately give him a defense.

* * *

THE COURT: . . . The only option that I would have, if I appointed anyone, would be the public defender's office.

MR. MCCOY: I can't get a conflict of interest attorney, Your Honor? Outside the public defender's office? From what I understood, Your Honor, I am entitled to a conflict of interest attorney, Your Honor.

[DISTRICT ATTORNEY]: Your Honor, there's never been any conflict of interest.

THE COURT: Not that I know of . . . . Mr. McCoy, there has not been a conflict of interest. The public defender's office would have been appointed in your case and has been appointed in your case. You retained private counsel through Mr. English . . . . And then you stated that you wished to waive his capital certification on the record. The other side of that is that if this Court were to appoint anyone the Court would have to appoint the public defender's office. That's the only persons that the Court could appoint . . . . So the Court would only have the option to appoint the public defender's office. If the public defender's office felt that there was a conflict in any way then they would appoint conflict counsel at that point. But I would have to go back to the public defender's office to appoint someone as a co-counsel, Mr. McCoy . . . Do you wish this Court to appoint a public defender office attorney as a second attorney? That is up to you, Mr. McCoy.

* * *

MR. ENGLISH: I . . . would not object to a co-counsel being appointed but that's up to Mr. McCoy.

MR. MCCOY: Your Honor, I'm undecided at this moment . . . that's a hard decision to make, Your Honor. This decision that I make, Your Honor . . . will be a decision that will mitigate the rest of my life, Your Honor.

* * *

MR. ENGLISH: I think . . . to make sure that we move forward with this that the Court appoint a public defender as a second counsel in this case, Your Honor.

THE COURT: Mr. Fish?

MR FISH: Your Honor, on behalf of the public defender's office we're going to certainly object . . . to being appointed as co-counsel . . . . Mr. McCoy has private counsel, Your Honor.

* * *

MR. ENGLISH: . . . [B]ecause the public defender's office objects,

54

Your Honor, I withdraw that . . . request.

* * *

THE COURT:     Okay, then that request has been withdrawn.

Thereafter, trial counsel again conferred with the defendant and the following statements were made:

> MR ENGLISH:     . . . Your Honor, Mr. McCoy wants me to put on the record I have other lawyers who are advising me on this case, including the public [defender's] office . . . . I will be the only lawyer that will be handling the trial, Your Honor, but in terms of . . . helping prepare me for this case, I have . . . relied on both Pam Smart [and] James Gray . . . [of] . . . the state public defender's office, and . . . several mitigation experts, Your Honor . . . Mr. McCoy is now . . . going to state, Your Honor, that he waives appointing a second person to the case. Correct, Mr. McCoy?
>
> MR. MCCOY:     You're correct.

The January 24, 2011 hearing concluded with the defendant waiving appointment of a Rule XXXI second attorney to his case.

The counsel issue was back before the court on February 3, 2011, following remand from the Second Circuit, which included a strong directive to the trial court "to ensure that Mr. McCoy is, or has been, fully apprised on the record of the benefits of having two capital-defense qualified attorneys and that McCoy has knowingly and intelligently waived same." **State v. McCoy**, 46,394 (La. App. 2 Cir. 2/3/11). In response to the Second Circuit's February 3rd ruling, the State filed, on the same day, its motion to appoint additional counsel. The trial court held a hearing on the motion, upon its filing, on February 3rd. Randall Fish, of the public defender's office was also present at the February 3rd hearing, when the trial court fully explained the situation to defendant:

> THE COURT:     Mr. McCoy . . . you have been declared indigent . . . for purposes of being able to get mitigation experts. There is a Supreme Court rule that is out there that states that if you're declared indigent that you have the right to counsel, which you've already been advised of that right to counsel, that you would be given -- Mr. English would still be your counsel but that . . . death qualified attorneys would be appointed to represent you in this matter. That

would come through the public defender's office, which they would appoint death qualified personnel to be able to represent you in this case. Mr. Marvin has asked that those two people be qualified and that you be appointed through the public defender's office death qualified individuals. That usually comes through CAPOLA, which is the Capital Assistance Program if I'm stating that correctly, and CAPOLA would be appointed and determine who those counsels are . . .

[DISTRICT ATTORNEY]: I think that the Court should . . . appoint the public defender's office with instructions that it should appoint two death qualified people and there may be one from this local PDO and one from CAPOLA or maybe more tha[n] one.

* * *

MR. ENGLISH: . . . Mr. McCoy has an objection . . . if the counsels come from the public defender's office here locally. I have explained to him that . . . more likely than not . . . that those two attorneys would be appointed from the Louisiana Capital Defense Association. Which means they . . . do not work for the public defender's office. They are death penalty qualified. More likely than not they will be two attorneys in private practice who . . . work with this association. And that the public defender's office will merely be retaining those people. But nobody from the local public defender's office will be involved in this case and . . . would the local public defender's office agree with that?

* * *

MR. FISH: Randall Fish, on behalf of the public defender's office. Your Honor, at this time we don't know. As far as I know a capital case through the public defender's office would be assigned to me and Larrion Hillman. I don't know, at this point, I certainly don't know that the Capital Assistance Project would be secured through the public defender's office . . . at the present time. And in addition, we may or may not seek . . . review of being appointed in addition to Mr. English. That's something I have to discuss with Ms. Smart and make a decision on in the next day or two. But I do see some practical problems with appointed counsel being appointed in addition to private counsel . . . . [I]f we're to be appointed, I think it should be our responsibility to solely handle the defense of the case and not share that responsibility with Mr. English.

* * *

MR. ENGLISH: Your Honor, the Second Circuit made a certain suggestion, the D.A. has filed a motion . . . I don't object to additional counsel being appointed to support me. [M]y ego is not such as that . . . . I'm confident that under the facts of this case that I can do what needs to be done. But certainly having two additional attorneys in no way offends me. Mr. McCoy, Your Honor, does not believe . . . that the public defender's office will adequately represent him . . . . He would not have any problems, Your Honor, if the lawyers come from

56

the Louisiana Capital Defense Association. In light of everything that Mr. Fish has said . . . I have no response . . . to that. I'm simply trying to communicate where I believe my client's position is . . . . I personally do not have any problem and recommended to Mr. McCoy that you cannot have to[o] many lawyers in a case like this . . . . I'm perfectly comfortable proceeding as a single attorney because I'm relying upon the expertise -- there are other . . . capital defense lawyers who have been providing me expertise and direction in this case. I understand it is a capital case; I feel confident . . . that I can represent Mr. McCoy. But I welcome any help if the Court so deems so and the district attorney's office deems so. The problem is with Mr. McCoy, Your Honor, . . . he doesn't have any confidence in the public defender's office.

THE COURT:      All right. Mr. McCoy?

MR. ENGLISH:    Have I said that correctly, Mr. McCoy?

MR. MCCOY:      You're exactly right, sir.

THE COURT:      . . . The district attorney has asked that additional capital qualified personnel be appointed to represent you, sir. And I am entertaining that motion at the present time. The only way that I can appoint anybody is that it has to be appointed through the public defender's office. And the public defender's office would of course decide who would be capital qualified to be able to represent you, and assist Mr. English, that is my option. From listening to Mr. English you're stating that you want Mr. English and Mr. English alone to represent you and you do not want the public defender's office to represent you. Is that what this Court is hearing?

MR. MCCOY:      Well what I'm saying today, Your Honor, I would love, you know, to have my prior representation of Mr. English but the assistance of the public defender board, no, sir, it's not needed by myself. I have no confidence in the public defender board. I've had prior run-ins with the public defender board. And if I'm not mistaken, Judge, I mean, please correct me if I'm wrong, there are some outside officials that can be retained through the -- the Louisiana Association for other conflict of interest attorneys, Your Honor. I mean, this is my life, Your Honor . . . . I understand the statements . . . that are validated before the Court, Your Honor, but I have no second chance at this, Your Honor. And I don't want the Court to put counsel on me, Your Honor, that I don't want. I object of this, Your Honor.

* * *

[Mr. English confers with Mr. McCoy off the record.]

* * *

THE COURT:      Mr. McCoy, are you telling this Court that you fully waive the public defender's office being appointed? Understanding that Mr. English is not capital qualified. And that you

57

waive these two attorneys, I mean, you waive the Court appointing the public defender's office with capital qualified attorneys to be sitting on this case?  Is that what you're telling this Court?

MR. MCCOY:      Your Honor, I'm telling this Court today that I am confident with Mr. English but with other legal assistance beyond the public defender's office, Your Honor.  Beyond the public defender's office, Your Honor.  Because if they was to appoint me -- Your Honor, this is to better represent the Court as well.  If they were to appoint me some counsel from the public defender's office, I'm going to fire them, Your Honor.  I'm just putting it qualified on the record; I'm going to fire them.

THE COURT:      So you are waiving any representation by the public defender's office fully and voluntarily, is that what I hear you say?

MR. MCCOY:      Yes, I don't want anybody from the public defender's office, Your Honor.  But beyond the public defender's office, Your Honor, conflict of interest attorney, I will accept . . . from the Louisiana Defense Association of the Capital Association, I will accept, Your Honor.

THE COURT:      Mr. McCoy, I don't have that authority.  The only authority I can do is appoint the public defender's office.  I will ask you again, are you fully, and knowingly, and voluntarily waiving the public defender's office to be appointed as co-counsel with Mr. English?

MR. MCCOY:      Yes, I am, Your Honor.

Thereafter, the defendant acknowledged that he did not know who the public defender's office might assign to his case, but he reiterated that he had past dealings with Mr. Fish and Ms. Smart, and consequently, he did not want as counsel any representative from the public defender's office, even someone he had never known before.  The district attorney re-emphasized the rationale underlying Rule XXXI to the defendant:

[DISTRICT ATTORNEY]:      . . . And you understand the reason the Court is trying to appoint two lawyers is if you end up being found guilty and this case proceeds into the penalty phase to determine whether you end up with a death penalty or life in prison.  The reason the Supreme Court rule says that you should appoint two attorneys is because that attorney that handled the guilt phase of the trial has failed . . . . And the jury might possibly have lost confidence in anything that he or she says and not believe them.  So in the penalty phase when that same lawyer stands up there and says, ladies and gentlemen, you only have two options here give my client death or give him a life

58

sentence. There is no not guilty at that point.

The defendant responded affirmatively, indicating, "Uh-huh." The district attorney then asked the defendant, "Do you understand that if the Court appoints the public defender's office and you end up with two lawyers that you don't like . . . you always have the right to terminate those lawyers?" The defendant answered:

> MR. MCCOY: Yes, sir. I just spoke that on the record; I'm fully aware of that. But the repercussions of that is this is time consuming . . . . and most of all . . . that is against my best judgment . . . to even obtain someone that I have no confidence in whatsoever . . . .

Thereafter, the trial judge reiterated the purpose of appointing two attorneys to represent an indigent capital defendant and then asked for the defendant's confirmation:

> THE COURT: Mr. McCoy, [the district attorney] has covered, like I tried to cover with you, what the Supreme Court is stating. The Supreme Court has stated that . . . for some reason you go into the guilt phase and they find you guilty, and then it goes to a penalty phase. If Mr. English is the only attorney the Supreme Court has stated that he may lose creditability and that may affect you in the penalty phase as [the district attorney] has stated before. That is the reason behind the Supreme Court statute . . . . My only recourse is to appoint the public defender's office. Do you want me to appoint the public defender's office as second counsel?

> MR. MCCOY: For the record, again, Your Honor, I'm totally opposed to that and most of all, Your Honor. I mean, if you really look at it, Your Honor, I choose not to be strong armed to take a public defender's aspect of secondary counsel when that's totally against my wishes, Your Honor. I know the Court by verbatim can work some other appointment of capital specialist out -- other than the public defender board, Your Honor. Because the public defender board may can finance someone through the public defender's office to represent me in another . . . jurisdiction.

> THE COURT: The only option . . . this Court has is once you're declared indigent is to appoint the public defender's office. You understand all of your rights, is that correct, Mr. McCoy?

> MR. MCCOY: That's exactly correct, Your Honor.

> THE COURT: You understand that you have the right to have another attorney appointed to represent you through the public defender's office, is that correct?

> MR. MCCOY: Yes, sir, but I don't want that, Your Honor.

THE COURT: And you are fully and voluntarily waiving those rights, is that correct?

MR. MCCOY: I'm waiving the right of someone from the public defender's office representing me, Your Honor, because --

THE COURT: And you're doing that knowingly and voluntarily, is that correct?

MR. MCCOY: Yes, sir.

THE COURT: All right, thank you, sir. Then I will not appoint the public defender's office at this time . . . .

Nevertheless, the defendant now suggests that, even after these comprehensive exchanges, he "was denied" the right to qualified counsel based on an "inadequate waiver."

Importantly, Rule XXXI does not create a statutory right to two attorneys for indigents facing a capital trial. "The Rules shall not be construed to confer substantive or procedural rights in favor of any accused beyond those rights recognized or granted by the United States Constitution, the Louisiana Constitution, the laws of the state, and the jurisprudence of the courts." Louisiana Supreme Court Rule XXXI(B).[40] In **State v. Jones**, 97-2593 at pp. 5-6, 707 So.2d at 978, the trial court faced the same situation and determined that for purposes of Rule XXXI, co-counsel could be appointed notwithstanding that the **Jones** defendant had a retained, and subsequently pro bono, counsel, presaging the scenario at hand:

> It is plainly preferable to have two attorneys in a capital case and we find no reason that the presence of collaterally retained private counsel should eliminate the need or countermand the advantages of two. Further, we can discern no reasoning nor find authority for the proposition that an indigent defendant is entitled to two State-funded attorneys, but an indigent defendant who has retained counsel from a collateral source is not entitled to a second counsel. Certainly, it is in the best interest of the taxpayer to encourage collaterally obtained counsel at no cost to the public fisc. It would therefore defy logic to

---

[40] We note that the language of Rule XXXI expressly states that "[i]n all capital cases, the following *standards* shall be applicable to the defense of indigents . . . ." (Emphasis added.)

punish such a defendant by refusing to appoint co-counsel because he has, in effect, saved IDB funds through retention of private counsel.

However, we reiterate that an indigent capital defendant has no recognized right to two attorneys and in some cases may not desire a second appointed counsel. In such a case, it would be unjust to require a defendant to accept appointed counsel along with his retained counsel. Because there is no right to second counsel, because a defendant may oppose the appointment, and because other unforeseen reasons may weigh against appointment of second counsel, such an appointment is left to the discretion of the trial court.

In the subsequent case of **State v. Koon**, 96-1208 (La. 5/20/97), 704 So.2d 756, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997), the defendant claimed he was denied the assistance of co-counsel to which he was entitled under Rule XXXI. Like the instant defendant, the **Koon** defendant became unhappy with his public defender early on, and the trial court appointed a solo practitioner as lead counsel, and the lead defense counsel recruited a second attorney who later abandoned the case, leaving Koon with only his original defense counsel to try the case. **Koon**, 96-1208 at pp. 20-21, 704 So.2d at 769. The **Koon** defendant waived a second defense counsel, and this court affirmed his conviction and death sentence, noting that Rule XXXI "does not give rise to an affirmative right to multiple attorneys in capital trials." **Koon**, 96-1208 at p. 21, 704 So.2d at 769. The court found that Koon had waived the right to co-counsel after discussion with his original defense counsel and advisement by the judge. **Id.**

Koon's subsequent counseled post-conviction application, raising ineffective assistance of trial counsel, based in part on the absence of a second trial counsel, was denied, and this court denied certiorari. **State ex rel. Koon v. State,** 3-93-1268 (19th J.D.C. 3/21/00), writ denied, 00-1205 (La. 1/26/01), 781 So.2d 1258. However, over a decade after his capital trial, Koon's conviction for three counts of first degree murder and his death sentence were vacated on federal habeas review for ineffective assistance of counsel. In granting Koon's petition for writ of habeas corpus, the federal district court observed that Koon's private counsel

61

rendered ineffective assistance in four respects; the most egregious omission was that defense counsel failed to interview and investigate the only known witness to the crime. **Koon v. Cain**, 2007 U.S. Dist. LEXIS 97113, *26-30 (M.D. La. Feb. 1, 2007). The federal court also relied on the fact that defense counsel: (1) presented a mental-health/status defense at trial, yet only hired his chief expert witness on the issue one day before trial; (2) failed to use the assistance of co-counsel; and (3) failed to adequately prepare Koon for testimony at trial. **Koon v. Cain**, 2007 U.S. Dist. LEXIS 97112 *2 (M.D. La. Apr. 11, 2007). The **Koon** court found that counsel's decision to proceed to trial alone without the aid of at least one other attorney was part of the basis of its ruling, observing that "although an 'affirmative right' to two attorneys may not exist in Louisiana, defense counsel's refusal to be assisted by competent co-counsel can factor into the ineffective assistance analysis." **Koon v. Cain**, 2007 U.S. Dist. LEXIS 97113 at *31-32. The Fifth Circuit affirmed the district court's ruling. **Koon v. Cain**, 277 Fed.Appx. 381 (5th Cir. 2008).

Importantly, the federal district court granted habeas relief in **Koon v. Cain** on February 1, 2007, some seven months before the Louisiana Public Defender Act of 2007 became effective, and over three years before the Capital Defense Guidelines (La. Admin. Code, Title 22, Section 901 et seq.) were promulgated in May 2010, as discussed hereinafter. The statutory enactments, LSA-R.S. 15:141-184, and Capital Defense Guidelines became effective after **Koon v. Cain** and suggest that **Koon** may be distinguishable from the instant case, given those statutes and guidelines place the ongoing responsibility for filling out the defense team on the state public defender, which was not the statutory landscape when **Koon v. Cain** was decided.

Notably, **Koon v. Cain** presented a case of ineffective assistance of counsel, decided under the principles announced in **Strickland v. Washington**, 466 U.S.

62

668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). By appellate counsel's choice, he specifically has not raised a claim of ineffectiveness of counsel in this direct appeal, and thus, such a claim is not before the court.

In the present case, at the hearing on the motion for new trial, John Di Giulio of the Louisiana Public Defender Board ("LPDB"), formerly the Louisiana Indigent Defense Assistance Board ("LIDAB"), was called as a witness. Mr. Di Giulio testified that Randall Fish's objection, on behalf of the local public defender's office, to being appointed alongside retained counsel (Mr. English) was inconsistent with the Capital Defense Guidelines, enacted in May 2010, approximately one year before the defendant's capital trial.

Mr. Di Giulio explained that under the Capital Defense Guidelines, the district public defender or the state office is responsible for supplying the additional resources to bring the defense team into compliance with the guidelines, even for a capital defendant with retained or pro bono counsel. He stated that the minimum compliance for capital defense is two counsel, at least one of whom is certified as a capital defense qualified lead counsel. Mr. Di Giulio testified that his office provides supervision of capital trial counsel, receives monthly reports of every capital trial in the state, and contracts with a number of non-profit corporations to provide indigent capital defense. Mr. Di Giulio testified specifically that Randall Fish, in objecting to the local public defender's office being appointed as co-counsel to serve alongside Mr. English, expressed a position inconsistent with the guidelines and, thus, was not accurate. According to Mr. Di Giulio, the notion expressed by the trial judge in this case - that co-counsel would have to be appointed *from* the local public defender's office - seemed to be the understanding of the parties at the time, but it was not the only option. Mr. Di Giulio posited that, in a case such as the present one - when the local public defender's office had been involved and then removed - it would have been more

appropriate to contact the LPDB office, which could have appointed one of its contract program attorneys, who do trial level work all over the state, to assist in the case. Mr. Di Giulio suggested that, even in a case in which the defendant has a private attorney, the Capital Defense Guidelines would still apply to remedy a deficiency if a determination of indigency has been made. Mr. Di Giulio indicated that, in a situation in which the public defender's office has "an inability to get along with the defendant," the state public defender's office could appoint one of their 501(c) attorneys to either assist or replace trial counsel.

Of particular interest to the instant case is § 905(B)(1) of the Capital Defense Guidelines, which states, "The district public defender, regional director and state public defender are to be independent of the judiciary and they, not the judiciary or elected officials, shall select lawyers for specific cases." 22 La. Admin. Code, Part XV, § 905(B)(1). Also, the guidelines require "the district public defender, regional director or state public defender, as appropriate, [to] be responsible for supplementing existing services available to the defendant to meet the requirements of this Section." 22 La. Admin. Code, Part XV, § 913(C)(2). In addition, 22 La. Admin. Code, Part XV, § 905(D)(1) states, "In any circumstance in which the performance of a duty under this Section would result in a conflict of interest, the relevant duty should be performed by the state public defender, a defender organization or independent authority free of a conflict of interest and identified for this purpose in the Capital Representation Plan." Further, the guidelines provide that "[c]ounsel shall not be assigned to a defendant who indicates that he does not wish to receive public defender services." 22 La. Admin. Code, Part XV, §911(C)(4). Thus, as these provisions and the testimony of LPDB witness John Di Giulio affirmed, if the instant defendant were entitled to conflict counsel, the starting point would necessarily be via referral by the district public defender to the LPDB regional director and/or the state public defender. The

February 3, 2011 colloquy shows the difficulty the parties had in explaining that reality to the defendant because he vehemently rejected anything involving the "public defender."

Based on the absence of trial co-counsel, the defendant's appellate counsel urges that the defendant should be granted a new trial as to both the guilt and penalty phases of trial. The State maintains no new trial is warranted, arguing during the hearing on the motion for new trial, "[I]t's real convenient now to come back and say, well, we've got all [these] problems, the ones that are all protected by attorney-client privilege so there's no way anybody could have known that but they were such of big magnitude that I was effectively denied my right to a lawyer, so that's where we are."

The record presented in this case demonstrates that the defendant could not have been more resolute in declaring that the appointment of co-counsel through the public defender's office was unacceptable to him.

The trial court clearly informed the defendant that a second co-counsel would be appointed "through the public defender's office"; this statement was in compliance with the Capital Defense Guidelines, which, as stated above, directs in § 905(B)(1) that the district public defender, regional director, and state public defender, not the judiciary or elected officials, select lawyers for specific cases and, when there is a conflict of interest, § 911(C)(4) directs that the state public defender, a defender organization or independent authority free of a conflict of interest must undertake the indigent defense. Implicit in the delivery of indigent defense organizational structure is that a claim of conflict is evaluated within the public defender hierarchy by "the appropriate non-conflicted authority," as stated in §911(E)(1), and, if a conflict is found, the case is referred to an attorney hired by the LPDB for conflict-free representation.

Notwithstanding, the defendant in this case steadfastly persisted in rejecting

any participation of the "public defender" in his defense, stating at the February 3, 2011 hearing on the issue that he did not need "the assistance of the public defender board" and that he had "no confidence in the public defender board."

This court has previously indicated that a trial court would be "unjust" in compelling a defendant to accept a second indigent defender along with his retained counsel, when he has expressed opposition to such, in **State v. Jones**, 97-2593 at p. 6, 707 So.2d at 978 ("[I]n some cases [a defendant] may not desire a second appointed counsel. In such a case, it would be unjust to require a defendant to accept appointed counsel along with his retained counsel."). Moreover, the decision of whether or not to appoint counsel to an indigent defendant is reviewed under the abuse of discretion standard. **Id.** ("Because there is no right to second counsel, because a defendant may oppose the appointment, and because other unforeseen reasons may weigh against appointment of second counsel, such an appointment is left to the discretion of the trial court.").

Under the particular facts and circumstances of this case, we find no abuse of discretion in the trial court's failure to appoint a second trial counsel, and there is no merit in this assignment of error.

Motion to Suppress

In his ninth assignment of error, the defendant contends that the trial court erred in refusing to grant his pro se motion to suppress the pretrial statement given by his friend and neighbor, Gayle Bernard Houston, because the statement was coerced. This handwritten motion was entitled "Motion to Suppress Evidence & Motion for Acquittal/Dismissal" and was filed in the trial court by the defendant on April 8, 2009. The motion stated, in pertinent part:

> State of Louisiana - Detectives of Bossier City Police . . . violated said suspects Spartacus McCoy; Carlos McCoy; and neighbor Gale Houston's 6th Amendment right to counsel by interrogating them without their lawyer present and/or forcing/pressuring them to make a false confession . . . .

. . . Gale Houston stated: "He only did and said what was told of him", "so he too wouldn't be incarcerated." Law states: "that no suspect should be forced; threatened; co-hearsed [sic]; and coached to make any statement in which they do not want to make . . ." "Violation of 5th Amendment right and numerous civil rights by law enforcement officials . . . Suspect was also intoxicated."

On July 21, 2009 the trial judge ruled on the defendant's motion in pertinent part as follows:

First, this Court will address Petitioner's "Motion to Suppress Evidence." Petitioner fails to adhere to the time limitations provided for such a motion in Arts. 703 and 521 of the Code of Criminal Procedure. Such a motion should be filed within 15 days after arraignment. Petitioner has not done so. Petitioner was arraigned on June 17, 2008 and Petitioner's "Motion to Suppress" was filed on April 8, 2009. While the court has such discretion to allow an untimely "Motion to Suppress," the burden of proof is on the defendant to prove the ground of his motion, which he has not done so in this case. Therefore, for the foregoing reasons, Petitioner's Motion to Suppress is DENIED.

The defendant faults the trial court for setting a series of new filing deadlines for motions to be filed even after it denied the defendant's pro se filing as untimely, noting that the trial court set motions to be heard up to December 28, 2010, and the defendant's trial did not commence until July 28, 2011, some two years after the defendant's motion to suppress was denied as untimely. Counsel suggests that the judge's denial was "arbitrary and unfairly targeted [defendant's] pro se filings."

Importantly, LSA-C.Cr.P. art. 17 vests in the trial court "all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders . . . . It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done." Further, LSA-C.Cr.P. art. 521(A) provides: "Pretrial motions shall be made or filed within fifteen days after arraignment, unless a different time is provided by law or fixed by the court at arraignment upon

a showing of good cause why fifteen days is inadequate." In addition, LSA-C.Cr.P. art. 703(C) governs motions to suppress evidence and provides:

> A motion filed under the provisions of this Article must be filed in accordance with Article 521, unless opportunity therefor did not exist or neither the defendant nor his counsel was aware of the existence of the evidence or the ground of the motion, or unless the failure to file the motion was otherwise excusable. The court in its discretion may permit the filing of a motion to suppress at any time before or during the trial.

The purpose of these rules is to prevent interruption of trials, avoid the effort and expense of useless trials, and to protect juries from exposure to inadmissible evidence. **State v. Taylor**, 363 So.2d 699, 702 (La. 1978).

In the present case, the defendant filed numerous pro se motions and subpoena requests and also initiated disciplinary complaints against Mr. English. The district attorney asserted that the defendant's actions were "meant to harass and unduly delay this matter." The attorneys who represented the defendant actively sought to curtail his pro se filings. At every opportunity, Mr. English advised the trial court that he did not adopt the defendant's motions or subpoena requests. When Mr. English first enrolled as counsel, he expressed optimism in representing the defendant: "Based upon our conversations, I'm confident that he will rely on my counsel and allow me to be the counsel in this case. We had a very candid conversation about this. That I would be the only voice from this day forward speaking for Mr. McCoy." That optimism faded over the intervening months, and trial counsel's frustration was palpable at the hearing on January 4, 2011 because the defense was not speaking with one voice:

> MR. ENGLISH: I believe also, Your Honor, there was a Motion to Suppress Evidence that Mr. McCoy had filed and I'm looking at a ruling here and I don't see a date on it, but indicated that the Court would set a new date to hear his Motion to Suppress the Weapon, the Illegal Tape Recording, Confidential Communication without Accused's Knowledge and Consent, and a Coerced Confessions and State Dispositions. I have talked to Mr. McCoy. I . . . told him that I don't believe that this motion has any value in this particular case and that it would be a waste of resources given what the evidence is. He

has agreed and so we're not going to argue that motion either, Your Honor.

THE COURT:     All right, and that motion will be withdrawn at this time . . . .

In **State v. Bodley**, 394 So.2d 584, 593 (La. 1982), this court confronted a similar situation and reasoned that "[w]hile an indigent defendant has a right to counsel as well as the opposite right to represent himself, he has no constitutional right to be both represented and representative." The instant case is an example of a defendant who sought to be both represented and representative.

Notwithstanding, although Gayle Bernard Houston testified as a State witness, the pre-trial statement of Mr. Houston was not admitted into evidence; however, it was used to refresh his memory. Mr. Houston testified that he was a childhood friend of the defendant and he had known the defendant all of his life. Mr. Houston related to the jury that on the night of May 5, 2008, he and his brother picked up the defendant and his brother, Spartacus McCoy (who was deceased by the time of trial), in downtown Shreveport. Mr. Houston further testified that he and his brother went to pick the defendant up because the defendant's brother had sounded upset so they "decided to see what was going on." Mr. Houston disclosed that when the defendant got into his car "he was just quiet and -- and then eventually he just said, you know, he 'F'd' up and we was all trying to figure out what -- what you done 'F'd' up." Mr. Houston repeated several times in his testimony that the defendant "looked normal" to him.

On further questioning by the district attorney, Mr. Houston seemed hesitant to repeat the entirety of the defendant's statements made on that date and, when asked about whether he had given a statement to police, Mr. Houston acknowledged that he had given a statement to Detective Brian Griffith on May 8, 2008. Referring to the transcript of that statement, Mr. Houston agreed that his memory was refreshed, and he was able to give additional details about the events

of that evening.  See LSA-C.E. art. 612(B) ("In a criminal case, any writing, recording, or object may be used by a witness to refresh his memory while testifying.").

Referencing Mr. Houston's statement to Detective Griffith, the district attorney asked Mr. Houston what he told the detective in relation to the defendant saying he "F'd up," to which Mr. Houston replied, "I said he done shot three people."  The district attorney then read aloud from the statement in formulating his next questions to Houston, as reflected in the following colloquy:

> [DISTRICT ATTORNEY:] . . . [A]round in the middle of that page you said, "He wouldn't explain why or he -- he just wouldn't explain nothing.  He just said that he shot three people.  I done F'd up.  I'm not going back to jail, Gayle."  That's you right?
>
> [MR. HOUSTON:]       Yes.
>
> [DISTRICT ATTORNEY:]     "Robert, you need to turn yourself in."  "I'm not going back to jail."  Do you remember him saying that to you?
>
> * * *
>
> [MR. HOUSTON:]       Now, you know, like I said, when I'm doing my statement, you know, I -- I been drinking and I could have everything backwards.

Mr. Houston also stated that he could only say for sure that the defendant stated that he "F'd up."  Mr. Houston explained that he could have heard the other statements, which he reported to police as having been made by the defendant, from other people, instead of directly from the defendant.

Thereafter, Mr. English cross-examined Mr. Houston, quoting verbatim from his statement, asking, "After reading this statement do you still say Robert was acting normal or was he crying that night?"  Mr. Houston again responded that the defendant was "acting normal."  The following colloquy ensued:

> [MR. ENGLISH:] . . . On a direct question from [the district attorney], you stated that Mr. McCoy was acting normal, correct?
>
> [MR. HOUSTON:]       Yes.

[MR. ENGLISH:] But in your statement to the police you told him he was crying, correct?

[MR. HOUSTON:] Yes.

[MR. ENGLISH:] Which one was it?

[MR. HOUSTON:] Crying.

Mr. English then propounded a line of inquiry submitted by the defendant:

[MR. ENGLISH:] Now, did you lie to the Bossier -- What you said in this statement, now, even though you don't remember it, did you lie to the police department?

[MR. HOUSTON:] No.

[MR. ENGLISH:] . . . Mr. McCoy wants to know did you tell his father that the detectives had coached you and you made all of this up?

[MR. HOUSTON:] No.

[MR. ENGLISH:] Okay. Mr. Houston, you indicated that you were drinking, correct?

[MR. HOUSTON:] Yes.

[MR. ENGLISH:] And the -- the -- This is a legitimate question. The fact that you were drinking, would that have clouded your recollection in any way of what Mr. McCoy did or did not do?

[MR. HOUSTON:] No . . . .

In support of this assignment of error, the defendant cites this court's decision in **State ex rel. Johnson v. Maggio**, 440 So.2d 1336, 1337 (La. 1983) (per curiam), for the proposition that a pro se petitioner "is *not* to be denied access to the courts for review of his case on the merits by the overzealous application of form and pleading requirements or hyper-technical interpretations of court rules." **State ex rel. Johnson** involved appellate review of a habeas corpus proceeding following the pro se applicant's conviction for criminal mischief, which was in contrast to the instant proceeding wherein the defendant attempted to act both pro se and via trial counsel.

Under the instant circumstances, we conclude that any error of the trial court

71

in denying the defendant's pro se motion to suppress the statement of Gayle Houston was harmless since the written statement was not introduced into evidence, but rather was used only to refresh the memory of Gayle Houston during his trial testimony, pursuant to LSA-C.E. art. 612(B), and since there was no contemporaneous objection made to the use of the statement at trial. We expressly note that defense counsel also used the statement to refresh the witness's memory on cross-examination. Furthermore, there was no motion by either the district attorney or defense counsel to introduce any part of the statement into evidence. This assignment of error fails on the merits.

Voir Dire

In the defendant's tenth assignment of error, he argues that the State's exercise of peremptory challenges as to prospective jurors was based on race, in violation of the U.S. and Louisiana Constitutions, as well as LSA-C.Cr.P. art. 795(C) ("No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror."), necessitating a new trial.

The discriminatory use of peremptory challenges by a prosecutor to exclude potential jurors based solely on race has long been considered a constitutional violation. **Batson v. Kentucky**, 476 U.S. 79, 84-85, 106 S.Ct. 1712, 1716-17, 90 L.Ed.2d 69 (1986); **Swain v. Alabama**, 380 U.S. 202, 203-04, 85 S.Ct. 824, 826-27, 13 L.Ed.2d 759 (1965). The **Batson** court outlined a three-step process for a trial court to use in evaluating a claim that a peremptory challenge was based on race. **Snyder v. Louisiana**, 552 U.S. 472, 476, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008); **State v. Nelson**, 10-1724, p. 9 (La. 3/13/12), 85 So.3d 21, 28. Under **Batson** and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. **State v. Nelson**, 10-1724 at p. 9, 85 So.3d at 28-29. Second, if a prima facie showing is made, the burden shifts to the State to articulate a race neutral explanation for the challenge. **Id.**, 10-1724 at p. 9,

72

85 So.3d at 29. Third, the trial court then must determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. **Id.** (citing **Batson**, 476 U.S. at 98, 106 S.Ct. at 1724).

This final step involves evaluating "the persuasiveness of the justification" proffered by the striking party, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." **State v. Nelson**, 10-1724 at p. 15, 85 So.3d at 32 (quoting **Purkett v. Elem**, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam)). Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. **Purkett v. Elem**, 514 U.S. at 768, 115 S.Ct. at 1771; **Hernandez**, 500 U.S. at 359, 111 S.Ct. at 1866.

Since the trial judge's factual findings in the context of evaluating discriminatory intent largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference. **Hernandez v. New York**, 500 U.S. 352, 364, 111 S. Ct. 1859, 1869, 114 L.Ed.2d 395 (1991); **Batson**, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724, n. 21. A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. **Snyder v. Louisiana**, 552 U.S. at 477, 128 S.Ct. at 1207. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. **Hernandez v. New York**, 500 U.S. at 369, 111 S.Ct. at 1871.

In the instant case, following a **Witherspoon**[41] qualification, ninety-four prospective jurors remained in the venire, and those prospective jurors were further divided into panels of seven prospective jurors, each, for general voir dire questioning. The parties questioned eight full panels and two prospective jurors from the ninth panel to complete jury selection of twelve jurors and two alternate

---

[41] See **Witherspoon v. Illinois**, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d. 776 (1968) (holding that a prospective juror who under no circumstances would vote to impose the death penalty, instead voting automatically for a life sentence, is properly excluded).

jurors. Of those fifty-eight prospective jurors, ten appear to have been African-American: Ms. Curry, Ms. Venus, Ms. Eason, Ms. Thomas, Mr. Burks, Mr. Mitchell, Mr. Burrell, Mr. Landry, Mr. Small, and Ms. McWashington. According to the defendant, the jury was composed of eleven Caucasian jurors and one African-American juror, and the two alternate jurors were Caucasian.

Three **Batson** challenges were made by the defense, respecting peremptory strikes made by the State as to prospective jurors Ms. Curry, Mr. Landry, and Ms. McWashington. The defendant now contends that, in denying these challenges, the trial court relied on incorrect factual bases, failed to assess the credibility of the State's proffered race neutral reasons in light of disparate treatment of similarly-situated white jurors and other evidence of discriminatory intent, and failed to "have regard for" the State's strike of the "jointly struck juror, Ms. Venus."

During voir dire in this case, the first peremptory strike against an African-American, Ms. Curry, was made upon completion of questioning of the first panel of prospective jurors. Afterward, following the questioning of the second and third panels, the State and the defense both exercised a peremptory back-strike to remove first panel prospective juror Ms. Venus, making her the second African-American removed by a peremptory strike (the two other African-Americans previously removed were removed "for cause," not peremptorily).

After the back-strike of Ms. Venus, the defense raised its first **Batson** claim. The defense urged that there had been a clear pattern of striking African-American jurors by the State. The district attorney responded that Ms. Venus could not be considered as part of a pattern of racially discriminatory strikes when the defense also submitted a peremptory strike against her. Mr. English, in essence, asserted that, because Ms. Venus was a "strongly pro-death penalty" juror, she favored the prosecution, such that the only reason the district attorney could have had for striking her was the fact that she was African-American. Mr. English also

conceded that he was not seeking to have Ms. Venus returned to the jury venire; however, the State's strike of Ms. Venus, as the second peremptory strike of an African-American in the trial, gave him a basis upon which to contend that there was a pattern of racially discriminatory strikes and that the previously-stricken African-American, Ms. Curry, should be returned to the jury venire. The trial judge reviewed the voir dire up to that point and did not perceive a pattern of discriminatory strikes on the State's part; thus, the trial judge did not require the State to make a race neutral articulation at that time. Nevertheless, the district attorney volunteered that the contents of Ms. Curry's juror questionnaire "are clear as to the reason she was struck."

The fourth and fifth panels of prospective jurors were questioned together and, of those fourteen prospective jurors, three were African-American - Mr. Burks, Mr. Burrell, and Mr. Mitchell. At the conclusion of questioning, the State challenged Mr. Burks for cause, based on his opposition to the death penalty, which the trial court granted without objection by the defense. The State then submitted a challenge for cause as to Mr. Burrell, based on his personal knowledge of the case and of the victims, and the defense did not enter a formal objection. Mr. Mitchell was selected from these panels to serve as the only African-American juror in this case.

Following the examination of the seventh panel of prospective jurors, the State exercised its twelfth peremptory challenge to excuse Mr. Landry, and the defense then urged its second **Batson** claim. Mr. English urged, "I believe that there's a clear pattern of [the district attorney] striking African-Americans from this jury. I think that Ms. Curry should be brought back in and should be placed back on this jury, Judge." The trial judge then noted that there had been three African-American jurors peremptorily struck, at that point, stating:

Ms. Curry was the first -- She was a black female that was struck.

Ms. Venus, however, was struck by both Mr. English and Mr. Marvin at the same time . . . . And I will take note of that. I will state that there is a black male [Mr. Landry] that was finally struck by Mr. Marvin. I will let Mr. Marvin state any race-neutral reasons that he has and I will take those into consideration . . . .

Before the district attorney began articulating his neutral reasons for his peremptory challenges, he argued that Ms. Venus should not be considered as part of a pattern of racial discrimination, for purposes of evaluating the **Batson** challenge, given that both sides struck her, stating, "The remedy of **Batson** is to put the person back on the jury, okay. Do you want her back?" Mr. English responded that, while he did not seek to reseat Ms. Venus, he thought that both Ms. Curry and Mr. Landry should be placed back on the jury.

The district attorney offered as his reason for peremptorily striking Ms. Curry, her responses on the juror questionnaire, which established that she was "personally, morally, or religiously opposed to the death penalty and will always vote to impose life sentence." The trial court accepted the State's reasons for striking Ms. Curry as race neutral and denied the **Batson** claim as to her. As for Mr. Landry, the district attorney pointed to the fact that Mr. Landry did not answer most of the multiple questions on his juror questionnaire pertaining to the death penalty, that the death penalty sections were the only sections in the juror questionnaire that Mr. Landry did not fill out, and that Mr. Landry's failure to fill out the death penalty sections of the juror questionnaire indicated that he must have had "some kind of reservation about the death penalty." Mr. English countered that he thought Mr. Landry's statements during voir dire were so strongly in favor of the death penalty that he had Mr. Landry on his list to strike because "he would not be favorable to my side." The trial court ruled that the district attorney had stated "a race-neutral reason" and denied the **Batson** claim over the objection of the defense.

At the conclusion of the examination of the seventh panel of prospective

76

jurors, twelve jurors had been selected and placed under the rule of sequestration. An eighth panel of prospective jurors was then brought in for the selection of the alternate jurors; in that panel were two African-Americans, Mr. Small and Ms. McWashington. The defense challenged Mr. Small for cause because he had been a high school classmate of Gregory Colston's, and the challenge for cause was granted by the trial court.

Thereafter, the State peremptorily struck Ms. McWashington, and the defense then made its third **Batson** claim. As a race neutral reason for his peremptory challenge, the district attorney pointed to Ms. McWashington's statement that Officer Richard McGee had been pastor of her church for the preceding four or five years. The district Attorney further stated:

> Richard McGee is in these police reports. He is the man that Mr. English's client has accused of having an affair with his wife that provoked all this. I'm not going to let one of his parishioners sit on this jury . . . . If I'm not mistaken, one of the subpoenas that we've been arguing about weeks before was to Mr. McGee.

The district attorney further noted that Ms. McWashington had indicated that if Richard McGee were called to the stand as a witness, "she would tend to believe him" because "[h]e's her pastor." The trial court found that the State had articulated a race neutral reason under **Batson**, and excused Ms. McWashington over defense objection.

Whether peremptorily striking three African-American jurors in the present case constitutes a prima facie pattern of discriminatory strikes is a question that becomes moot after the State provides race neutral reasons, pursuant to **Hernandez v. New York**, 500 U.S. at 359, 111 S.Ct. at 1866 ("Once a prosecutor has offered a race neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). A trial judge may therefore effectively collapse the first two

stages of **Batson** and rule on the question of discriminatory intent without deciding the question of whether the defendant established a prima facie case of purposeful discrimination.  See **State v. Nelson**, 10-1724 at p. 10, 85 So.3d at 29.

On appeal, the defendant concedes that Ms. Curry's strong aversion to capital punishment was a legitimate basis for the State to peremptorily strike Ms. Curry.  We find no merit in the defendant's assertion that, when considered in context with the other State peremptory challenges, which he claims were race-based, the trial court erred in failing to grant the Batson challenge as to Ms. Curry.  As shown hereinbelow, all of the peremptory challenges exercised by the State at trial arose from legitimate race neutral considerations.

During the **Witherspoon** voir dire, Ms. Curry declared unequivocally that "I am not for the death penalty . . . . I could consider it but I would always lean toward life."  We conclude that the State's peremptory strike of Ms. Curry was justified given her pro-life sentence stance, and the trial court's ruling upholding the State's strike is supported by precedent.  See **State v. Williams**, 96-1023, p. 33 (La. 1/21/98), 708 So.2d 703, 727 (holding that the State's articulated reason for striking a prospective juror because she appeared "weak . . . on the death penalty" was accepted as a race neutral reason) (quoting **United States v. Bentley-Smith**, 2 F.3d 1368, 1375 (5th Cir. 1993) ("The reason certainly is stronger if the attorney is able to articulate an objective fact, such as that the juror was slow in answering questions or had to have questions repeated . . . . [but] the judge is free, based upon all the information presented and that judge's eyewitness observation of counsel, to conclude that the reason is offered in good faith and not as a subterfuge for race.")).  In this case, looking at the whole of Ms Curry's voir dire testimony, no racial animus was apparent in the making of this peremptory challenge.  See **Miller-El v. Dretke**, 545 U.S. 231, 252, 125 S.Ct. 2317, 2332, 162 L.Ed.2d 196 (2005) (wherein the Supreme Court considered "[t]he whole of the voir dire

78

testimony" to evaluate the prosecution's reasons for striking the juror at issue).

Further, the defendant's argument on appeal, that the State's peremptory challenge of Ms. Venus should be considered when evaluating the State's peremptory challenge of Ms. Curry, ignores the clear directives of LSA-C.Cr.P. art. 795(D) to the contrary, given that the defense simultaneously challenged the same juror. Although Paragraph (C) of Article 795 authorizes the trial court to demand a race neutral reason for the exercise of a peremptory challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror, Paragraph (D) of Article 795 provides that the "provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror." Because Ms. Venus was peremptorily challenged by both the State and the defense, the trial court was not required to order the articulation of race neutral reasons, pursuant to LSA-C.Cr.P. art. 795(D), and we find no **Batson** violation apparent in the peremptory strike of Ms. Venus.

As to the **Batson** claim made after the peremptory challenge of Mr. Landry, the defendant argues that, when the district attorney in this case was concerned that the failure of Mr. Landry to answer juror questionnaire death penalty questions suggested his ambivalence about the death penalty, he should have asked additional questions about the matter and his failure to do so was an indication that the State's articulation of this reason in support of his peremptory strike against Mr. Landry was pretextual. On this point, the defense cites **Miller-El v. Dretke**, wherein the Supreme Court similarly reasoned, when a perceived conflict in a juror's position arose, "[W]e expect the prosecutor would have cleared up any misunderstanding by asking further questions before getting to the point of exercising a strike." **Miller-El v. Dretke**, 545 U.S. at 244, 125 S.Ct. at 2327. The defense also cites **State v. Harris**, 01-0408, p. 8 (La. 6/21/02), 820 So.2d 471, 476,

and **State v. Collier**, 553 So.2d 815, 822 n.11 (La. 1989), which recognized that the failure of a prosecutor to question, or questioning in only a cursory manner, a prospective juror who is challenged on the basis of a claimed bias raises a strong inference that the juror was excluded on the basis of race alone. Notwithstanding, we note that **Miller-El v. Dretke** further directs:

> [T]he rule in **Batson** provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives.

**Miller-El v. Dretke**, 545 U.S. at 251-52, 125 S.Ct. at 2331-32 (citations omitted). Indeed, in **Miller-El v. Dretke**, the Supreme Court noted that "we read [the juror's] voir dire testimony in its entirety." **Id.**, 545 U.S. at 247, 125 S.Ct. at 2329.

Turning to Mr. Landry's voir dire, "in its entirety," we conclude that the record supports the articulated reasons for the district attorney's exclusion of him. Mr. Landry's responses in the **Witherspoon** round, at the very least, lacked clarity and potentially demonstrated an inconsistency in his thought process. Mr. Landry's response to questioning by the district attorney presented a somewhat confused opinion about the death penalty:

[DISTRICT ATTORNEY]: Tell me your views on the death penalty?

MR LANDRY:     I'd say give them life in prison.

* * *

[DISTRICT ATTORNEY]: Okay. Did I take that to mean you're opposed to the death penalty?

MR. LANDRY:   I would like to know what really he done to put him life in prison. Well put him in there, you know?

[DISTRICT ATTORNEY]: I'm having a little difficulty hear[ing] you.

MR LANDRY:     I'd say I'd have to know what's going on in order

to put him in there.  To take the penalty, you know.  To put him in penalty.

[DISTRICT ATTORNEY]:  . . . [C]an you consider the death penalty as an option . . . as a verdict that you personally could . . . render?

MR. LANDRY:    I would say that, yeah.

[DISTRICT ATTORNEY]:  Okay.  And that you were saying you need to know factors about --

MR. LANDRY:    What -- right what he did and everything.

[DISTRICT ATTORNEY]:  Okay. Well that's what the whole trial would be about.

MR. LANDRY:    Yeah -- yeah, before I put, you know, say about a penalty, death penalty and everything.

[DISTRICT ATTORNEY]:  Okay.  But -- but do you see yourself as someone -- let's just -- let's go at it like this.  Let's say you were in an argument with your best friend just a friendly argument about the death penalty . . . .  And your best friend said the death penalty should be abolished; we should not have it in our law.  What do you say back?

MR. LANDRY:    I wouldn't go for it.

[DISTRICT ATTORNEY]:  Why?

MR. LANDRY:    Because I don't believe that, you know, the death penalty is good, you know.  If he did the crime it's all right, and, you know, he did the crime.  But if he didn't do the crime, well, you know, it's way just -- you know.

[DISTRICT ATTORNEY]:  Okay.  So you would take the position the death penalty should not be in our laws?

MR. LANDRY:    It should be in the law if you did it if you did the crime but if you didn't do the crime he shouldn't, you know, he shouldn't have it.

[DISTRICT ATTORNEY]:  Okay.  Do you see yourself as someone that could vote to impose the death penalty and come back into the courtroom and say, yeah, that's my verdict?

MR. LANDRY:    Yeah.

* * *

[DISTRICT ATTORNEY]:  Can you consider a life sentence too?

MR. LANDRY:    Yeah.

81

Ultimately, Mr. Landry concluded that he could consider both verdicts, a life sentence or a death sentence, and the district attorney did not issue a cause challenge as to Mr. Landry.

However, during general voir dire, the district attorney asked Mr. Landry, "[O]n your questionnaire there were a couple of sections on here regarding the death penalty. And I notice that you didn't answer . . . . So, tell me what your views are on the death penalty?" Mr. Landry's response seemed to indicate that he was expecting to see a video of the crime, when he stated, "I would really have to see what really happened and watch the films to see what was going on - or watch the pictures." The district attorney pressed Mr. Landry for a definitive statement as to his opinion, asking, "Do you think the death penalty should be in our law?" Mr. Landry replied, "Well, if they did the crime, you know, it would be, you know." The district attorney then inquired, "If the death penalty is available and you're on a jury what are you looking for that would make you say . . . the death penalty should be the punishment here?" Mr. Landry replied, "Well, when you look at it you'll probably be able to see what happened, you know, if he did the crime, killed the people, you know."

In explaining his reasons for striking Mr. Landry, the District Attorney stated:

> Mr. Landry did not fill out the form in either of the sections that only pertain to the death penalty. He refused to fill it out. He didn't check anything in there. So he had some kind of reservation about the death penalty. He may be the most pro-death penalty guy out there. I don't know. But I know he didn't fill out the form . . . . And that's the only two sections that he didn't fill out. He told us three times about his bad back and medical problems and what sports and what courses he took and his income range and everything else in there, but wouldn't answer the questions about the death penalty . . . . I'm trying to find folks that will sit on the jury that I think have the guts to impose the death penalty.

The defendant further contends that other prospective jurors, who were white and who omitted one or two of the death penalty questions, were not struck

82

from the jury, indicating that this fact supports his claim that these other jurors were "similarly situated" to Mr. Landry, and yet, Mr. Landry received disparate treatment.[42] However, the fact that the State did not strike similarly situated white jurors is not, alone, grounds to find the stated reason for the strike pretextual. See **State v. Juniors**, 03-2425, p. 31 (La. 6/29/05), 915 So.2d 291, 317-18, cert. denied, 547 U.S. 1115, 126 S.Ct. 1940, 164 L.Ed.2d 669 (2006) ("[T]he fact that a prosecutor excuses one person with a particular characteristic and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination."); **State v. Collier**, 553 So.2d at 822 ("Other courts have rejected explanations for challenges when the prosecutor failed to challenge other jurors, not of the defendant's race, who shared the same characteristic as that claimed by the prosecutor as the reason for the challenge . . . . However, the fact that a prosecutor excuses one person with a particular characteristic . . . and not another similarly situated person does not in itself show that the prosecutor's explanation was a mere pretext for discrimination. The accepted juror may have exhibited traits which the prosecutor could have reasonably believed would make him desirable as a juror.").

Looking at his voir dire testimony as a whole, Mr. Landry's **Witherspoon** responses and his general voir dire responses revealed repeated incidents of inconsistency about his opinion on the death penalty, which prompted the State to peremptorily exclude him. See **State v. Juniors**, 03-2425 at pp. 31-32, 915 So.2d at 318 (Although "an equivocal response in answer to whether [a prospective juror] could legitimately consider voting for death . . . may not have risen to the level of a sustainable challenge for cause, it does support the race-neutral reasons furnished by the State after defense counsel objected on **Batson** grounds to the peremptory

---

[42] We note that none of the white comparables disregarded death penalty question numbers 93 through 103, as Mr. Landry did on his juror questionnaire.

strike against [the prospective juror].").  See also **Uttecht v. Brown**, 551 U.S. 1, 7, 127 S.Ct. 2218, 2223, 167 L.Ed.2d 1014 (2007) ("[W]hen there is ambiguity in the prospective juror's statements," the trial court is "entitled to resolve it in favor of the State.").

Mr. Landry gave answers that were both distinctly pro-life and answers in which he seemed to indicate that he could consider death if he "could see" that the defendant did commit murder.  In addition to these disparate opinions, Mr. Landry did not respond to death penalty question numbers 93 through 103 on his questionnaire, checking answers only to death penalty question number 104 (with its 8 subparts).  The totality of Mr. Landry's responses left the district attorney with questions as to Mr. Landry's position on the death penalty and whether he could actually vote to impose it.  Given that uncertainty, the decision of the district attorney to excuse Mr. Landry peremptorily does not appear to be founded on race, and no discriminatory intent appears to have tainted the State's peremptory strike of Mr. Landry.

The State's peremptory challenge of prospective juror Ms. McWashington was based on her friendship with Officer Richard McGee, who was named by the defendant to a jailhouse confidant as having been involved with his wife, contributing to the family breakdown that lead to the events at issue in this case. However, the defendant argues on appeal that it was known by the time that Ms. McWashington was peremptorily challenged (after acknowledging that Officer McGee was a family friend and the pastor of her church) "that Officer McGee was not going to be called as a witness in the case by either side," though it was not a fact established in the record.  Consequently, the defendant asserts that the State's reasons were pretextual, given that Ms. McWashington's answers otherwise favored the State (having expressed no aversion to the death penalty during voir, when she stated, "I really don't see a problem with the death penalty," and

acknowledging that she could consider both life imprisonment and the death penalty). Thus, the defendant claims it was error for the trial court to deny his **Batson** challenge as to Ms. McWashington. Nevertheless, knowledge of, or a personal relationship with, a party or potential witness in a case is a sufficient race neutral explanation for challenge to prospective juror. See **State v. Qualls**, 40,630, pp. 20-21 (La. App. 2 Cir. 1/27/06), 921 So.2d 226, 240; **State v. Mamon**, 26,337, p. 18 (La. App. 2 Cir. 12/16/94), 648 So.2d 1347, 1359, writ denied, 95-0220, p. (La. 6/2/95), 654 So.2d 1104. Therefore, we conclude that the State's peremptory challenge of Ms. McWashington bears no indicia of racial animus, and the trial court properly denied the **Batson** claim as to her.

The Supreme Court has acknowledged that, looking back on voir dire from the appellate level, "[t]he rub has been the practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences, whatever the race of the individuals on the panel from which jurors are selected." **Miller-El v. Dretke**, 545 U.S. at 238, 125 S.Ct. at 2324. Given the broad discretion **Batson** accords the trial judge in ruling on the fact-bound question of whether race was significant in determining who was challenged and who was not, an appellate court should not substitute its evaluation of the record for that of the trial court. See **Hernandez v. New York**, 500 U.S. at 364, 111 S.Ct. at 1868 ("[T]the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal."); **Batson**, 476 U.S. at 98 n.21, 106 S.Ct. at 1724 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

In the instant case, the defendant has not borne his burden under **Batson.** At a point when three African-Americans had been struck peremptorily from the

twelve-person jury, the judge acquiesced in the suggestion that the State should articulate reasons; however, it should be noted that, of the two African-American females in that number, one was strongly opposed to the death penalty (Ms. Curry), and the other was struck simultaneously by the State and the defense (Ms. Venus), and thus, was not part of the **Batson** equation, pursuant to LSA-C.Cr.P. art. 795(D). Additionally, the parties expressed uncertainty as to the race of the third juror struck (Mr. Landry).

Neither the numbers nor the facts support a prima facie showing that the State based its peremptory challenges on race. The trial judge's findings that no discriminatory purpose tainted the State's peremptory strikes is borne out by the record, and no abuse of discretion is apparent. Under the circumstances, the defendant's **Batson** claims fail on the merits and warrants no relief by this court.[43]

Jury Instruction on Lesser Included Offenses

---

[43] We note that the defendant's **Batson** claim was revisited in connection with the defendant's motion for new trial. At a January 23, 2012 hearing the defense filed into evidence statistical data from the judicial district "from January 2007 to July 2011," arguing that this data demonstrated a longstanding pattern of disproportionate numbers of African-Americans being struck by the Bossier Parish District Attorney's Office, at a rate of "almost two and a half times the rate that they reject white jurors" in the parish. However, this court instructed against relying solely on such statistical data to establish a prima facie case of discrimination in **State v. Dorsey**, 10-0216 (La. 9/7/11), 74 So.3d 603, and in **State v. Duncan**, 99-2615 (La. 10/16/01), 802 So.2d 533. In **State v. Duncan** this court rejected an exclusively numerical formula in establishing a prima facie case under **Batson**, stating, "[T]here is not a per se rule that a certain number or percentage of the challenged jurors must be black in order for the court to conclude a prima facie case has been made out . . . Such number games, stemming from the reference in **Batson** to a 'pattern' of strikes, are inconsistent with the inherently fact-intense nature of determining whether the prima facie requirement has been satisfied. Indeed, such attempts to fashion absolute, per se rules are inconsistent with **Batson** [476 U.S. at 96-97, 106 S.Ct. 1712] in which the court instructed trial courts to consider 'all relevant circumstances.'" **State v. Duncan**, 99-2615 at pp. 21-22, 802 So.2d at 549-50. We concluded in **State v. Duncan** that "it is important that the defendant come forward with facts, not just numbers alone, when asking the district court to find a prima facie case." **Id.**, 99-2615 at p. 22, 802 So.2d at 550 (quoting **United States v. Moore**, 895 F.2d 484, 485 (8th Cir. 1990)). See also **Foster v. Chatman**, ___ U.S. ___, ___, 136 S.Ct. 1737, 1748, ___L.Ed.2d ___ (2016) ("[A]ll of the circumstances that bear upon the issue of racial animosity must be consulted."). We conclude that the trial court did not abuse its discretion in denying the defendant's motion for new trial on **Batson** grounds. No prejudicial error was demonstrated under LSA-C.Cr.P. art. 851(B)(2) or (4), which would warrant granting a new trial, and none of the "new material" presented in the motion for new trial persuades that the trial court erred in denying the motion for new trial on **Batson** grounds. (We note that the instant case is clearly distinguishable from **Foster v. Chatman**, which held that the strikes of two African-American prospective jurors violated the defendant's constitutional rights under **Batson**, based on a finding that certain of the prosecutor's race neutral reasons were expressly contradicted by other evidence and that there was a "persistent focus on race in the prosecution's file.")

In his eleventh assignment of error, the defendant avers that the trial court erred by failing to instruct the jury as to any lesser-included offense, which did not require specific intent to kill or inflict great bodily harm, i.e., felony murder, particularly when the sole defense offered by trial counsel was that the defendant's diminished mental capacity precluded him from formulating the requisite specific intent to kill or inflict great bodily harm. The defendant also complains, on appeal, that the trial court failed to charge the jury as to its authority to return a lesser verdict, even if convinced of guilt of first degree murder.[44] The defendant argues that failure to so instruct the jury constituted a violation of due process, in violation of the rule announced in **Beck v. Alabama**, 447 U.S. 625, 636, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392 (1980): "[A] defendant is entitled to a lesser included offense instruction where the evidence warrants it."

As an initial matter, the defendant concedes that trial counsel neither requested any such jury instruction, nor objected to the instructions as given. In fact, when queried by the trial court as to whether he was "satisfied with the jury charges," Mr. English responded, "I'm satisfied with them, Your Honor." Accordingly, the claim raised here was not preserved for appellate review. LSA-C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence . . . . It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor."); **State v. Draughn**, 05-1825 at p. 56, 950 So.2d at 621 ("The failure of the defense to contemporaneously object . . . waives

---

[44] The jury instructions, as given, demonstrate that this portion of the defendant's claim is meritless, as the trial judge plainly instructed the jury, "If you are not convinced that the defendant is guilty of the offense charged, you may find the defendant guilty of a . . . responsive lesser offense . . . ." The trial court's jury instructions further included detailed instructions regarding the "two possible . . . responsive lesser offenses" in this case, second degree murder and manslaughter.

our review of the issue on appeal."). Although the defendant contends that this is a fundamental structural error that should be reviewed by this court, we conclude that the jury instructions as given in this case do not demonstrate error.

Louisiana Code of Criminal Procedure Article 802 requires the trial court to charge the jury as to the law applicable to the case. As a general matter, a trial judge has the duty to instruct jurors as to "every phase of the case supported by the evidence whether or not accepted by him as true," and that duty extends to "any theory of defense which a jury could reasonably infer from the evidence." **State v. Marse**, 365 So.2d 1319, 1323 (La. 1979). See also **State v. Henry**, 449 So.2d 486, 489 (La. 1984) ("'[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction. The jury's discretion is thus channeled so that it may convict a defendant of any crime fairly supported by the evidence.'") (quoting **Hopper v. Evans**, 456 U.S. 605, 611, 102 S.Ct. 2049, 2053, 72 L.Ed.2d 367 (1982)).

In the present case, the State charged the defendant in a single indictment with three counts of first degree murder, committed when the offender had the specific intent to kill or inflict great bodily harm upon more than one person, pursuant to LSA-R.S. 14:30(A)(3). The legislatively approved responsive verdicts for first degree murder are set out in LSA-C.Cr.P. art. 814(A)(1), which states:

> The only responsive verdicts which may be rendered when the indictment charges the following offenses are:
>
> 1. First Degree Murder:
>     Guilty.
>     Guilty of second degree murder.
>     Guilty of manslaughter.
>     Not guilty.

The guilt phase verdict forms for each of the three counts in this case comported with LSA-C.Cr.P. art. 814(A)(1), stating, in pertinent part:

1.     We, the jury, find the defendant guilty.

2. We, the jury, find the defendant guilty of Second Degree Murder.

3. We, the jury, find the defendant guilty of Manslaughter.

4. We, the jury, find the defendant not guilty.

Further, as set forth hereinabove, the trial judge's instructions to the jury also comported with **Beck v. Alabama**, in that the jury was not given an all-or-nothing option between capital punishment or innocence, as the jury was also instructed as to, and given the option of returning, the lesser included verdicts of second degree murder or manslaughter.

Notably, the guilt phase of the defendant's capital trial was virtually devoid of evidence that the May 5, 2008 triple homicide unfolded as a felony murder, i.e., during the perpetration of an aggravated burglary, given that the defendant was the son-in-law of two of the victims and step-father of the third victim, although he was clearly not a welcome guest, as evidenced in Christine Colston Young's 911 call upon his arrival at her home. There was no sign of forced entry upon the first responders' arrival at 19 Grace Lane, as attested to by Sergeant Alvin Eagle, Jr., who testified that the front door was slightly ajar - "two to three inches opened." Under these circumstances, even had trial counsel requested a jury instruction on felony murder, a lesser offense excluding the element of specific intent, such an instruction would not have been properly admitted under **Hopper v. Evans** because the elements of such crime were not "fairly supported by the evidence." Nevertheless, the absence of a jury instruction on felony murder did not preclude the defendant from testifying that he had no intent to kill his family, nor Mr. English from urging to the jury repeatedly in his guilt phase closing argument that his client had no intent to kill because "Robert McCoy is so defective emotionally. He is so defective mentally . . . . Robert McCoy doesn't have the mental capacity to form a specific intent." The instructions provided by the trial judge closely

89

follow those provided in Section 7.03 of the Louisiana Judges' Criminal Bench Book. Accordingly, this assignment of error lacks merit.

Admission of Other Crimes Evidence

In his twelfth assignment of error, the defendant contends the trial court erred in allowing the admission of evidence of other unadjudicated violent crimes allegedly committed by the defendant, during the penalty phase of the trial, without prior notice by the State or the holding of an advance hearing outside the presence of the jury, in violation of **State v. Jackson**, 608 So.2d 949 (La. 1992). The defendant contends that the result was an unfair sentencing hearing, and the defendant's death sentence be vacated and a new penalty phase ordered.

Louisiana Code of Criminal Procedure Article 905.2(A) provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates." Rules governing the admission in penalty phase hearings of unrelated and unadjudicated crimes evidence to prove the defendant's character and propensities have evolved jurisprudentially.

In **State v. Brooks**, 541 So.2d 801, 814 (La. 1989), this court approved the State's introduction in its penalty phase case-in-chief of unrelated and unadjudicated crimes, once the trial court determines that: (1) the evidence of the defendant's connection with the commission of the unrelated criminal conduct is clear and convincing; (2) the proffered evidence is otherwise competent and reliable; and (3) the unrelated crimes have relevance and substantial probative value as to the defendant's character and propensities, which is the focus of the sentencing hearing under LSA-C.Cr.P. art. 905.2.

In **State v. Jackson**, 608 So.2d 949, 955 (La. 1992), this court reaffirmed the holding announced in **State v. Brooks**, but deemed it necessary to place a

limitation on this type of evidence in order to ensure that due process is not violated by the injection of arbitrary factors into the jury's deliberations and to prevent a confusing or unmanageable series of mini-trials of unrelated and unadjudicated conduct during the sentencing hearing. In **Jackson**, this court ruled that, to be admissible in a penalty phase hearing, the evidence of the unadjudicated criminal conduct must involve violence against the person of the victim, for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for capital murder. **State v. Jackson**, 608 So.2d at 955-56.

In **State v. Bourque**, 622 So.2d 198, 248 (La. 1993), cert. denied, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998), this court held that evidence of an unrelated, unadjudicated killing, committed one hour before the murder at issue in the capital case being tried, was admissible, since it was relevant evidence of the defendant's character and propensities and fell within the **State v. Brooks** and **State v. Jackson** limitations. However, in **State v. Bourque**, the defendant's death sentence was reversed because the prosecutor had conducted a "prohibited mini-trial" on the issue of the defendant's guilt or innocence in the unadjudicated killing. **State v. Bourque**, 622 So.2d at 248. In **Bourque**, of the twelve prosecution witnesses heard at the penalty phase, eleven testified about the unadjudicated killing, which this court held "impermissibly shift[ed] the focus of a capital sentencing jury from considering the character and propensities of the defendant to a determination of guilt or innocence of the unadjudicated criminal conduct." **Id.** Thus, this court limited the amount of admissible evidence of unadjudicated criminal conduct, which a prosecutor may introduce in its case-in-chief during the penalty phase to a "minimal" amount. **Id.**

However, this court retreated from that opinion and overruled **State v. Bourque** in **State v. Comeaux**, 93-2729, p. 10 (La. 7/1/97), 699 So.2d 16, 22, cert.

91

denied, 522 U.S. 1150, 118 S. Ct. 1169, 140 L. Ed. 2d 179 (1998), holding that **Bourque**'s limitation on the amount of admissible evidence, no matter how highly relevant to the defendant's character and propensities, was unnecessary to guarantee due process. In retreating from the **Bourque** holding, **State v. Comeaux** recognized that "[p]erhaps an overabundant amount of evidence of significant unadjudicated criminal conduct . . . could reach a point where the jury's attention is improperly shifted, this court concluded that "whether otherwise admissible evidence of unrelated and unadjudicated criminal conduct (the admissibility of which has already been subjected by this court to significant limitations) injects an arbitrary factor into a capital sentencing hearing is one to be decided on a case-by-case basis." **State v. Comeaux**, 93-2729 at pp. 10-11, 699 So.2d at 22. The **Comeaux** court held that a trial judge "should cautiously consider the quantum of evidence necessary to convey the message to the jury that the defendant has engaged in other serious criminal conduct that the jury should consider in its determination of sentence, without shifting the jury's focus from its function of determining the appropriate sentence in the capital case to a focus on the defendant's involvement in other unrelated criminal conduct." **Id.**, 93-2729 at pp. 11-12, 699 So.2d at 23.

In the instant case, for context we note that, on March 12, 2010 (over a year before defendant's capital trial commenced), the State filed pretrial notice of its intent to use evidence of other crimes pursuant to LSA-C.Cr.P. art. 720 and LSA-C.E. art. 404(B) "at the defendant's trial," leaving open the possibility that the evidence would be admitted in either the guilt phase or the penalty phase. The State's notice described the other crimes evidence it sought to introduce as: "All evidence from the criminal investigation of the incident that occurred on or about the 2nd day of April, 2008 concerning Yolanda Colston."

On November 16, 2010 the trial court held a pretrial hearing on the matter,

and after considering the parties' arguments, the court ruled that the State's other crimes evidence was res gestae and thereby admissible. The defendant's trial counsel noticed his intent to seek writs on the issue, and thereafter, the Second Circuit denied review of the trial court's ruling permitting the state to introduce evidence of prior other crimes evidence under LSA-C.E. art. 404(B). See **State v. McCoy**, 46,266 (La. App. 2 Cir. 1/6/11) (unpublished). Contrary to appellate counsel's assertion in brief, the trial court did not limit its ruling to the guilt phase.

During the penalty phase, the State called Yolanda Colston as its first witness, and she was introduced as the mother of victim Gregory Lee Colston. Yolanda was also the daughter of victim Christine Colston Young, and the step-daughter of victim Willie Ray Young. Yolanda testified that by the Spring of 2008, her relationship with the defendant had "gotten bad" and the two had separated, with Yolanda and her children leaving the marital residence. Yolanda described the event that led to the warrant being issued for that defendant's arrest, which was outstanding at the time of the triple homicide, telling the jury that the defendant had broken into her house through a sliding door and was hiding inside, lying in wait, when she and her two-year-old daughter returned home. Yolanda said that the defendant came out of hiding with a knife and took her to the back room with the knife pressed against her throat; he held her down on a bed and threatened to kill her and then kill himself - all in the presence of their eighteen-month-old daughter. Yolanda testified that she pleaded with the defendant, "Please do not to do this."

At that point, the defense objected, arguing (outside the presence of the jury) against the evidence "that should have been put on at the guilt phase" coming in at the penalty phase. The defense asserted that the State "cannot go into details of prior criminal acts . . . it is not permissible under the laws of Louisiana." The district attorney reminded the court that it filed its notice of intent to introduce

other crimes evidence "a long time ago," and it was ruled admissible to show "what motivation [the defendant] had for being there and why the police were looking for him and why he was named as a suspect immediately after discovery of the bodies . . . . [S]he is allowed under the law to tell the jury what happened between her and the defendant and how it's affected her life. That's what this . . . penalty phase is about." The defense disagreed, seeking to limit the evidence to the fact that a warrant issued against the defendant for aggravated battery against Ms. Colston and to limit the testimony to exclude any "graphic detail" about the actual battery. The defense moved that Ms. Colston's testimony be struck for going "into the specific details."

The trial court overruled the defense objection relying on **State v. Comeaux**, which he quoted as holding: "Evidence that established the defendant in the recent past has engaged in criminal conduct involving violence to the person is highly probative of the defendant's character and propensities." The defense then moved for a mistrial on grounds that the evidence should not be admitted because they are "mere allegations," which the defendant had never been tried on. The trial court reiterated his reliance on **State v. Comeaux** and denied the mistrial.

The defendant contends on appeal that it was clear error for the trial court to deny a mistrial when the State elicited inadmissible evidence of other, unadjudicated criminal conduct. The defendant further asserts that, based on the admission of this inadmissible evidence, his sentence should be vacated.

Pursuant to LSA-C.Cr.P. art. 775, upon motion of a defendant, a mistrial shall be ordered when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial or when authorized by LSA-C.Cr.P. art. 770 (listing as a basis for mistrial, among others, reference to "[a]nother crime committed or alleged to have been committed by the defendant as to which evidence is not admissible") or LSA-C.Cr.P. art. 771 (regarding

94

inappropriate remarks or comments). A trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial. **State v. Sanders**, 93-0001, p. 21 (La. 11/30/94), 648 So.2d 1272, 1288, <u>cert. denied</u>, 517 U.S. 1246, 116 S. Ct. 2504, 135 L. Ed. 2d 194 (1996); **State v. Wingo**, 457 So.2d 1159, 1166 (La. 1984), <u>cert. denied</u>, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985). Mistrial is a drastic remedy and is warranted under LSA-C.Cr.P. art. 770 only when a remark or comment referencing an accused's commission of other crimes results in prejudice to his substantial rights sufficient to undermine the fairness of trial. **State v. Broaden**, 99-2124, p. 16 n.5 (La. 2/21/01), 780 So.2d 349, 360 n.5.

In the present case, when Yolanda Colston's testimony resumed, the district attorney asked no more questions about the previous aggravated battery, and the remainder of her testimony was in the form of a victim impact statement. Yolanda's testimony regarding the previous incident in which defendant threatened her life consumed less than two pages of transcript, and thus did not constitute a "prohibited mini-trial" or inappropriately shift the jury's focus. Yolanda's recollection of the prior aggravated battery event was concise and did not recount graphic details. The evidence of the defendant's unadjudicated aggravated battery against Yolanda Colston was timely,[45] competent, clear and convincing, and highly probative of the defendant's character and propensity for violence, and thus, had direct bearing on the penalty phase of his bifurcated trial without injecting an arbitrary factor. No **State v. Jackson** violation is apparent under these facts, and

---

[45] As applied to the instant case, the defendant committed an aggravated battery against Yolanda Colston in April 2008. The punishment for aggravated battery is imprisonment, with or without hard labor, for not more than ten years, pursuant LSA-R.S. 14:34(B). Under LSA-C.Cr.P. art. 572(A)(2), the State had four years, or until April 2012 to institute prosecution against the defendant for aggravated battery, as an offense not necessarily punishable by imprisonment at hard labor. Accordingly, on May 29, 2008, the date the defendant was indicted for triple homicide, the **State v. Jackson** timeliness window ("to that conduct for which the period of limitation for instituting prosecution had not run at the time of the indictment of the accused for the first degree murder for which he is being tried") for introducing evidence of the April 2008 aggravated battery was still open. <u>See</u> **State v. Jackson**, 608 So.2d at 955.

this assignment of error fails on the merits.

Victim Impact Testimony

In the defendant's thirteenth assignment of error, he contends that the State exceeded the scope of appropriate victim-impact evidence, beyond that authorized under **State v. Bernard**, 608 So.2d 966 (La. 1992), during the testimony of Kent Falting, teacher and basketball coach of the youngest victim, Gregory Colston, and thereafter, State Exhibit Number 101 ("S-101"), written by Coach Falting, was sent into the jury's deliberation room, allegedly in violation of LSA-C.Cr.P. art. 793. As discussed below, neither complaint warrants this court's intervention.

Louisiana Code of Criminal Procedure Article 905.2(A) provides, in pertinent part: "The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates."[46] Thus, the State was entitled to introduce evidence at the penalty phase that provided the jury with "a quick glimpse" of Gregory Colston's short life of seventeen years and the impact his loss of life had on his family members, friends, and associates. See **Payne v. Tennessee**, 561 U.S. 808, 830, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991) ("A State may decide also that the jury should see 'a quick glimpse of the life petitioner chose to extinguish,' . . . to remind the jury that the person whose life was taken was a unique human being.") (quoting **Mills v. Maryland**, 486 U.S. 367, 397, 108 S.Ct. 1860, 1876, 100 L.Ed.2d 384 (1988)).

**State v. Bernard** allowed the State to "introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." **Bernard**, 608 So.2d at

---

[46] Article 905.2 was amended in 1999 (via 1999 La. Acts, No. 783, § 3 (effective January 1, 2000)) to expand who may testify as "victim impact" witnesses - from merely family members - to also allow testimony from a victim's "friends and associates."

971. In providing guidance for the proper introduction of victim impact evidence, the court instructed that the State may present evidence reasonably showing that the defendant "knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors . . . ." **Id.**, 608 So.2d at 972. However, the **Bernard** court cautioned that "the more detailed the evidence relating to the character of the victim or the harm to the survivors, the less relevant is such evidence." **Id.**, 608 So.2d at 971. Also forbidden are "detailed descriptions of the good qualities of the victim or particularized narrations of the emotional, psychological and economic sufferings of the victim's survivors." **Id.**, 608 So.2d at 972.

Under LSA-C.Cr.P. art. 905.2(A) and **State v. Bernard**, Coach Falting qualified as an appropriate victim impact witness for seventeen-year-old Gregory Colston. Coach Falting, whose testimony consumed only five pages of the sentencing hearing transcript, told the jury that Gregory, a high school senior at the time of his murder, had earned a "preferred walk-on spot" at Northwestern State University in Natchitoches for the upcoming year. Coach Falting taught Gregory geometry his sophomore year, and he earned the highest grade in the class that year, a 98% "A." Coach Falting also recalled that Gregory volunteered to tutor other athletes, and he was "extremely loyal to his teammates and friends and was more than willing to help them out . . . getting them on the right track for the class."

Through Coach Falting, the State admitted its only exhibit at the penalty phase, S-101, a newspaper article written by Coach Falting about Gregory entitled, "The World Has Lost a Dreamer," which had been published in the local newspaper after the triple homicide. During Coach Falting's testimony, the defense objected to the newspaper article being admitted into evidence on grounds that it was "written" and because "newspaper articles are not allowed into

evidence," an assertion that the district attorney promptly took odds with; and the trial court overruled the objection and received the evidence.

According to the defendant, on appeal, the newspaper article was not immediately published to the jury. However, during the State's closing argument, the district attorney told the jury:

> I had Coach Falting testify earlier today and he brought me the article that he wrote and it's offered into evidence. This is State's Exhibit 101. And I'm not going to read it because I can't, but I invite you to. And you can - you can take that back into the jury room.

Notably, the defense voiced no objection during the State's argument. Shortly after retiring to deliberate, the foreperson sent a note to the trial court stating that the jury wished to inspect S-101, the newspaper article written by the coach. When asked if he had any objection to the trial court delivering that writing to the jurors, Mr. English responded, "No, Your Honor." Thereafter, extra copies of S-101 were delivered to the deliberation room to facilitate the jurors' inspection.

The defendant complains, on appeal, that S-101 was "entirely inadmissible" as hearsay and as a written document, which should not have been sent into the jury room under LSA-C.Cr.P. art. 793. The defendant's broader argument is that the combination of Coach Falting's testimony, his newspaper article admitted as S-101, and the fact that the jurors read the article in the jury room "exceeded the narrow limit of permissible victim impact" evidence in violation of **State v. Bernard**.

Nevertheless, the alleged error of sending the article into the jury room was not preserved for appellate review in the absence of a contemporaneous objection. LSA-C.Cr.P. art. 841; **State v. Draughn**, 05-1825 at p. 56, 950 So.2d at 621 ("The failure of the defense to contemporaneously object . . . waives our review of the issue on appeal."). In any event, as discussed below, the error, if any, was harmless. See **State v. Frost**, 97-1771 at p. 14, 727 So.2d at 430 ("The

98

adducement of victim impact evidence which exceeds the scope of **Bernard** is reviewed under a harmless error standard.").

Louisiana Code of Criminal Procedure Article 793(A) provides, in pertinent part:

> [A] juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence . . . . Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.

See **State v. Johnson**, 541 So.2d 818, 824 (La. 1989) (holding it was error to allow the jury to view autopsy and crime lab reports when they would assist the jury only if examined for content); **State v. Perkins**, 423 So.2d 1103, 1109-10 (La. 1982) (holding that the jury should not inspect written documents for the contents during deliberation). In **State v. Johnson**, this court recognized that Louisiana follows a minority view regarding written evidence in the deliberation room:

> The rationale for the rule expressed by Art. 793 appears to be the concern that if jurors are allowed to review the contents of written exhibits during their deliberations, they will place undue weight on such exhibits and not decide the case with an even balance concerning all of the evidence, and their own recall thereof. "[T]he Louisiana legislature has made the value-determination that, because of the presumed prejudice, documents received in evidence should be sent to the jury on its request *only* 'when a *physical examination* thereof is required to enable the jury to arrive at a verdict.'" **State v. Freetime**, 303 So.2d 487, 489 (La. 1974) (emphasis in opinion).
>
> As we have noted in the past, **Freetime**, 303 So.2d at 489, most other jurisdictions allow jurors to take documents or papers, with the exception of depositions, into the jury room. See 4 Wharton's Criminal Procedure 555 (Torcia 1976); Annt., 37 ALR 3d 238. But the Legislature has not seen fit to change our state's rule, the violation of which has usually resulted in the reversal of the defendant's conviction. See, e.g. **Perkins**, supra (trial judge committed reversible error by allowing jury to view a copy of defendant's statement in the jury room); **Freetime**, supra (conviction reversed where trial judge allowed jury to review defendant's confession during deliberations). See also **State v. Passman**, 345 So.2d 874 (La. 1977) (trial judge correctly refused jury's request to examine police radio log).

**Johnson**, 541 So.2d at 824. In reversing the **Johnson** defendant's first degree

murder conviction and death sentence on other grounds, the court instructed that "it is unnecessary for us to determine whether the violation of Art. 793, standing alone, warrants reversing defendant's convictions." **Id.**, 541 So.2d at 825. Nevertheless, the court added that on retrial, "the jury should not be allowed to examine the verbal contents of written exhibits during deliberations." **Id.**

In **State v. Adams**, 550 So.2d 595, 599 (La. 1989), this court stated that the "trial judge has no discretion to make exceptions" to the statutory prohibitions of LSA-C.Cr.P. art. 793. However, the **Adams** court recognized that the State and defense may agree to waive the statutory provisions of LSA-C.Cr.P. art. 793, but the agreement must be in clear express language and must be reflected in the record. **State v. Adams**, 550 So.2d at 599.

More recently, in **State v. Baham**, 13-0058 (La. App. 4 Cir. 10/1/14), 151 So.3d 698, <u>writ denied</u>, 14-2176 (La. 9/18/15), 178 So.3d 138, 139, during prosecution of a second degree murder the jury requested during deliberations to see the statement of an eyewitness who had testified at trial. Over defense objection, the trial judge sent the jury the transcript of the witness's statement, reasoning that, under LSA-C.Cr.P. art.793(A), it would have been permissible to replay the audio of the witness's statement, properly admitted as impeachment evidence, to the jury but that it was easier to allow them to read the statement rather than to deal with the technical difficulties of audio player. **State v. Baham**, 13-0058 at p. 10, 151 So.3d at 704.

The Fourth Circuit found that the trial court erred in permitting the jury to review the transcribed statement, but opined that "such errors may not necessitate reversal." **Id.**, 13-0058 at p. 11, 151 So.3d at 705. The Fourth Circuit deemed the error a "trial error," which can be quantitatively assessed in the context of other evidence and therefore is subject to harmless error analysis, as opposed to a "structural error," which defies analysis under the harmless error doctrine. **Id.**, 13-

100

0058 at p. 12, 151 So.3d at 705. Accordingly, the Fourth Circuit opined that "although Art. 793's prohibition is explicit, violation of that article does not mandate reversal." **Id.** Thus, when viewed in relation to the "substantial" and "extensive" evidence of the **Baham** defendant's guilt (the crime was captured from numerous video-surveillance camera angles), the Fourth Circuit found the error of the jury's access to a witness's statement during deliberation was harmless, as it did not contribute to the verdict, and affirmed the conviction. **Id.**, 13-0058 at pp. 12-13, 151 So.3d at 705-06.

In the instant case, even if trial counsel's objection during Coach Falting's testimony, based on the article as a "written" piece of evidence, preserved the issue on appeal, despite trial counsel having expressed no objection when the newspaper article was sent to the jury,[47] it is nevertheless significant that the newspaper article was admitted during the penalty phase. The article was a tribute piece, written in memory of the defendant's youngest victim, Gregory Colston and, although it was written victim-impact evidence, its purpose was to paint a picture of who Gregory had been to Coach Falting.[48] Given that the focus of the penalty phase is "the character and propensities of the offender, and the victim, and the impact that the

---

[47] The contemporaneous objection rule, contained in LSA-C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.") and LSA-C.E. art. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [w]hen the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection . . . ."), does not frustrate the goal of efficiency; instead, it is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors that either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings. **State v. Taylor**, 93-2201, p. 7 (La. 2/28/96), 669 So.2d 364, 368.

[48] We note that the largest portion of the less than one-page newspaper article by Coach Falting consisted of the title "The World Has Lost a Dreamer" in large lettering and a photograph of the victim Gregory Colston, thus, it seems likely that the newspaper article was requested at least as much for the photograph as for the written content. See **State v. Davis**, 93-1623, p. 23 (La. 5/23/94), 637 So.2d 1012, 1025 (a "[p]hotograph is not 'written' evidence of 'testimony' within the meaning of art. 793."). See also **State v. Overton**, 337 So.2d 1058, 1065 (La. 1976) ("As [Article 793] reads, the matter is one to be decided 'in the discretion of the court.' In this situation, where the jury had not yet viewed the photographs in evidence, it was more orderly to permit the photographs to be sent to the jury room than to conduct [a] . . . proceeding for this purpose in open court after oral arguments . . . . There is no abuse of discretion in this ruling.").

crime has had on the victim, family members, friends, and associates," pursuant to LSA-C.Cr.P. art. 905.2, the newspaper article was probative evidence relevant to the defendant's sentencing hearing.

We conclude that any error of the trial court, under LSA-C.Cr.P. art. 793, in providing written copies of the newspaper article to the jury to read during deliberations was a trial error, subject to harmless error analysis. Under the specific facts of this case, wherein the defendant shot three family members in the head at close range, the jury's decision to return a sentence of death on all three counts seems wholly unattributable to the trial court's decision to provide copies of the written article, S-101, to the jury during their penalty phase deliberations. See LSA-C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."); **State v. Johnson**, 94-1379, p. 14 (La. 11/27/95), 664 So.2d 94, 100 ("The **Sullivan** inquiry 'is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error.'") (quoting **Sullivan v. Louisiana**, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).

Coach Falting's victim-impact statements were neither overly emotional nor overly descriptive of the victim. Nor did his newspaper article provide more than "a quick glimpse" of Gregory Colston. Further, the trial judge instructed the jury on the weight to be given to the victim impact testimony. Under these circumstances, even assuming that the trial court technically erred in permitting the written article to be read by the jurors in the deliberation room, that error appears harmless beyond a reasonable doubt. None of the victim impact testimony interjected an arbitrary factor into the proceedings so as to undermine confidence in the sentencing verdict returned by the jury. We find no merit in this assignment

of error.

Presence of the Defendant a Trial

In his fourteenth assignment of error, the defendant argues that he was prejudiced by being forced to remain in the courtroom during his trial after he requested to be allowed to excuse himself from the proceedings.

With respect to a jury trial, LSA-C.Cr.P. art. 831(A) provides generally that a defendant shall be present at all proceedings "when the court is determining and ruling on the admissibility of evidence," "at all proceedings when the jury is present," and "[a]t the rendition of the verdict or judgment, unless he voluntarily absents himself." However, this court has recognized that the provisions of LSA-C.Cr.P. art. 831 are not absolute and may be tempered by exigent circumstances arising at trial. See **State v. Broaden**, 99-2124, pp. 14-15 (La. 2/21/01), 780 So.2d 349, 360 ("[T]he provisions of Article 831 are not absolute . . . . [A]n accused may waive his presence by voluntary absence, [LSA-C.Cr.P.] art. 832,[49] or by not objecting to his absence from an Article 831A(3) hearing . . . .").

A defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom; a trial judge "must be given sufficient discretion" to deal with a disruptive defendant. **Illinois v. Allen**, 397 U.S. 337, 343-44, 90 S.Ct. 1057, 1060-

---

[49] Article 832 provides, in pertinent part:

> A defendant initially present for the commencement of trial shall not prevent the further progress of the trial, including the return of the verdict, and shall be considered to have waived his right to be present if his counsel is present or if the right to counsel has been waived and:
> (1) He voluntarily absents himself after the trial has commenced, whether or not he has been informed by the court of his obligation to be present during the trial; or
> (2) After being warned by the court that disruptive conduct will cause him to be removed from the courtroom, he persists in conduct which justifies his exclusion from the courtroom.

61, 25 L.Ed.2d 353 (1970).  Code of Criminal Procedure Article 832 was adopted to comply with the opinion in **Illinois v. Allen** and to clarify the trial court's right to exclude an unruly defendant.  LSA-C.Cr.P. art. 832, 1997 Revision Comment (b).  In tandem, LSA-C.Cr.P. art. 17 vests in the trial court "all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders . . . . It has the duty to require that criminal proceedings shall be conducted with dignity and in an orderly and expeditious manner and to so control the proceedings that justice is done."

In this case, the defendant seemingly orchestrated outbursts for effect during his capital trial, exemplifying the type of defendant for whom LSA-C.Cr.P. art. 832(A)(2) was enacted.  The defendant's disruptive behavior began with the State's opening statement, on August 4, 2011, when he turned around in his seat and appeared to be talking to a member of the audience; whereupon, the trial judge excused the jury, and gave the defendant his first warning:

> I'm making this warning.  Mr. McCoy, if you do that again, then I will warn you one more time.  After that, I will remove you from this courtroom to a place where you can hear the evidence in this proceeding, but you will not disrupt this courtroom.  You are to pay attention.  You're not to talk to anyone behind you . . . .

> \* \* \*

> . . . Mr. McCoy, we are in trial proceedings at this time.  Any other outbursts -- I will warn you again . . . I have no problem in removing you from this courtroom . . . . You will be in a spot where you can hear the proceedings so that you can hear the testimony, but you will not be a disruption to this courtroom, sir.

Afterwards, trial counsel gave his opening statement, in which he conceded the defendant was the cause of the victim's deaths and informed the jury that the defendant did not have specific intent to kill because he stated that "Mr. McCoy is crazy."  At which point, the defendant exclaimed, "What?" and then, "Judge Cox, may I be excused?"  Once again, the jury was excused, and the trial judge further admonished the defendant:

> Mr. McCoy, this is your second warning . . . . If you make any other outbursts I will remove you from the courtroom to a conference room where you can hear the proceedings, sir . . . .

The defendant again asked if he could be removed, and the trial judge at first stated that the defendant could be removed to a conference room, but then ordered: "Deputy, he has to remain at the table, please."

The next outburst by the defendant came on August 5, 2011, as the penalty phase commenced, and the State called its first witness, the defendant's ex-wife, Yolanda Colston. Again, the defendant requested to be removed from the courtroom. The trial judge again denied the request, stating:

> I cannot do that under the law, Mr. McCoy, so I'm letting you know that ahead of time. I'm asking that you restrain yourself and stay in your chair, please, sir. And you are to be present according to the law.

Thereafter, during mitigation evidence presented by the defense, via the testimony of clinical psychologist Mark Vigen, Ph.D., the defendant began challenging the expert verbally by interjecting his own questions to the witness and, once again, the jury was excused. The trial judge reprimanded the defendant and directed him to "write those questions down and give them to your attorney to ask, but you are not to have an outburst in this courtroom again, sir." The jury was returned, only to be excused again a few minutes later following another outburst, after which the judge removed the defendant from the courtroom. Given that it was noon when the judge removed the defendant from the courtroom, Mr. English suggested that they break for lunch so that the jury would not have to be told that the defendant had been removed and so that "maybe Mr. McCoy will have calmed down by the time we get back and you can bring him back in." Upon returning from the lunch recess, the judge engaged in the following colloquy with the defendant before the jury came back into the courtroom:

> THE COURT: . . . Mr. McCoy, sir, you have the right to write questions to your attorney . . . . I don't need any statements, please, Mr. McCoy. I'm just doing the best that I can with trying to keep

everything even-keeled. I need you to sit in that chair and be quiet. And you can slide your questions to Mr. English. You can ask him to ask any questions of Dr. Vigen that you want him to ask . . . . But I cannot have those with you speaking out like that . . . [Y]ou and I've talked.

MR. McCOY: Yes, we have, Your Honor.

THE COURT: . . . I'm asking you to please not disrupt the courtroom. And I'm asking you that as a gentleman. Can you do that sir?

MR. McCOY: Yes, sir, I can, Your Honor. I give you my word as a gentleman. I won't interrupt anymore.

No further disruptions occurred on the record of the defendant's sentencing hearing.

The defendant now makes the argument on appeal that, under LSA-C.Cr.P. art. 832, he had a legal right to voluntarily absent himself from the proceedings and the trial court erred as a matter of law by denying him that right. The defendant claims that he was prejudiced by being forced to remain in the courtroom, citing trial counsel's concession of guilt and presentation of sentencing hearing testimony against the defendant's wishes. The defendant contends that his presence at the defense table "implicitly endorsed the existence of a lawyer-client relationship and gave Mr. English's representation a legitimacy it did not have." The defense further contends that the district attorney capitalized on the defendant's outbursts, when cross-examining the defense's mental health expert, Dr. Vigen, by questioning whether the defendant is someone who cannot not follow rules or laws and pointing to the defendant's disruption of the trial proceedings "three times this morning"; and thereafter arguing this point to the jury at the close of the penalty phase.

Recently, in **State v. Tucker**, 13-1631 at pp. 41-42, 181 So.3d at 621-22, this court faced a similar scenario when a capital defendant was removed from court at the request of defense counsel after the defendant became disruptive, then

argued on appeal that counsel could not waive his presence at his capital trial. This court found that, "assuming the trial court erred in not first warning defendant under **Illinois v. Allen** or in not inquiring further into the validity of the waiver asserted by defense counsel, a violation of defendant's right to be present at all stages of trial may constitute harmless error if a reviewing court determines beyond a reasonable doubt that the error did not influence the verdict." **State v. Tucker**, 13-1631 at p.42, 181 So.3d at 622. Accordingly, this court concluded that Tucker's absence from the final moments of the State's rebuttal argument was harmless. **Id.**

The present defendant's behavior does not rise to the level of disorder, disruption, and disrespect evinced in **Illinois v. Allen**, 397 U.S. at 339-40, 90 S.Ct. at 1059 (during his trial the defendant, "in a most abusive and disrespectful manner," argued with, and threatened, the judge and tore his attorney's file and threw papers on the floor) or in two leading Louisiana cases, **State v. Riles**, 355 So.2d 1312, 1313 (La. 1978) (during his trial the defendant argued with the judge, scuffled with the deputy sheriffs, and "otherwise disrupted the trial") or **State v. Lee**, 395 So.2d 700, 701-04 (La. 1981) (during his trial the defendant sang the Star Spangled Banner, "spoke in Elizabethan English of a rather Biblical style," recited scripture, and generally ranted). Nevertheless, the defendant's conduct appears to have been disruptive enough to warrant admonishment by the trial judge. Even though the defendant sought to voluntarily remove himself from the courtroom, the trial judge exercised the utmost restraint in responding to his disruptive behavior and, given that the jurors were judging the defendant in life or death matters, the trial court implicitly recognized that the jury had a right to observe the conduct and demeanor of the defendant during the trial as he faced the evidence of his crimes. Under the standard of review set forth in the above-cited jurisprudence, we find no abuse of discretion or due process violation apparent in the trial court's decision to

107

deny the defendant's request to be removed from the proceedings. This assignment is without merit.

Denial of "Second Motion for New Trial"

In his fifteenth assignment of error, the defendant contends that the trial court erred in dismissing his "Second Motion for New Trial," without reaching the merits, on the basis that it was untimely filed.

We reiterate that the evidence of the defendant's guilt was overwhelming. Nonetheless, the defendant persists in pursuing his alibi theory, and appellate counsel has expended considerable resources to investigate that defense,[50] which appears wholly baseless. In the defendant's second motion for new trial, he alleged there was newly discovered evidence relevant to his alibi.[51]

---

[50] We note that a significant portion of the post-trial record in this case contains defense filings and hearing transcripts pertaining to appellate counsel's efforts to ascertain how and when the defendant's personal cell phone, which had been seized as evidence, had gone missing, post-verdict, an exercise which the district attorney aptly described as "go[ing] down rabbit trails wasting dollars and time." In addition, we also note that, during the course of the defendant's appeal, the defense's investigation into the defendant's alibi included an ex parte motion to view tangible objects in the possession of the BCPD, including a black "Mason" bag and its contents abandoned inside the defendant's white Kia, after the murders. Even though the defendant's cell phone had not been in the defendant's possession after May 5, 2008, since it was also abandoned inside the white Kia, the defense sought to have it forensically tested. On November 16, 2011, appellate counsel's associate, Ada Phelger, made an appointment to view and photograph the evidence according to police protocols and under police supervision. However, during that appointment, appellate counsel telephoned Ms. Phelger to meet him at Bossier Max for lunch. Whereupon, Ms. Phelger returned the evidence under inspection to the evidence bags and returned it to the police property room as per protocol. On November 30, 2011 Ms. Phelger returned to the Bossier City police department, unannounced, seeking to continue viewing the evidence that she had previously been viewing on November 16, 2011. The police were able to accommodate her, even though she had not made an appointment, and the police brought out the evidence boxes she had previously been viewing. At that time, however, the defendant's personal cell phone could not be found, and it has not subsequently been located. The trial court held at least three hearings related to the missing cell phone, and it was alluded at those hearings that the BCPD attribute the loss of the cell phone to Ms. Phelger; and appellate counsel went to great lengths to absolve his associate of any blame in the loss. This cell phone, which the defendant abandoned in the white Kia, though designated as Exhibit D-2, was not introduced as evidence at trial as it was deemed to have no evidentiary value. Appellate counsel justified the protracted post-verdict investigation because Mr. English did not investigate the defendant's alibi defense at the guilt phase.

[51] In the defendant's "Second Motion for New Trial," he asserted that "new and material evidence" shows: (1) The defendant left the Shreveport area near the end of April 2008 (after BCPD officers allegedly beat him and stole his car), when his brother, Carlos McCoy drove him to Dallas, Texas, where the defendant boarded a Greyhound Bus for Oakland, California, under the assumed name of "Ricki Ross" on April 18, 2008; (2) on May 2, 2008 the defendant flew from Oakland, California, to Houston, Texas, where he and a childhood friend, Robert Evans, stayed at a motel. While in Houston, the defendant spent time with two women he met there; (3)

The second motion for new trial has no demonstrable merit as it fails to show that on the date of the triple murder, May 5, 2008, the defendant was anywhere other than 19 Grace Lane in Bossier City, and the trial court did not abuse its discretion by denying the motion for new trial.

Under LSA-C.Cr.P. art. 853(B), a motion for new trial, founded on grounds of newly discovered evidence, may be filed within one year after the verdict. The jury in this case returned its unanimous verdict in the guilt phase on August 4, 2011, and returned its recommendation of the death sentence on August 5, 2011. The defendant timely filed his original motion for new trial on December 6, 2011, after twice seeking a continuance of the formal imposition of sentence in order to obtain more time for preparation of the motion for new trial, pursuant to LSA-C.Cr.P. art. 853(A). The original motion for new trial urged seven arguments, all of which are re-urged in the defendant's appellate brief before this court. On January 20, 2012 the defendant filed a "Supplemental Motion for New Trial." The trial court held a contradictory hearing on the motion for new trial on January 23, 2012 and denied the defendant's motion for new trial.

on May 4, 2008 Robert Evans, a professional truck driver, left Houston and returned to Shreveport to pick up a tractor trailer, which was bound for California, but, the defendant was afraid of returning to Bossier Parish because of his encounters with law enforcement, so Robert Evans agreed to take some of the defendant's "property" home for him to Bossier City; the defendant and Evans agreed to meet in Dallas on May 6, 2008, to head to California together; (4) the defendant rode from Houston to Dallas with Reena Miles, a friend of his brother, Carlos, and stayed in her home in Dallas; (5) as arranged, the defendant and Robert Evans met at a truck stop in Dallas, Texas, on May 6, 2008, and headed toward California. We note that LSA-C.Cr.P. art. 854, requires that, when the ground for the motion for new trial is newly discovered evidence, the motion must show: "(1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial; (2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence; (3) The facts which the witnesses or evidence will establish; and (4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available." In the present case, although the allegedly new and material evidence, described in the defendant's second motion for new trial, would add certain details not contained in the defendant's trial testimony, all of the salient facts were testified to by the defendant at trial; thus, the new evidence is merely cumulative. Further, there is no statement in the second motion for new trial as to whether the listed new witnesses are within the process of the court or are otherwise available. In fact, rather than make the assurance of availability of these new witnesses, the second motion for new trial notes, "Undersigned counsel has begun the laborious task of investigating the evidence supporting Mr. McCoy's account, but the work is intensive given the geographic breadth of Mr. McCoy's journeys, his lack of knowledge of the full names of some of the persons with whom he travelled and associated, and the peripatetic lifestyle of many of these potential witnesses."

Thereafter, the defendant's appellate counsel deposited his "Second Motion for New Trial" with the U.S. Postal Service ("USPS"), by certified mail, on Monday, August 6, 2012. Given that in 2012, August 4th and 5th fell on Saturday and Sunday, respectively, appellate counsel justified mailing his motion on Monday, as the first business day after the one-year anniversary of the verdicts.[52]

The second motion for new trial was physically received and filed in the district court on August 8, 2012.[53] The State responded, on September 14, 2012, arguing that the second motion for new trial was untimely filed and that the defendant's conviction and sentence were "on appeal" on August 8, 2012. On October 1, 2012 the defendant's appellate counsel filed his reply to the State's opposition to the second motion for new trial. On October 9, 2012 the trial court filed its written judgment, which included reasons for ruling that the second motion for new trial was untimely filed on August 8, 2012. The trial court also spoke to the merits of the defendant's "new evidence," noting specifically that the defendant failed to specify his whereabouts on May 5, 2008, the day of the triple homicide in Bossier City, Louisiana, although he asserted additional details about his alleged whereabouts on May 4th and May 6th.

On November 8, 2012 appellate counsel filed his notice of intent to seek writs and also filed a motion to reconsider denial of the second motion for new trial. The district court denied the motion to reconsider on November 16, 2012. The Second Circuit denied the writ application, on January 17, 2013, with the

---

[52] It is appellate counsel's position that depositing the second motion for new trial in USPS mail, on August 6, 2012, amounted to "timely filing on that date" and comports with the "mail box" rule of **Houston v. Lack**, 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) (the date a pro se inmate deposits his habeas corpus application in the prison mail system, as reflected by the metered postage and the stamp placed on the envelope by prison authorities, is considered the date of filing). However, that rule pertains to inmates only and attorneys are held to a stricter time limit under Louisiana Supreme Court Rule VII, § 9, and Rule X, § 5(d), infra.

[53] In reply to the State's opposition to the second motion for new trial, the defendant's appellate counsel attached exhibits showing a certified mail receipt for item number 7011 1150 0000 0130 8781 bearing a USPS cancellation stamp date of "Aug 6 2012." Additionally, a USPS.com track and confirm notice for item number 7011 1150 0000 0130 8781 reflects that the item was delivered on August 8, 2012 at 9:08 a.m.

following order:

> **WRIT DENIED**.
>   The applicant, Robert McCoy, seeks review of the trial court's denial of his second motion for a new trial. Although this writ application is timely filed, on the showing made, this writ is hereby denied. See La. C.Cr.P. art. 853; La. C.Cr.P. art. 851(3); La. C.Cr.P. art. 858; **State v. Cavalier**, 96-3052 (La. 10/31/97), 701 So.2d 949.

**State v. McCoy**, 48,083 (La. App. 2 Cir. 1/17/13) (unpublished). Thereafter, the defendant sought supervisory review from this court, which was denied. **State v. McCoy**, 13-0400 (La. 4/5/13), 110 So.3d 1067.

On appeal, the defendant now argues that filing by mail is permissible and "the date the filing is tendered to the postal service for shipment is considered the filing date" under Rules of the Supreme Court of Louisiana, Rule VII, Section 9, and Rule X, Section 5(d). However, even were we to conclude that the cited appellate court rules apply to the filing of a motion for new trial in the district court, the defendant's second motion for new trial would nevertheless have been untimely under those rules. While the Louisiana Rules for Proceedings in District Courts are silent on the question of filing by mail, this court's Rules VII and X, as well as the Uniform Rules of Louisiana Courts of Appeal, Rule 2-13, direct that if a brief, writ, or other document due to be filed in an appellate court is received by mail on "the first legal day following the expiration of the delay," there shall be a rebuttable presumption that it was timely filed. Here, the defendant's second motion for new trial was received in the district court on August 8, 2012, which was the third legal day following the filing delay. Thus, the motion was untimely, and the trial court did not abuse its discretion by denying it as untimely.

Even if the defendant's second motion for new trial had been timely filed, the defense faced a formidable hurdle of showing that it exercised reasonable diligence yet failed to find the new evidence before trial. See LSA-C.Cr.P. art. 851(B)(3) (grounds for a new trial include "[n]ew and material evidence that,

notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during trial . . . and . . . would probably have changed the verdict or judgment of guilty."). The "new and material evidence" section of the defendant's second motion for new trial relies almost exclusively on the defendant's trial testimony and his pro se "Affidavit - Facts of Incident" (referenced in the defendant's appellate brief as "Affidavit 7/28/10"), which he prepared on July 28, 2010 and filed into the trial court record on August 4, 2010, approximately one year before his capital trial. Given that the defendant was the author of that pro se affidavit and he was fully aware of his own trial testimony, nothing presented in the second motion for new trial appears to be the type of evidence that was unavailable to the defense at the time of the defendant's capital trial, or at the latest, at the time he filed his original motion for new trial. Despite the defendant's actual knowledge of the events, the second motion for new trial avers that the "newly discovered" evidence "remained unavailable to defendant."

In the second motion for new trial, appellate counsel further suggests that had the jury heard from the fourteen witnesses, which the defendant repeatedly sought, pro se, to have subpoenaed, the outcome of trial would have been different. However, this issue was not *newly*-discovered at the time the second motion for new trial was filed. The pro se subpoena issue was the subject of trial court hearings as far back as 2009, some two years before the defendant's capital trial, and even then, the relevance to the defendant's capital trial of those fourteen witnesses was never established. Appellate counsel also uses the second motion for new trial to revive the right-to-counsel issue, which was previously urged in the original motion for new trial, and was argued at length during the hearing on the original motion for new trial.

Given that this assignment of error involves a *second* motion for new trial, LSA-C.Cr.P. art. 856 applies: "A motion for a new trial shall urge all grounds

112

known and available to the defendant at the time of the filing of the motion. However, the court may permit the defendant to supplement his original motion by urging an additional ground, or may permit the defendant to file an additional motion for a new trial, prior to the court's ruling on the motion." Here, the defense failed to discharge its affirmative duty to present all grounds known and available to it in the initial motion for new trial. The defense offers no explanation as to why it failed to present the travel itinerary of the defendant, alleged to establish his alibi and which was surely known to the defendant from the start of this prosecution, in the first motion for a new trial.

Moreover, the "newly" discovered evidence presented in the second motion for new trial is not material. Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed. **State v. Marshall**, 94-0461, p. 16 (La. 9/5/95), 660 So.2d 819, 826 (citing **United States v. Bagley**, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). A reasonable probability is one that is "sufficient to undermine confidence in the outcome." **State v. Marshall**, 94-0461 at p. 16, 660 So.2d at 826. In **State v. Watts**, 00-0602, p. 9 (La. 1/14/03), 835 So.2d 441, 449, this court held that a trial court should ascertain on a motion for new trial "whether there is new material fit for a new jury's judgment." The only issue is "whether the result will probably be different." **Id.** Herein, nothing presented in the defendant's second motion for new trial is either new or material; it merely restates arguments raised in his initial motion for new trial, which the trial court had already denied on the merits, following a lengthy contradictory hearing.

It is well established in our jurisprudence that the granting or refusing to grant a motion for a new trial rests within the sound discretion of the trial judge and will not be disturbed on review in the absence of clear abuse. **State v. Credeur**, 328 So.2d 59, 62 (La. 1976) (citing **State v. Randolph**, 275 So.2d 174,

177 (La. 1973), and **State v. Jackson**, 253 La. 205, 215, 217 So.2d 372, 376 (1968)). Under these circumstances, the trial court did not abuse its discretion by denying the second motion for new trial on timeliness grounds, as the filing by certified mail was untimely by three days. Moreover, the second motion for new trial failed to establish "new and material" evidence, which had it been introduced would probably have changed the outcome in defendant's capital trial, as required by LSA-C.Cr.P. art. 851(B)(3). This assignment of error is without merit.

Failure to Hold Post-Verdict Competency Hearing

In the defendant's sixteenth assignment of error, he asserts that the trial court erred in refusing to hold a post-verdict competency proceeding to re-assess the defendant's mental capacity. Approximately four months after the defendant's conviction in his capital trial, but before the trial court imposed the jury's recommended sentence of death, appellate counsel filed a motion for a sanity commission, seeking to have the defendant's mental capacity evaluated for a second time.

At a hearing held on January 23, 2012, appellate counsel argued that, notwithstanding the original sanity commission's findings "early on" that the defendant was competent to proceed to trial, "things did change" and the defendant's "unquestionably bizarre behavior" warranted appointment of a second sanity commission. Following the hearing, the trial court denied the motion.

On appeal the defendant now contends that the trial judge was put on notice - both before and during trial - and failed to make further inquiry into the defendant's competence, violating statutory law and due process principles.

Louisiana Code of Criminal Procedure Article 642 provides: "The defendant's mental incapacity to proceed may be raised at any time . . . . When the question of the defendant's mental incapacity to proceed is raised, there shall be no further steps in the criminal prosecution, except the institution of prosecution, until

the defendant is found to have the mental capacity to proceed." This court has recognized that the issue of mental capacity to proceed may even be raised after conviction. See **State v. Clark**, 367 So.2d 311, 312 (La. 1979). See also **State v. Payne**, 586 So.2d 652, 654 (La. App. 5 Cir. 1991). The Supreme Court has held that "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." **Drope v. Missouri**, 420 U.S. 162, 181, 95 S.Ct. 896, 908, 43 L.Ed.2d 103 (1975).

Generally, a person who suffers from a mental disease or defect, which renders him incapable of understanding the nature and object of the proceedings against him, of consulting with counsel, and of assisting in preparing and conducting his defense, may not be subjected to trial. LSA-C.Cr.P. arts. 641 649.1; **State v. Rogers**, 419 So.2d 840, 843 (La. 1982) (citing **Drope v. Missouri**, 420 U.S. at 171, 95 S.Ct. at 903, and **State v. Bennett**, 345 So.2d 1129, 1136-38 (La. 1977)). Given the presumption of sanity in Louisiana, the defense carries the burden of proving by a preponderance of the evidence that, as a result of a mental disease or defect, the defendant lacks the capacity to understand the proceedings against him or to assist in his defense. **State v. Bennett**, 345 So.2d at 1138.[54] The determinations of the trial judge as to competency of the defendant to stand trial are entitled to great weight on review and will not be overturned absent an abuse of discretion. **State v. Rochon**, 393 So.2d 1224, 1228 (La. 1981).

In the present case, just a few months post-indictment, the trial court ordered a sanity commission to evaluate the defendant at the behest of his then-appointed public defenders. The trial judge appointed Dr. Richard W. Williams, a psychiatrist, and Mark P. Vigen, Ph.D, a psychologist, to evaluate the defendant.

---

[54] See also LSA-R.S. 15:432 ("A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; such is the presumption . . . that the defendant is sane and responsible for his actions . . . .").

Both experts submitted confidential reports to the trial court. Dr. Vigen assessed the defendant's full scale IQ score as 89, with his verbal IQ measured at 95, and his Performance IQ at 83.[55] Dr. Vigen diagnosed the defendant with narcissistic personality disorder, but found no active mental state that would interfere with his rational understanding of the proceedings against him or his ability to assist his counsel in his defense. Similarly, Dr. Williams found the defendant exhibited no evidence of intellectual disability.[56] Dr. Williams diagnosed the defendant with antisocial personality disorder, with narcissistic features, and found the defendant capable of understanding, assisting, and testifying in his own defense. On November 14, 2008 the trial judge held a hearing on the record with the attorneys present and ruled: "This Court does find that Mr. McCoy is competent to assist his attorney in this matter and is competent to stand trial according to Dr. Richard Williams and according to Dr. Mark Vigen. The Court finds this case is able to go forward."

In his appellate brief to this court, the defendant asserts that before and during trial, the trial judge was put "on notice" that there was "a bona fide doubt as to defendant's competence to proceed," as repeatedly advised by the defendant's trial counsel, Mr. English. To put the issue in context, we review a few of the trial court incidents during which the defendant's competence was questioned by his trial counsel.

On January 4, 2011 (when defendant's capital trial was slated to commence the following month, on February 7, 2011), Mr. English apprised the trial court that defendant had ordered him not to develop any mitigation evidence, even though

---

[55] An IQ score of 75 or below warrants further inquiry into whether a defendant has an intellectual disability. See **Brumfield v. Cain**, ___ U.S. ___, ___, 135 S.Ct. 2269, 2278, 192 L.Ed.2d 356 (2015); **Hall v. Florida**, ___ U.S. ___, ___, 134 S.Ct. 1986, 1996-2001, 188 L.Ed.2d 1007 (2014); **State v. Dunn**, 01-1635, p. 25 (La. 5/11/10), 41 So.3d 454, 470, cert. denied, 562 U.S. 1063, 131 S.Ct. 650, 178 L.Ed.2d 480 (2010).

[56] See LSA-C.Cr.P. art. 905.5.1 ("Notwithstanding any other provisions of law to the contrary, no person with an intellectual disability shall be subjected to a sentence of death.").

Mr. English stated he "believe[d] that those experts are important . . . if there is a guilty verdict and he face[s] a capital sentencing." Mr. English notified the court that he was not abiding by the defendant's wishes, but was adhering to his ethical duty to provide a defense that was in the defendant's best interest. Mr. English advised the trial judge that "my client is suffering from some severe mental and emotional issues that [have] an impact upon this case." "I do not believe that Mr. McCoy is capable of making value judgments in this case about his defense and I ask him . . . that he not make any statements in this courtroom." One of the issues before the court on January 4, 2011 was the defendant's pro se motions and subpoena requests, which the defendant had persisted in filing notwithstanding that he was represented by retained counsel. At the conclusion of the hearing that day, Mr. English announced that the defendant "has accepted my advice to not speak in this court today." Thereafter, the defendant's pro se motions were withdrawn.

On January 24, 2011 (with the trial still slated to commence on February 7, 2011), the trial court held a hearing on the State's motion to "flush out the issue" of whether the defendant, having been declared indigent, was entitled to two attorneys under Louisiana Supreme Court Rule XXXI. The defendant's express waiver of a second trial counsel was necessary, and the trial court took great care to explain the advantages of a second trial counsel to the defendant and to ensure that the defendant was aware of his **Miranda** rights. The defendant replied to the trial court, "I'm fully competent upon understanding everything [the trial judge] has to say to me, sir." Even though trial counsel advised the defendant not to speak on the record, the defendant reminded the trial judge that when Mr. English enrolled in March 2010, it was with the stipulation that he would "put a legal team together," observing that it now looked like the team was going to come from members of the local public defender's office, some of whom were present in court. The defendant made it clear that any involvement of public defender's

office in his case was unacceptable to him, explaining, "I've had problems with the public defender's office, Your Honor, from day one."

The defendant waived appointment of a second attorney to assist in his capital case under Louisiana Supreme Court Rule XXXI, and the hearing moved on to the topic of funding for mitigation experts. Mr. English announced that Dr. Mark Vigen, Dr. Craig Forsyth, and John Craft would be mitigation experts for the defendant. The district attorney announced that the State would be ready for trial on February 7, 2011, whereupon Mr. English disclosed that his experts would need more time to prepare for trial. The defendant took the opportunity to report to the trial court the difficulty he was having getting trial counsel to issue the subpoenas he requested, and the trial judge advised him that the subpoenas he was asking about had not been issued in proper form, which is why they were quashed. The trial judge clearly informed the defendant that he was free to properly subpoena those witnesses through his attorney. The ensuing colloquy between the defendant, his trial counsel, and the trial judge illustrate the defendant's intellectual capacity and the absence of any intellectual disability:

> MR. MCCOY: . . . Mr. Larry English told me that I cannot subpoena a sitting judge. And I know that is very contrary to the record.
>
> THE COURT: . . . Mr. McCoy, you are being advised by Mr. English on that . . . .
>
> MR. MCCOY: I understand, but --
>
> THE COURT: If proper procedure is followed, Mr. English will follow your instructions, or not follow your instructions, based on his advice.
>
> MR. MCCOY: But Mr. English works for me, Your Honor. Mr. English is --
>
> THE COURT: I understand that, Mr. McCoy.
>
> MR. MCCOY: -- required to follow the instructions that I give Mr. English, Your Honor.

THE COURT: I understand that, Mr. McCoy, but that's between you and your attorney.

MR. ENGLISH: Your Honor, I need to state something on the record.

THE COURT: Yes, sir.

MR. ENGLISH: I believe that Mr. McCoy has severe mental issues.

MR. MCCOY: No, sir, that is not going to work on the record, Your Honor.

* * *

MR. ENGLISH: Let me finish, Your Honor. I believe Mr. McCoy has severe mental issues. Mr. McCoy has made statements to me that has caused me to have some concerns even though I know there's been a sanity commission . . . put in place. I'm going to reiterate to the . . . Court again, Your Honor, I believe Mr. McCoy has severe mental issues. That is a mitigating factor in this case as the reason why my motion to continue to allow Dr. Mark Vigen to do a full evaluation of him, Your Honor, to bring those issues forward. Mr. McCoy has made statements to me, Your Honor. He is - he is irrational . . . . He's asking me to do . . . things which I . . . cannot do that goes . . . counter what his interests are in this trial. I believe, Your Honor, it is imperative that this Court grant me a continuance so that I can have Mr. McCoy evaluated in some detail by Mark Vigen to present that evidence as mitigating facts in this case, Your Honor. We're all in this courtroom. It is what it is. All of us in this courtroom, we had an opportunity to evaluate Mr. McCoy, Your Honor . . . . I have tried to give Mr. McCoy the best counsel I can. Mr. McCoy, Your Honor, continues to make statements that are irrational. He continues to ask me to do things, Your Honor, that if I followed his advice would almost certainly lead to a conviction and a jury issuing a death penalty in this case. That is the reason why I am asking . . . Your Honor, for a continuance in this case . . . given that Mr. McCoy has exhibited very bizarre behavior to me that warrants . . . being further evaluated, Your Honor, . . . and there are mitigating circumstances in this case.

* * *

MR. MCCOY: Your Honor, to address that matter, *Mr. English is putting on the judicial record that there is something wrong with me and I defer that to Your Honor.* Let me share what my problem is with Mr. English, Your Honor . . . .

* * *

THE COURT: Mr. McCoy, please listen to me. You're fixing to reveal attorney/client privilege. You're fixing to put this all on the record . . . . Sir, if ever a person needed to exercise their rights to be quiet and to use their right to remain silent, this is one of those cases,

119

sir . . . . Mr. English has advised you. I'm advising you. I cannot stop you from making a statement, Mr. McCoy.

MR. MCCOY: But, Judge Cox, this -- this really needs to be heard though. This really needs to be put on the record, not just for court documents but for validation. When your own attorney, Your Honor, tells you that the District Attorney brung [sic] a plea saying that you got your fingerprints on the gun; that the victims' blood is on your clothing; . . . when it comes to evidence that there is no victims' blood on your clothing; that there's no fingerprints on the gun . . . . Mr. English has been very deceptive towards me. Mr. English do not want me to talk, Your Honor, because Mr. English has fed me nothing but a whole bunch of mishaps since we have been in this. Did he say I'm irrational, Your Honor? Because, I'm not going to let him tell me anything, Your Honor. I know what I've done and I know what I didn't do, Your Honor. Mr. English has told me there is no way he can win this case . . . .

MR. ENGLISH: . . . I'm going to again advise Mr. McCoy . . . not to continue to divulge attorney/client conversations. And I'm going to reiterate to the Court, Your Honor, why I'm making a motion to continue. I apologize to the Court while I'm making a Motion to Continue . . . . Mr. McCoy, Your Honor, . . . is severely mentally compromised.

MR. MCCOY: No, sir.

MR. ENGLISH: He is . . . continuing, Your Honor, against all advice of counsel to not listen to me when his life is on the line . . . . If I followed Mr. McCoy's advice, I'd be put in a position, Your Honor, that I've never been put into my time as a lawyer of not following my client's advice. Your Honor, . . . this is a predictor. You're watching this man's behavior. It is bizarre.

MR. MCCOY: No, it's not, Your Honor.

MR. ENGLISH: I need a mental health expert appointed to evaluate Mr. McCoy, Your Honor . . . . Mr. McCoy is going to attempt to take over this trial and argue in front of the jury. And when he does that, Your Honor, I have the responsibility of then standing in front of the jury and fighting for his life . . . . This man is irrational. He is severely emotionally and mentally compromised . . . . He will not and cannot assist me. He is going to fight me. He is going to take over this trial . . . . This man needs to be evaluated, Judge, and that evidence needs to be brought before a jury at the proper time . . . .

* * *

MR. MCCOY: But, Your Honor, if I don't put it on the judicial record and Mr. English still don't agree with the things that I'm asking him to do as far as subpoenaing people, Your Honor, if we go to trial without these proper people subpoenaed, Your Honor, that's a worse situation for me, Your Honor. Just like, Your Honor, the

120

eyewitness that gave the description of the person at the scene of the crime, Your Honor, that hasn't been turned over to me for discovery so I could subpoena that person so that person can validate, Your Honor, that that wasn't me at the crime, Your Honor. The District Attorney haven't turned it over to us, Your Honor, and that's exculpatory evidence to prove my innocence . . . .

\* \* \*

MR. ENGLISH: Your Honor, the District Attorney, to my knowledge, turned over all discovery to date.

MR. MCCOY: No, he didn't.

MR. ENGLISH: May I finish? Your Honor, Mr. McCoy is asking me to subpoena witnesses to put forth a theory . . . that will help the District Attorney send him to the death chamber. I will not follow his advice. I will not subpoena FBI agents. I will not subpoena judges. I will not . . . not run all over the country looking for witnesses that don't exist. Mr. McCoy is severely mentally compromised, Your Honor, . . . and I'm asking this Court to grant my Motion to Continue so that he can be evaluated because this is going to be the case. It is going to be a zoo.

MR. MCCOY: No, it's not, Your Honor.

MR. ENGLISH: It's going to be a zoo, Judge, because I'm not going to do what he wants me to do. I can be relieved from this case. I do not believe this man is rational. I think I have an ethical duty . . . . I have sought legal counsel from other death penalty lawyers on advice on this. I have an ethical duty to this man not to follow his bizarre behavior . . . . And I'm asking this Court to please allow me to have this man evaluated, Your Honor, because he is mentally and emotionally compromised.

MR. MCCOY: And, Your Honor, for the record, and I'm going to end my conversation, Your Honor. ***Your Honor, I've been evaluated. There is . . . nothing wrong with me, Your Honor . . . . Mr. English wants the Court to believe something is wrong with me to further evaluation that has already been evaluated before, your Honor. There is nothing wrong with me. I'm fully competent. I'm fully understanding of the aspects of this case*** . . . .

MR. ENGLISH: I'm going to advise Mr. McCoy to be quiet, Your Honor.
\* \* \*

MR. MCCOY: Let - let me talk here.

MR. ENGLISH: . . . He's now saying stuff, Your Honor, that goes to the heart of his defense and he's compromising his case.

[Emphasis added.]

121

At the conclusion of the hearing, the trial court denied trial counsel's motion for a continuance, and the ruling was ultimately overturned by the Second Circuit, which stayed the proceedings and remanded the case back for consideration of the second counsel issue; the defense having prevailed in obtaining a continuance, the trial was rescheduled for July 28, 2011.

On July 12, 2011 (with trial set for July 28, 2011), the trial court held a hearing, once again, to quash subpoenas requested by the defendant, pro se. On this date, the defendant voiced his displeasure with Mr. English's reluctance to abide by his wishes and issue the subpoenas for the alibi witnesses he wanted for trial, pointing out, "There's a zeal that an attorney is supposed to have for his client and that zeal is not being met here." Mr. English responded, "I have no ethical duty as a lawyer to hold Mr. McCoy's hand while he walks into the death chamber . . . . I have an ethical duty, Your Honor, to try to defend him and do the . . . best I can to save his life." Afterwards, Mr. English assured the trial court that he would "not call those witnesses if they are subpoenaed." Mr. English reiterated, "I do not believe that Mr. McCoy has the mental capacity to assist himself to - to insist on going down this path, Your Honor, is reckless."

On July 26, 2011, two days before trial, Mr. English told the court, "I was informed by Mr. McCoy this weekend that it was his intention to terminate my services." The defendant explained, at length, to the court that he no longer wished to be represented by Mr. English because counsel was trying to make him "cop out to three counts of first degree murder." Mr. English confirmed that "we have an irrevocable disagreement between how to proceed in this case." Even though Mr. English requested to be allowed to withdraw as counsel in the case, the trial judge refused that request. Thereafter, during his opening statement on August 3, 2011, Mr. English told the jury, "Robert McCoy is crazy."

As the quoted incidents establish, when the defendant's trial counsel asserted that defendant was irrational, incompetent, or crazy, the defendant would rationally respond to deny the assertions. Throughout such proceedings in which the defendant complained to the trial judge that his trial counsel would not investigate and secure evidence to put forth his desired alibi defense, the trial judge had the benefit of witnessing firsthand the defendant's demeanor and his pro se performance in court, during which the defendant strongly defended himself against his trial counsel's claims that his behavior was crazy or abnormal. The State observes, in brief to this court, that the defendant was disruptive in court when he disagreed with trial counsel "but exercised self-control when he wanted to."

Against this backdrop of trial court exchanges, we review the applicability in this case of LSA-C.Cr.P. art. 643, which requires a trial court to appoint a sanity commission "when it has reasonable ground to doubt the defendant's mental capacity to proceed." Reasonable ground in this context refers to "'information which, objectively considered, should reasonably have raised a doubt about defendant's competency and alerted [the court] to the possibility that the defendant could neither understand the proceedings or appreciate their significance, nor rationally aid his attorney in his defense.'" **State v. Snyder**, 98-1078, p. 24 (La. 4/14/99), 750 So.2d 832, 851 (quoting **Lokos v. Capps**, 625 F.2d 1258, 1261 (5th Cir. 1980)). The fact that the defendant's capacity to proceed is called into question does not, for that reason alone, require the trial court to order a mental examination of the defendant. **State v. Cyriak**, 96-0661, pp. 8-9 (La. App. 3 Cir. 11/6/96), 684 So.2d 42, 47. In **State v. Synder**, 98-1078, p. 23 (La. 4/14/99), 750 So.2d 832, 850,[57] the court stated that, "when such claims, combined with

_____

[57] We note that **State v. Snyder** is distinguishable from the instant case. In **State v. Synder**, a sanity commission had found the defendant competent to proceed and counsel conceded that the defendant was "technically competent," in that he had an understanding of the proceedings

123

objective medical evidence, raised a sufficient doubt as to defendant's competence, we must question whether defendant received a fair trial in this regard."

While appellate counsel, in this case, offers no objective medical evidence, he suggests that the testimony of various law enforcement officers at the guilt phase, who testified as to the defendant's various pretrial suicide attempts,[58] demonstrate "reasonable grounds" that should have prompted the trial judge to order a reexamination of the defendant's mental capacity.  However, in **Drope v. Missouri**, the Supreme Court recognized that "'the empirical relationship between mental illness and suicide' or suicide attempts is uncertain and that a suicide attempt need not always signal 'an inability to perceive reality accurately, to reason logically and to make plans and carry them out in an organized fashion.'"  **Drope v. Missouri**, 420 U.S. at 181 n.16, 95 S.Ct. at 908 n.16 (quoting Greenberg, "Involuntary Psychiatric Commitments to Prevent Suicide," 49 N.Y.U.L.Rev. 227, 234-36 (1974)).  When the defendant, in this case, testified at trial on his own behalf and was asked about whether he had wanted to kill himself, he responded, "As you see, I love me.  What am I going to kill myself for?"  The defendant denied attempting suicide and told the jury that the suicide watch he was placed under in Lewiston, Idaho was a sham to cover up the fact that the officers there had beaten him.

That the defendant's mental capacity did not degenerate from the time of his sanity commission in 2008 through the course of 2011 trial was evidenced by the

___

against him.  However, the sanity commission doctors also found that the defendant was so depressed he had some difficulty in communicating and they recommended a change in medication.  This court held that, under these circumstances, the trial court abused its discretion by taking absolutely no steps to investigate the problem despite objective medical corroboration of counsel's complaints and by denying counsel's motion to continue trial (and also denying counsel an opportunity to make an ex parte showing of the problems she was having with the defendant) for four or five weeks while the defendant's new medication reached maximum therapeutic levels.

[58] Trial testimony indicated that the defendant had, after he was first apprehended in Idaho, attempted to hang himself in the Idaho jail, that he later swallowed a razor blade, that he later swallowed a large quantity of paper, and on another occasion he bit into his arm.

defendant's own statements at trial, which demonstrated his efforts to educate himself on relevant legal issues. During questioning about adverse statements made by witness Gayle Houston, his childhood friend, the defendant related that the district attorney "had told him [Mr. Houston] that they was going to tie him into it as an accessory to the fact [and] . . . that's a threat . . . . That's coercion." The defendant continued, in his testimony, "[T]hey coerced him . . . to the point that he couldn't make an intelligent decision on his own. That's the aspects of *Mintzy* (sic) *versus Arizona.* You can't coerce a person. You can't lead a person. You can't vindicate the aspects of your law to a person in which they -- they're not able to make a probable decision."

Also, during his trial testimony, the defendant was being asked about whether he was the person seen purchasing ammunition at Walmart on the date of the murder and whether he was the person seen by Officer Szyska jumping out his white Kia automobile on the night of the murder and running away, and the defendant replied:

> *State versus Tilley* vindicates that the description of a suspect has to be sufficient and in detail. You can't speculate and say this is someone. You have to know that that is someone. There are a lot of people on death row right now because someone speculated because that is someone. You have to be specific. You have to know if that's Robert McCoy, that's Robert McCoy; if that's McGee, that's McGee.

At the post-trial January 23, 2012 hearing on the defense motion for the appointment of a second sanity commission, appellate counsel pointed to trial counsel/Mr. English's specific and emphatic declarations to the trial court that the defendant was incompetent and unable to assist in his defense. Appellate counsel also pointed to the allegations that the defendant had attempted suicide. Appellate counsel further claimed that following the verdict, he had solicited the help of Dr. Frank Gresham, a psychologist with expertise in administering intelligence testing, and asserted that Dr. Gresham opined that the verbal score obtained in the

125

defendant's earlier IQ testing was inflated by eleven points and that the full scale IQ score was inflated as a result of the error.

The district attorney countered that the defendant was examined pre-trial by Dr. Vigen, a member of the 2008 sanity commission that found the defendant competent to proceed. The district attorney reminded the trial court that Dr. Vigen was subsequently retained by the defense (after obtaining a requisite waiver from the State), as their mitigation expert for trial purposes, evidencing the defense's high regard for Dr. Vigen. The district attorney further pointed out that, at trial, Dr. Vigen testified that the defendant's mental health was such that he was competent and capable of standing trial. The district attorney further asserted that "there is absolutely nothing that indicates that since that [original] testing that his mental health has deteriorated to the point that he should not be competent to stand trial and assist in his defense."

At the conclusion of the January 23, 2012 hearing, the trial court denied the motion for appointment of a post-verdict sanity commission and, relying on **State v. Holmes**, stated that "it was not surprising for a defendant facing a capital murder trial to become depressed and contemplate suicide." The trial judge also cited **State v. Bridgewater** (wherein the defendant requested a sanity commission, after a sanity commission one year previously found the defendant competent, and no additional medical evidence was brought forth to challenge the determination of competency) as similar to the instant case. Herein, the trial judge stated that "[o]bjections by attorneys, standing alone, are not enough to require a commission," cogently summarizing his appreciation of the defendant's mental state:

> [I]t's my belief that Mr. McCoy completely understood the seriousness of the charges against him. After all, he wrote scores of his own motions regarding his case. Many of those motions were legally on point. If he didn't understand the seriousness of the charges or the way the legal system works, he wouldn't have filed

everything that he did. If we were to accept movant's claim at face value and determine that a court determine sanity at the drop of a hat, then every time a defendant acted differently before trial, or argued with his attorney, or said I'm mentally incompetent, everything would have to stop until a new commission was held and found the defendant to be competent to stand trial. While it is true that Mr. English stated he thought Mr. McCoy lacked the capacity to help defend himself in this case, we need to recognize that Mr. McCoy only wanted to plead not guilty, and Mr. English determined that the best trial strategy would be to plead guilty, according to Mr. English. A major reason that Mr. McCoy would be unable to assist in his own defense is due to the major divide over trial strategy. This court cannot set a precedent that permits a finding of lack of capacity when the defendant disagrees with trial strategy and refuses to speak to their attorney out of anger. Using the factors of *US versus Moghaddam*, a case that movant relies upon but fails to cite, Mr. McCoy's history of irrational behavior was limited . . . . Mr. McCoy has a criminal history which doesn't show irrationality, just a disrespect of the law. While Mr. McCoy's behavior at trial warranted his removal from the courtroom, after being told to, he did settle down. Prior medical opinions, specifically the medical opinion that created the report, stated he was mentally competent to stand trial . . . . Dr. Vigen was called to testify at the trial, had the opportunity to visit with Mr. McCoy further, and never raised that Mr. McCoy was incompetent or not competent to stand trial. For those reasons, I deny that motion.

The present case fails to demonstrate that reasonable grounds existed at the time of sentencing to convene a second sanity commission. **State v. Hicks**, 286 So.2d 331, 333 (La. 1973) (wherein defense counsel presented no evidence on the motion for appointment of a sanity commission and the psychiatrist asked by the court to examine the defendant reported that the defendant appeared to have the capacity to proceed; thus, "[t]he only logical conclusion that can be drawn from this record is that the defense has failed to convince the court that there was a reasonable ground to doubt the defendant's mental capacity to proceed."). Similarly, in the present case, trial counsel told the trial court repeatedly that he believed the defendant had severe mental issues, but brought forth no objective medical evidence to support his belief sufficient to raise the "reasonable ground" required under LSA-C.Cr.P. art. 643. Consequently, the mere repetition of the allegation did not put the trial judge on notice of a bona fide change in the defendant's mental functioning. Furthermore, appellate counsel's reliance on the

127

defendant's alleged suicide attempts is misplaced since all of those incidents pre-dated the defendant's 2008 evaluation by the initial sanity commission. Here, the trial judge specifically noted that he had heard no reasonable ground or any medical evidence to support ordering a new sanity commission. The trial judge's ruling is entitled to great weight on review, and we find no abuse of discretion in his decision to deny the post-verdict motion for the appointment of a sanity commission. We find no merit in this assignment of error.

Capital Sentence Review

Under LSA-C.Cr.P. art. 905.9 and Rules of the Supreme Court of Louisiana, Rule XXVIII, this court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, pursuant to Rule XXVIII, Section 1, this court considers: whether the jury imposed the sentence under the influence of passion, prejudice, or any other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.

Pursuant to Rule XXVIII, Section 3, a Uniform Capital Sentence Report ("UCSR") and a Pre-Sentence Investigation Report ("PSI") were filed into the appellate record for review by this court. In addition, the State and the defense have filed sentence review memoranda, and the defense filed objections to the UCSR and PSI, contending only a de minimis mitigation investigation was performed in this case and specifically claiming there was a deficiency in detail as to the defendant's educational and employment history.

These documents, along with the defendant's guilt phase testimony and Dr. Vigen's penalty phase testimony, indicate that the defendant, Robert Leroy McCoy, is an African-American male, born on October 2, 1973, and is the second oldest of five children born to the marital union of Robert McCoy, Sr. and Mary

McCoy.  The defendant was raised by both parents in a home in the Eden Gardens neighborhood of Shreveport, where his parents still reside.  Mrs. McCoy worked as a sitter and performed domestic work before becoming disabled, due to congestive heart failure, and Mr. McCoy did cement work for various construction companies before retiring.  The defendant mentioned an older half-brother and half-sister born to his father.  At trial, the defendant described his childhood as "fair," and that they were "working class" but there was always food on the table.  The defendant stated that he was educated at Eden Gardens Elementary, Ridgewood Middle School, and C.E. Byrd High School, where he participated in football, weight-lifting, and ROTC.  The defendant claimed to have graduated high school with a 3.8 grade point average.

The defendant had no military service.  His employment history, through 1999, was with Dominos, the Sheraton Hotel, the casinos, and Foremost Dairy.  From 1999 to 2001, he worked as a deckhand for Nabor's Drilling; from 2001 to 2002, he worked at Langston Drilling; from 2002 to 2006, he ran a lawn service called The Real McCoy; and from 2006 to 2008, he worked for Greystone Drilling and Union Pacific Railroad.

The defendant married Yolanda Colston in 2005, during which time a daughter was born, but the defendant stated that he is not certain he is her father.  The defendant reported no prior marriages, but has four children from four previous relationships:  a daughter born in 1996, and three sons born in 1999, 2000, and 2005.  The defendant was raised in the Baptist church and most recently was a member of Stonewall Baptist Church in Bossier City, where he and Yolanda sought counseling with the pastor.

The defendant denied abusing alcohol or any illegal substances.  He underwent anger management counseling while incarcerated at Caddo Correctional Center on a previous offense.  Since his arrest on the instant triple homicide, the

defendant purportedly attempted suicide at least four times, all of which he denied, attributing his injuries to mistreatment by law enforcement. The sanity commission experts evaluated the defendant as having an exaggerated view of his self-worth, tending to rewrite reality in order to maintain his positive image, and having a Narcissistic Personality Disorder with antisocial and paranoid features.

The defendant has no juvenile criminal record, and excluding the crimes charged in the current case, the defendant's adult criminal record includes convictions for the following: March 30, 1997, simple criminal damage to property; March 18, 1999, simple criminal damage to property; September 7, 2000, no license plate light; April 24, 2001, attempted second degree kidnapping; and April 2008, aggravated battery.

The defendant is considered a third felony offender. The PSI notes his history of violent behavior has escalated and opined that he "cannot be rehabilitated." In the defendant's statement for the PSI, he denied committing the murders stating "he would never have hurt his family in that way." The defendant further stated that his trial counsel "sold me out," and "the District Attorney and Police Department are hiding the truth of this horrific crime."

Passion, Prejudice, or Other Arbitrary Factors

The first degree murders of Christine Colston Young, Willie Young, and Gregory Colston occurred on May 5, 2008. Following jury selection, trial commenced on August 3, 2011, approximately three years after the crime was committed.

The defendant is an African-American, as were all three victims. The victims were the mother, step-father, and son of the defendant's estranged wife, Yolanda Colston. Additionally, Willie Young was the defendant's cousin.

The defendant's jury was composed of one African-American juror and eleven Caucasian jurors. Trial counsel raised several **Batson** claims at the

130

defendant's trial, as to which the trial court found no discriminatory intent by the State. Appellate counsel re-urged the **Batson** claims in this appeal, and as discussed hereinabove relative to the defendant's tenth assignment of error, we concluded the **Batson** claims had no merit, as race was not an issue at trial.

At the time of the triple homicide, manhunt, and the defendant's suicide attempts, the defendant's case commanded some media attention, but not an abundance. At least one article was published about allegations of beatings of inmates, including the defendant, at Bossier Max. During the time that the defendant was acting as his own counsel, he filed and argued a motion to change venue based on pretrial publicity, which the trial court denied.

Appellate counsel argued that the State interjected an arbitrary factor into the defendant's sentencing hearing when it admitted Exhibit S-101, a tribute article written about Gregory Colston entitled, "The World Has Lost a Dreamer," which was published in the local newspaper after the murders. Appellate counsel claims that the error of admitting such an inflammatory victim article was compounded by the State making copies and distributing them for the jurors to review in the deliberation room. In this court's discussion of the defendant's thirteenth assignment, supra, we concluded that the article provided no more than a "quick glimpse" into the life of victim Gregory Colston, and any error associated with the jury's review of the written article was harmless; thus, no arbitrary factor appears to have been interjected by Exhibit S-101.

In the defense sentence review memorandum, it is argued that the defendant's execution would be arbitrary, given that he was represented by a single attorney at his bifurcated capital trial and that his attorney was not capitally-certified. The defense asserts that trial counsel conceded the defendant's guilt in the triple homicide, thereby effectively relieving the State's burden of proving the sole aggravating factor upon which the jury rested its sentencing recommendation,

pursuant to LSA-C.Cr.P. art. 905.4(A)(4) ("The offender knowingly created a risk of death or great bodily harm to more than one person.").

Aggravating Circumstances

The State relied upon three aggravating circumstances under: LSA-C.Cr.P. art. 905.4(A)(1) - the offender was engaged in the perpetration or attempted perpetration of aggravated burglary; LSA-C.Cr.P. art. 905.4(A)(4) - the offender knowingly created a risk of death or great bodily harm to more than one person; and LSA-C.Cr.P. art. 905.4(A)(7) - the offense was committed in an especially heinous, atrocious, or cruel manner. The jury based its verdicts in the sentencing phase on LSA-C.Cr.P. art. 905.4(A)(4), finding that the defendant created a risk of death or great bodily harm to more than one person. The record is replete with evidence supporting that aggravating circumstance. See **Jackson v. Virginia**, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

At the guilt phase, the jury heard Christine Colston Young's frantic 911 call, from which the jurors could infer that the defendant's arrival and entry into her home was uninvited and unauthorized. The trial court instructed the jury on the elements of aggravated burglary at the penalty phase, but otherwise, the State did not emphasize that aggravating circumstance. Likewise, the jury declined to find that the triple homicide, in which each of the victims succumbed to a single gunshot wound to the head, was committed in an especially heinous, atrocious, or cruel manner. This court has held on numerous occasions that the failure of one or more statutory aggravating circumstances does not invalidate others properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. **State v. Tate**, 01-1658, p. 23 (La. 5/20/03), 851 So.2d 921, 939, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); **State v. Letulier**, 97-1360, p. 25 (La. 7/8/98), 750 So.2d 784, 799.

In the instant case, evidence of the aggravating circumstances did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victim's injuries was relevant and properly admitted at trial. Furthermore, the remaining aggravating circumstance, i.e., that the offender killed more than one person, was more than amply supported. Hence, the jury's sentencing decision in this case does not appear to be arbitrary or capricious. See **State v. Roy**, 95-0638, pp. 19-20 (La. 1996), 681 So.2d 1230, 1242, cert. denied, 520 U.S. 1188, 117 S. Ct. 1474, 137 L. Ed. 2d 686 (1997). Consequently, the defendant's sentence of death is firmly grounded upon the jury's finding of the LSA-C.Cr.P. art. 905.4(A)(4) aggravating circumstance, as to each count.

Proportionality

Although the federal Constitution does not require proportionality review, as indicated in **Pulley v. Harris**, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. **State v. Burrell**, 561 So.2d 692, 710-11 (La. 1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); **State v. Wille**, 559 So.2d 1321, 1341 (La. 1990), cert. denied, 506 U.S. 880, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). This court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in one case, inter alia, a sufficiently "large number of persuasive mitigating factors." **State v. Sonnier**, 380 So.2d 1, 9 (La. 1979). See also **State v. Weiland**, 505 So.2d 702, 707-10 (La. 1987) (although this case was reversed on other grounds, dictum suggests that the death penalty was disproportionate).

This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent

with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. **State v. Sonnier**, 380 So.2d at 7.

The State's sentence review memorandum reveals that since 1976, jurors in the 26th Judicial District Court, which is comprised of Bossier and Webster Parishes, have returned a guilty verdict in twenty-two capital cases, excluding the defendant's case and, of those, nine juries recommended the death penalty.

It is appropriate for this court to look beyond the 26th Judicial District and conduct the proportionality review on a statewide basis. See **State v. Davis**, 92-1623, pp. 34-35 (La. 5/23/94), 637 So.2d 1012, 1031, cert. denied, 513 U.S. 975, 115 S.Ct. 450, 130 L.Ed.2d 359 (1994). This court has observed that Louisiana juries appear especially prone to impose capital punishment for crimes committed in the home. See **State v. Dressner**, 08-1366 (La. 7/6/10), 45 So.3d 127; **State v. Leger**, 05-0011 (La. 7/10/06), 936 So.2d 108; **State v. Blank**, 04-0204 (La. 4/11/07), 955 So.2d 90; **State v. Bridgewater**, 00-1529 (La. 1/15/02), 823 So.2d 877; **State v. Jacobs**, 99-1659 (La. 6/29/01), 798 So.2d 1280; **State v. Howard**, 98-0064 (La. 4/23/99), 751 So.2d 783; **State v. Gradley**, 97-0641 (La. 5/19/98), 745 So.2d 1160; **State v. Robertson**, 97-0177 (La. 3/4/98), 712 So.2d 8; **State v. Tart**, 92-0772 (La. 2/9/96), 672 So.2d 116; **State v. Code**, 627 So.2d 1372 (La. 1993); **State v. Burrell**, 561 So.2d 692 (La. 1990); **State v. Perry**, 502 So.2d 543 (La. 1986); **State v. Williams**, 490 So.2d 255 (La. 1986); **State v. Summit**, 454 So.2d 1100 (La. 1984).

**State v. Wingo** observed in this regard that "[t]he murder of a person by an intruder who violated the sanctuary of the victim's own home [is] a particularly terrifying sort of crime to decent, law abiding people." **State v. Wingo**, 457 So.2d at 1170. Moreover, juries in Louisiana have not hesitated in imposing the death penalty in a variety of cases involving multiple deaths or when a defendant creates the risk of death or great bodily harm to more than one person. See **State v. Scott**,

04-1312 (La. 1/19/06), 921 So.2d 904; **State v. Brown**, 03-0897 (La. 4/12/05), 907 So.2d 1; **State v. Robinson**, 02-1869 (La. 4/14/04), 874 So.2d 66; **State v. Wessinger**, 98-1234 (La. 5/28/99), 736 So.2d 162; **State v. Robertson**, 97-0177 (La. 3/4/98), 712 So.2d 8; **State v. Baldwin**, 96-1660 (La. 12/12/97), 705 So.2d 1076; **State v. Tart**, 93-0772 (La. 2/9/96), 672 So.2d 116; **State v. Taylor**, 93-2201 (La. 2/28/96), 669 So.2d 364; **State v. Sanders**, 93-0001 (La. 11/30/94), 648 So.2d 1272; **State v. Deboue**, 552 So.2d 355 (La. 1989). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate. Nothing in any of the post-trial documents, filed pursuant to Louisiana Supreme Court rule XXVIII, warrants reversal of the defendant's death sentence in this case.

## DECREE

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.

**CONVICTION AND SENTENCE AFFIRMED.**

**SUPREME COURT OF LOUISIANA**

**No. 2014-KA-1449**

**STATE OF LOUISIANA**

**VERSUS**

**ROBERT LEROY McCOY**

**APPEALED FROM
THE TWENTY-SIXTH JUDICIAL DISTRICT COURT,
PARISH OF BOSSIER**

**CRICHTON, J., additionally concurs and assigns reasons.**

I agree in all respects with the holding of this case, but write separately to spotlight the exhaustive efforts undertaken by the trial court and the state in ensuring that the representation of the defendant comported with all legal requirements. Our law and jurisprudence recognize the delicate balance which must be struck between protecting an accused's right to counsel with his or her liberty to reject counsel, as well as the duty of the trial court to maintain orderly proceedings. It is my opinion that the trial court here navigated these complex issues in exemplary fashion, and it is for this reason I agree wholeheartedly with the opinion's conclusion that Mr. McCoy's assignments of error relating to his representation are wholly without merit.

First, Mr. McCoy and his family selected Mr. English, known to the family from a prior attorney-client relationship, over and above any other attorney on the planet—despite his lack of capital certification. Notably, it was the district attorney who twice moved the court to examine Mr. McCoy's waiver of capital-certified counsel pursuant to Louisiana Supreme Court Rule XXXI. In both instances, the trial court and the district attorney advised Mr. McCoy that, as an indigent defendant, he was entitled to representation from no less than two capital-certified attorneys. Also in both instances, Mr. English reiterated on record to the

court and Mr. McCoy that he was not capital certified. Mr. McCoy in both hearings adamantly and unequivocally rejected the appointment of additional or new counsel pursuant to Rule XXXI and affirmed his choice of Mr. English as his trial counsel. I cannot conceive of any other steps which the district attorney or the trial court could have taken to apprise Mr. McCoy of his rights under Rule XXXI and ensure that his waiver of those rights was both knowing and voluntary.

Mr. McCoy furthermore exhibited such a strong aversion to the public defender's office that he elected to represent himself in the interim time between dismissing the public defender's office and his retention of Mr. English. He also sought to represent himself after the trial court rejected his request to substitute counsel two days before his trial began. However, the right to self represent and the right to counsel of choice are not absolute, and cannot "be manipulated to obstruct orderly court procedure or to interfere with the fair administration of justice." *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So. 2d 877, 896, *on reh'g* (June 21, 2002). Mr. McCoy's attempts to self represent or change counsel two days before the start of his trial would have wreaked havoc in this capital case; furthermore, defendants do not control court proceedings, and even Mr. English voiced concerns that Mr. McCoy was "going to attempt to take over this trial" through his representational demands. Thus, the trial court properly rejected his requests.

Finally, and though it is irrelevant to the untimeliness of the request, the stated reason Mr. McCoy wished to dismiss Mr. English—a trial strategy of conceding Mr. McCoy's guilt in hope of saving his life—is without merit. Mr. English was ethically bound under Louisiana Rules of Professional Conduct Rule 1.2(d) and Rule 3.3(b) to advance a defense which satisfies his ethical obligations to his client but also his ethical obligations to the court. Mr. English determined that, in the face of overwhelming evidence, and on the belief that advancing the

defense desired by Mr. McCoy would result in the subornation of perjury, conceding guilt and pleading with the jurors for Mr. McCoy's life was his only feasible tactical option. In reviewing the facts and evidence presented, I agree that Mr. English was left with few options in presenting a defense which satisfied both ethical standards, and that he chose the best option available. *Cf. Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002) ("those courts that have confronted situations in which defense counsel concedes the defendant's guilt for only lesser-included offenses have consistently found these partial concessions to be tactical decisions, and not a denial of the right to counsel.") (footnote omitted)).